ROBERT S. GIANELLI, #82116
JOSHUA S. DAVIS, #193187
ADRIAN J. BARRIO, #219266
GIANELLI & MORRIS, A Law Corporation
12121 Wilshire Boulevard, Suite 505
Los Angeles, California 90025
Tel: (213) 489-1600; Fax: (213) 489-1611
rob.gianelli@gmlawyers.com
joshua.davis@gmlawyers.com
adrian.barrio@gmlawyers.com

Attorneys for Plaintiff
MICHALA KAZDA,
on behalf of herself and all others
similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHALA KAZDA, on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>   v.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>              Defendant.<br>_____ | Case No.: 3:19-cv-02512 WHO<br>Assigned to Hon. William H. Orrick, D2<br><br>**DECLARATION OF JOSHUA S. DAVIS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT**<br><br>Date: December 10, 2025<br>Time: 2:00 p.m.<br>Courtroom: 2 |

I, Joshua S. Davis declare:

1.     I am an attorney licensed in California and duly admitted to practice law before this Court. I am an attorney in the law firm of Gianelli & Morris, attorneys of record for Plaintiff Michala Kazda and Class Counsel in this case. I have been involved in all aspects of litigating this action and I have first-hand knowledge of all matters stated in this declaration. If called upon to testify, I could competently do so.

2.     I make this Declaration in support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement, filed concurrently herewith.

3.     The law firm of Gianelli & Morris has specialized in representing aggrieved consumers in complex insurance class action and unfair business practices (Business & Professions Code section 17200) litigation for over 30 years.  I have been a practicing attorney for over 25 years. During this time, I have handled the investigation, preparation, and trial of numerous consumer class actions, in both state and federal courts.

4.     Gianelli & Morris has been appointed class counsel in a number of significant consumer class actions, including: *Trujillo v. UnitedHealth Group, Inc.* (C.D. Cal.) Case No. ED CV 17-2547-JFW*; Hill v. UnitedHealthcare Insurance Company (C.D. Cal.) Case No. SACV15-00526 DOC; Atzin v. Anthem, Inc.* (C.D. Cal.) Case No.: 2:17-cv-6816 ODW; *Bradford v. Anthem, Inc., et al.* (C.D. Cal.) Case No. 2:17-CV-5098-AB; *Escalante v. California Physicians Service dba Blue Shield of California* (C.D. Cal.) Case No. 2:14-CV-3021-DDP; *Sanchez v. Allianz Life Insurance Company*, Los Angeles Superior Court, Case No. BC594715; *Dion v. Kaiser Foundation Health Plan, Inc.*, Alameda County Superior Court, Case No. RG14718903; *Bodner v. Blue Shield of California Life and Health Insurance Company*, Los Angeles Superior Court, Case No. BC516868; *Akmal v. California Physicians' Service dba Blue Shield of California*, Los Angeles Superior Court Case No. BC 540033; *Gallimore v. Kaiser Foundation Health Plan, Inc.*, Alameda Superior Court, Case No. RG12616206; *Vaccarino v. Midland National Life Ins. Co.* (C.D. Cal.) Case No. 11 CV-5858-CAS; *Arce v. Kaiser Foundation Health Plan, Inc.*, Los Angeles Superior Court, Case No. BC388689; *Bath v. Blue Shield of California*, San Luis Obispo Superior Court, Case No. CV070360; *Ticconi v. Blue Shield Life & Health Ins. Co.*, Los Angeles Superior Court, Case No. BC330989;

*Peterman v. North American Co. for Life and Health*, Los Angeles Superior Court, Case No. BC357194; *Stephens v. American Equity Investment Life Insurance Company*, San Luis Obispo Superior Court, Case No. CV040965; *Iorio v. Allianz Life Ins. Co. of North America* (S.D. Cal.) Case No. 05-CV-0633-IEG; *Chastain v. Union Security Life Insurance Company* (C.D. Cal.) Case No. 06-CV-5885-ABC; and *Kavruck v. Blue Cross of California*, Los Angeles Superior Court, Case No. BC160180.

5.     Gianelli & Morris has represented the insureds in a number of significant consumer law decisions, including: *Baglione v. Health Net of California, Inc.* (2023) 97 Cal.App.5th 882; *Myers v. State Board of Equalization* (2015) 240 Cal.App.4th 722, *Broberg v. The Guardian Life Insurance Co.* (2009) 171 Cal.App.4th 912; *Rodriguez v. Blue Cross of California* (2008) 162 Cal.App.4th 330; *Kavruck v. Blue Cross of California* (2003) 108 Cal.App.4th 773; *State Farm Mutual Auto. Ins. Co. v. Superior Court* (Hill) (2003) 114 Cal.App.4th 434; *IT Corp. v General American* (9th Cir. 1997) 107 F.3d 1415; *American States Ins. Co. v. Borbor* (9th Cir. 1987) 826 F.2d 888; *Hansen v. Blue Cross* (9th Cir. 1989) 891 F.2d 1384; and *Allstate v. Overton* (1984) 160 Cal.App.3d 84; *Escalante v. California Physicians' Service* (C.D. Cal. 2015) 309 F.R.D. 612; *Hendricks v. Aetna Life Insurance Company* (C.D. Cal. 2021) 339 F.R.D. 143.

6.     This class action, *Kazda v. Aetna Life Insurance Company*, was brought because Aetna denied all requests for tumescent liposuction to treat lipedema ("Lipedema Surgery") as "cosmetic." Plaintiff Michala Kazda was denied Lipedema Surgery for this reason. This case sought to reverse Aetna's coverage position by showing that Lipedema Surgery is not performed for cosmetic reasons (make a patient look better) but to address functional problems caused by lipedema: pain, mobility problems, joint disorders and other debilitating conditions. Plaintiff sought an injunction requiring Aetna to retract its internal CPBs that erroneously classified tumescent liposuction as a "cosmetic" procedure, provide notice to Class Members who had their Lipedema Surgery denied about the retraction, and to re-review the denied the claims under the proper standard and make payment where appropriate.

7.     Class Counsel are experienced in cases of this nature having certified and tried cases against health plans over their refusal to provide benefits.  This included a successful class action

trial against Kaiser for violating California's reconstructive surgery law, a case that resulted in thousands of Kaiser members gaining access to excess skin surgery. (*Gallimore v. Kaiser Foundation Health Plan, Inc.*, Alameda Superior Court, Case No. RG12616206.)

8.      Class Counsel have also certified and obtained similar court-approved settlements in several other injunctive relief ERISA class actions regarding Lipedema Surgery, including *Goolsby v. Anthem Life Insurance Company*, Case No. (C.D. Cal. 2019) (ERISA class action regarding "cosmetic" denials of Lipedema Surgery); *Akhlaghi v. Cigna Life Insurance Company*, Case No. 4:19-cv-3754- JST (N.D. Cal. 2019) (Tigar, J.) (ERISA class action regarding experimental denials of Lipedema Surgery); *Caldwell v. United Health Ins. Co.*, Case No. 4:19-cv-2861 (N.D. Cal. 2019) (Alsup, J.) (ERISA class action regarding experimental denials of Lipedema Surgery).

9.      After over six years of vigorous litigation, investigation, and discovery; multiple mediations; and approximately six weeks before the scheduled trial in this matter, Plaintiff and Aetna agreed to settle this class action on the terms set forth in the Settlement Agreement ("the Settlement") attached hereto as Exhibit 1.

10.      The following documents are attached as Exhibits to the Settlement: Notice of Class Settlement – Exhibit A; Proposed Preliminary Approval Order – Exhibit B; Proposed Final Order Approving Class Action Settlement and Judgment – Exhibit C; New Coverage Policy Bulletin 0211 – Exhibit D; Claim Form for Reimbursement of Prior Lipedema Surgery- Exhibit E.

11.      The Settlement provides the following relief. First, effective August 28, 2020, Aetna revised its CPB 0211 on Abdominoplasty, Suction Lipectomy and Ventral Hernia Repair to state that Lipedema Surgery is considered medically necessary when certain criteria are met. (Ex. 1 at ¶ 16; *See also* Ex. D to Settlement.) Aetna has agreed not to change its revised coverage position regarding Lipedema Surgery unless such change is warranted by a "good faith" review of "new scientific evidence." (*Id.*)

12.      Throughout this litigation, I consulted with one of the leading experts on surgical treatment of lipedema, Dr. Dung Nguyen, at Stanford University regarding the medical criteria listed in the revised CPB 0211. She confirmed the criteria are reasonable and appropriate. (Nguyen Decl., ¶ 7.)

13.     Class Members who paid out-of-pocket for Lipedema Surgery are entitled to reimbursement under the Settlement. (Ex. 1 at ¶ 17.) To obtain the reimbursement, the Class Member must submit the claim form substantially in the form of Exhibit E attesting that their out-of-pocket payments were not paid or reimbursed by another health plan, documentation sufficient to show the Class Member had a Lipedema Surgery (such as medical records) and proof of payment. (*Id.*) If due to the passage of time, certain medical records are unavailable, the Settlement Administrator will make a good faith decision based on all reasonably available documentation provided by the Class Member. (*Id.*)

14.     Class Member reimbursement claims are subject to an aggregate cap of $650,000.00 ("Aggregate Cap"). (Ex. 1 at ¶ 17.) I have confirmed this cap is more than reasonable. Class Counsel has been able to contact 21 of the 25 Class Members through the process approved by this Court on June 13, 2024 (Dkt. 166) and learned that their out-of-pocket costs were about $423,771.00.  This still leaves more than $200,000 if the four additional Class Members, who Class Counsel has been unable to contact, respond to the class notice and submit reimbursement requests.

15.     If a Class Member disagrees with a decision to deny in whole or part a reimbursement claim, the Settlement provides a streamlined reconsideration process to resolve the matter. First, Class Counsel will meet and confer with Aetna's Counsel to attempt to resolve the dispute informally. (Ex. 1, ¶ 20.)   If unsuccessful,  Class Counsel and Aetna's Counsel will submit the dispute to the Court for final resolution. (Id.)

16.     Class Members who are covered under an Aetna Plan and have not yet had Lipedema Surgery can submit new coverage requests for Lipedema Surgery pursuant to the terms of their current Aetna Plan. (Ex. 1 at ¶ 18.) Aetna will review those coverage requests for Lipedema Surgery in accordance with the new CPB 0211. (*Id.*) Any new coverage request that is denied, in whole or in part, will be subject to the appeal or review process in the Class Member's current Aetna Plan, and ERISA law and regulations. (*Id.*)

17.     The Settlement expands the class definition to include Class Members whose Lipedema Surgery claims were denied as experimental or investigational. (Ex. 1, ¶ 14, definition (d).)  The Parties agreed to this expansion because they learned that one Aetna member in an

4

ERISA plan had her Lipedema Surgery denied as experimental because the medical director handling the claim wrongly applied an Aetna CPB for a different skin disease called Lymphedema. This change ensures that this Aetna member has an opportunity to participate in this Settlement.

18.     If the Court preliminarily approves the Settlement, Class Counsel will move for an award of attorney's fees under the lodestar method pursuant to ERISA's fee shifting statute (29 U.S.C. 1132(g)(1)) in an amount not to exceed $675,000.00 and litigation costs in an amount not to exceed $46,162.84. (Ex. 1 at ¶ 24.) This amount includes any fees and costs incurred through Final Approval. (*Id*.) Aetna has agreed not to contest a motion that seeks up to this amount. (*Id*. at ¶ 26.)

19.     This requested fees will not come close to compensating Class Counsel for their time spent on this case, but represent an approximate 45% reduction from Class Counsel's actual lodestar, which is more than $1.25 million. Any award of attorneys' fees and costs shall be paid separate and apart from the settlement consideration awarded to the Class. (Ex. 1 at 24.)

20.     In addition, Class Counsel will seek Court approval of an incentive award in the amount of $17,000 for Plaintiff Michala Kazda, based on the time and effort she devoted to the Litigation. (*Id*. at ¶ 27.)

21.     The Parties' settlement occurred a mere two months before trial and was well informed by the extensive discovery and investigation completed up to that point. At the time of Settlement, Aetna had produced nearly 4,600 pages of information concerning class and merit issues. For her part, Plaintiff produced 600 pages of information supportive of her position that Aetna's policies and practices are amenable to class treatment and that Lipedema Surgery is not cosmetic, but rather a safe and medically indicated treatment for lipedema.

22.     Plaintiff served numerous document requests, interrogatories, and requests for admissions. In addition, Plaintiff deposed numerous Aetna employees, doctors, and FRCP 30(b)(6) designated witnesses, and prepared for and defended the deposition of Plaintiff. Plaintiff provided her expert reports on December 20, 2024.

23.     Class Counsel supplemented formal discovery with their own investigation and research. Class Counsel engaged in extensive investigation and research regarding the safety and effectiveness of Lipedema Surgery and retained and extensively worked with experts on Lipedema

Surgery and the body of medical literature addressing it. These included Plaintiff's designated experts, Dr. Dung Nguyen of Stanford University, a specialist in the surgical treatment of lipedema, and Dr. Branko Kopjar, Associate Professor Emeritus of Clinical Epidemiology at the University of Washington.

24.    In addition, to assist with settlement negotiations, on June 12, 2024, the Parties requested permission from the Court to contact absent Class Members to find out their current lipedema condition, including whether they had paid out-of-pocket for Lipedema Surgery following Aetna's denial, and if so, when the surgery or surgeries took place and their estimated out-of-pocket costs. (Dkt. 165.) The Court entered an Order granting the request on June 13, 2024. (Dkt. 166). Following the Order, on or about July 1, 2024, Class Counsel sent a letter to the last known address of all Class Members asking them to contact Class Counsel about their situation. Class Counsel further reached out to the Class Members through telephone and email, to the extent that information could be obtained.

25.    Through this process, my office was able to contact 21 of the 25 Class Members, and learned that 12 of these Class Members had paid out-of-pocket for Lipedema Surgery prior to September 2022, in the total estimated amount of $423,771.00. None of the absent Class Members reported any Lipedema Surgeries after that date. Two of these Class Members reported they had already received some reimbursement separate from this lawsuit for their surgeries.

26.    The Parties participated in a mediation in this matter before Edwin Oster, Esq., an experienced and well-respected private mediator with Judicate West, on August 30, 2022. The Parties also participated in a mandatory settlement conference before Magistrate Judge Alex G. Tse on February 8, 2023. (Dkt. 124.)

27.    The Parties finally advised the Court that they reached a settlement in principle on June 11, 2025.

28.    I anticipate that the reimbursement claim rate will be very high, given the small size of the Class, Class Counsel's previous successful contacts with 21 of the 25 Class Members, and my experience in another lipedema class action settlement with United Healthcare that involved similar contacts with absent class members. I anticipate that most of the Class Members who paid

out of pocket for Lipedema Surgery will submit reimbursement requests.

29.     In my opinion, the proposed Settlement is fair, reasonable, and adequate and easily meets the criteria for preliminary approval. Indeed, the proposed Settlement provides more relief than would probably be available following a trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed this 29th day of October, 2025 at Los Angeles, California.


 /s/Joshua S. Davis
JOSHUA S. DAVIS

EXHIBIT 1

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") IS HEREBY STIPULATED

AND AGREED TO by and between Plaintiff Michala Kazda ("Plaintiff" or "Kazda"), on behalf

of herself and the proposed Class and Defendant Aetna Life Insurance Company ("Aetna")

(Plaintiff and Aetna are hereinafter referred to as the "Parties"), by and through their respective

counsel. The proceeding in the United States District Court for the Northern District of

California, *Michala Kazda v. Aetna Life Insurance Company*, Case No. 3:19-cv-02512-WHO

("Kazda Action") and matters raised by and related to the Kazda Action, as described herein, are

settled fully and finally and compromised on the terms and conditions set forth in this Settlement

Agreement ("Agreement") and the attached exhibits.

## RECITALS

1.      On May 9, 2019, Plaintiff filed the class action Complaint for Recovery of ERISA

Plan Benefits; Enforcement and Clarification of Rights; and Breach of Fiduciary Duty in the

Kazda Action seeking benefits, clarification of rights, and breach of fiduciary duty under the

Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA")

against Aetna over its denial of her request for coverage of liposuction surgery to treat lipedema,

on behalf of herself and all others similarly situated. A First Amended Complaint was filed on

September 26, 2019.

2.      Effective August 28, 2020, Aetna published a new version of its Coverage Policy

Bulletin 0211, which provides that Aetna considers liposuction to treat lipedema medically

necessary when certain criteria are met.

3.      On December 7, 2021, Plaintiff filed a motion for class certification.

4.      On April 26, 2022, the Court certified the following class: "All persons covered

under ERISA health plans, self-funded or fully insured, that are administered by Aetna and whose claims for liposuction treatment of their lipedema were denied as cosmetic. The Court also appointed Michala Kazda as Class Representative and Gianelli & Morris as Class Counsel.

5.    On January 25, 2023, Plaintiff filed a motion for summary judgment.

6.    On March 24, 2023, Aetna filed a motion to decertify the class.

7.    On November 6, 2023, the Court denied Plaintiff's motion for summary judgment and Aetna's motion to decertify the class.

8.    Plaintiff, through Class Counsel, represents that she has investigated the allegations asserted in the Kazda Action and has closely analyzed the merits of the alleged claims and the alleged damages suffered by the Class; that she has considered the facts, law, and potential defenses regarding the claims alleged against Aetna; that her investigation has been adequate; and that this Settlement is fully informed. Aetna does not contest those representations.

9.    After investigation, discovery, and litigation, the Parties have agreed to settle the Kazda Action. The Parties have conducted discussions and arm's-length negotiations with each other regarding the claims asserted in the Litigation.

**Aetna's Denials of Wrongdoing and Liability**

10.    Aetna denies each and every claim and contention alleged or otherwise made or pursued against it by Plaintiff in the Litigation. Aetna denies all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts, or omissions alleged, or that could have been alleged, in the Litigation.

11.    Aetna denies any and all liability and enters into this settlement solely for the purpose of avoiding the burden, expense, risk, and uncertainty of continuing the proceedings.

**Benefits of the Settlement to the Class**

12.    Class Representative and Class Counsel believe that the Settlement provides fair, reasonable, and adequate recovery for the Class based on the claims asserted and the evidence developed and what might be proven by Class Representative and the Class in the Litigation.

13.    Class Representative and Class Counsel further recognize and acknowledge the expense and time of prosecuting the Kazda Action through trial and appeal. Class Representative and Class Counsel also have considered the uncertain outcome and the risk of litigation, including the risk that the Class might obtain no relief, especially in a complex action such as this one, as well as the difficulties and delays inherent in any complex litigation.

**THEREFORE**, it is stipulated and agreed by and among the Parties to this Agreement, through their respective attorneys, in consideration of the benefits to the Parties from the Settlement, the adequacy of which is acknowledged by the Parties, and subject to (1) approval of the Court, and (2) the other conditions set forth in this Agreement, that the Released Claims against the Released Parties will be finally and fully compromised, settled, and released.

**DEFINITIONS**

14.    In addition to the definitions set forth elsewhere in this Agreement, the following terms used in this Agreement will have the meanings specified below.

a.    "Aetna's Counsel" means the law firm of Baker Botts LLP, and its partners, associates, paralegals, and employees, and its successors and assigns.

b.    "Aetna Plan" refers to ERISA-governed health benefit plans issued or administered by Aetna, including both fully insured and self-insured plans.

c.    "Class Counsel" means the law firm of Gianelli & Morris, A Law Corporation, and its shareholders, members, partners, associates, paralegals, and employees, and

its successors and assigns.

        d.    "Class" means all persons covered under ERISA Health plans, self-funded or fully insured, that are administered by Aetna and whose pre-authorization or post-service claims for liposuction for treatment of their lipedema were denied as cosmetic, experimental or investigational between May 9, 2015 and September 1, 2020.

        e.    "Class Members" means persons who meet the definition of the Class who are mailed the Notice referenced herein, and who do not properly exclude themselves from the Class under Paragraph 36 below.

        f.    "Class Representative" means collectively Plaintiff and her successors and assigns.

        g.    "Effective Date" means the first day following the date all of the following events have occurred:

        i.    entry of the Preliminary Approval Order;

        ii.    the deadlines for exercising an option to terminate the settlement, as set forth in Paragraphs 39 and 47, have expired, without any such option having been exercised;

        iii.    approval by the Court of the Settlement following class notice and a hearing and entry of Judgment; and

        iv.    Final Approval.

        h.    "Final Approval" means the expiration of the time for appeal or review of the Judgment or any part of the Judgment, including when any form of further review or appeal has been finally disposed and the time for any further appeal or review has expired. If there are no objections filed by a Class Member, Final Approval will be the date the Court grants final approval of the Settlement.

i.      "Final Approval Hearing" means the final hearing held by the Court to approve this Settlement.

j.      "Judgment" means the order and final judgment, in the form attached here as Exhibit C, which provides, among other terms, for approval of the Settlement, unless the Parties agree in writing to another form of the order and final judgment.

k.      "Lipedema Surgery" means liposuction to treat lipedema.

l.      "Notice" means the "Notice of Proposed Settlement of Class Action and Final Approval Hearing" substantially in the form attached as Exhibit A.

m.      "Person" means any individual, corporation, partnership, limited liability partnership, limited liability company, association, affiliate, joint stock company, estate, trust, trustee, unincorporated association, entity, government and any political subdivision, or any other type of business or legal entity, any legal representative, and their spouses, heirs, predecessors, successors, representatives, agents, members, managers, or assignees.

n.      "Preliminary Approval Order" means the Order Preliminarily Approving Settlement and Providing for Notice that the Class Representatives and Aetna will seek from the Court, substantially in the form attached as Exhibit B.

o.      "Affiliated Entities" means (i) any current, former, or future direct or indirect parents, subsidiaries, or affiliates of Defendant; (ii) any employees, agents, representatives, contractors, administrators, officers, or directors of Defendant or their direct or indirect parents, shareholders (all natural persons in the definition of Affiliated Entities are collectively referred to as "Affiliated Individuals"); (iii) any corporations in which any such Affiliated Entity or Affiliated Individual is a shareholder in excess of 5%; (iv) any partnerships or any other unincorporated forms of business, or limited liability companies, in which any Affiliated Entity or Affiliated Individual

5

owns an interest in excess of 5%; (v) any employee welfare benefits plans (including any self-funded or insured plans) in which any Plaintiff or Settlement Class Member participates or participated; (vi) any fiduciary, record keeper, claims administrator, plan sponsor, or plan administrator of such employee welfare benefits plans; (vii) any trusts of which any Affiliated Entity or Affiliated Individual is a grantor, trustee, or beneficiary; and (viii) any independent review organization that reviewed any claims for benefits or requests for coverage for Lipidemia Surgery for any Class Member. Affiliated Entities also means any corporations, business entities, partnerships or other unincorporated forms of business, or limited liability companies, that are controlled directly or indirectly by Defendant, Affiliated Entities, or Affiliate Individuals, or that are directly or indirectly under "common control" with Defendant, Affiliated Entities, or Affiliated Individuals as that term is defined under ERISA Section 4001(a)(14)(B), 29 U.S.C. § 1301(a)(14)(B).

      p.    "Released Claims" means any and all actual or potential claims, actions, demands, rights, obligations, liabilities, damages, attorneys' fees, expenses, costs, and causes of action, whether arising under local, state, or federal law, whether by statute, contract, common law, equity, or otherwise, whether brought in an individual or representative capacity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, that occurred prior to or during the Class Periods only, asserted against the Released Parties, that:

      (i)    are based on the facts alleged in the Complaint or First Amended Complaint, specifically, by reason of or arising out of Aetna's denial of any request (whether pre-service or post-service) for Lipedema Surgery on the grounds that the procedure is cosmetic, experimental or investigational under ERISA-governed plans, either fully insured or self-insured;

(ii) would be barred by the principles of res judicata or collateral estoppel had the claims asserted in the Complaint or First Amended Complaint been fully litigated and resulted in a final judgment; or

(iii) seek attorneys' fees or costs related to the Kazda Action in addition to the Attorneys' Fees and Costs specified in Paragraphs 24 through 26 below.

Released Claims do not include:

(i) Any reimbursement claims or requests for coverage, as described below, that were initially denied by Aetna after September 1, 2020.

(ii) Any request for reimbursement for a Lipedema Surgery that took place after September 1, 2022.

(iii) Any request for coverage by a former Aetna member, as described below, who has not yet had Lipedema Surgery.

q.      "Released Parties" means Aetna and its Affiliated Entities.

r.      "Settlement" means the collective settlement terms set forth in the Agreement.

s.      "Settlement Administrator" means the entity, with experience handling class action settlements involving Protected Health Information ("PHI") as defined by 45 C.F.R. § 160.103 and applicable state laws, that the Parties agree upon and request be appointed by the Court (1) to disseminate notice of the pendency of the Litigation and the proposed Settlement to the Class; (2)  and to determine Reimbursement and Coverage Claims for Class Members as set forth in this Agreement; and (3) to otherwise administer the Settlement as set forth in this Agreement following entry of the Preliminary Approval Order and Final Approval by the Court.

## ENTRY OF JUDGMENT

15.     If this Settlement is approved by the Court at or after the Final Approval Hearing, Class Counsel and Aetna's Counsel will request that the Court enter the Judgment substantially in the form attached here as Exhibit C.

## THE SETTLEMENT

16.     **Clinical Policy Bulletin Addressing Lipedema Surgery.**  Effective August 28, 2020, Aetna revised its clinical policy bulletin 0211 on Abdominoplasty, Suction Lipectomy and Ventral Hernia Repair to state that Lipedema Surgery is considered medically necessary when certain criteria are met, as set forth in the New Clinical Policy Bulletin attached as Exhibit D. The New Clinical Policy Bulletin will remain in effect in substantially its present form and publicly posted for two years after the date class notice is sent, but the content of the New Clinical Policy Bulletin may be updated or revised based upon a good faith review of any new scientific evidence as part of Aetna's standard review process, which considers generally accepted standards of medical practice that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, national physician specialty society recommendations, and the views of medical practitioners practicing in relevant clinical areas, and any other relevant factors (such as FDA approval status).

17.     **Reimbursement Claims**. Class Members who paid out of pocket for Lipedema Surgery for surgeries that took place after and as a result of the member's request for Lipedema Surgery that Aetna denied on or before September 1, 2020 (and while the member had coverage under an Aetna plan), and which surgery occurred on or before September 1, 2022, may seek reimbursement under this settlement, to the extent that the Class Member's out-of-pocket payments have not been paid or reimbursed by other health plans, insurers, Medicare, or other

reimbursement sources for which the Class Members owe no reimbursement obligation. If a Class Member's Lipedema Surgery was covered by another health plan, insurer, or Medicare, the Class Member's copay or coinsurance obligation under that separate coverage will not qualify as a reimbursable out-of-pocket expense. Class Member Reimbursement Claims are subject to an aggregate cap of $650,000.00 ("Aggregate Cap").

The Settlement Administrator will review each Reimbursement Claim and determine whether each Class Member seeking reimbursement is entitled to reimbursement, and the amount of reimbursement. To be entitled to reimbursement, the Class Member must submit:

a.    the claim form substantially in the form of Exhibit E, which shall include an attestation that the out-of-pocket payments have not been paid or reimbursed by other health plans, insurers, Medicare, or other reimbursement sources for which the Class Member owes no reimbursement obligation.

b.    documentation sufficient to show that the Class Member had a Lipedema Surgery (such as an operative report, other clinical records, or sufficiently detailed payment records) prior to September 1, 2022,

c.    proof of payment (checks, wire transfer receipts, invoices reflecting actual payment, or other reasonable proof substantiating payment) showing net out-of-pocket payments to medical providers for the surgery, and

d.    a statement of the specific amount of unreimbursed out-of-pocket costs for which the Class Member seeks reimbursement.

e.    If due to the passage of time, certain medical records are unavailable for submission of a reimbursement claim under this Paragraph 17, the Settlement Administrator will make a good faith decision based on all reasonably available documentation provided by the Class

9

Member. The information described above in Paragraphs 17.c and 17.d will be required in all instances.

Class Members who are no longer covered by an Aetna plan will be treated the same as current Aetna members so long as their Lipedema Surgery denial by Aetna occurred on or before September 1, 2020 (and while the member had coverage under an Aetna plan), and their surgery occurred after and as a result of such denial and on or before September 1, 2022. The amount payable to a Class Member may be reduced to account for the cost-share the member would have paid under the member's plan with Aetna, in the year they were denied. No class member shall be reimbursed more than they paid out-of-pocket, and Aetna's total payment to all class members shall not exceed $650,000. The $650,000 amount is a cap not a common fund.

If, at the completion of the claim process (including any reconsideration under paragraph 20), the total funds payable under all Reimbursement Claims is greater than the Aggregate Cap, then each Class Member that satisfies the Reimbursement Claim requirements in this paragraph 17 will receive payment for a percentage of unreimbursed out-of-pocket payments. Each such Class Member's payment will be reduced by an equal percentage sufficient to reduce the sum of all Reimbursement Claims to the Aggregate Cap, rounded to the nearest cent.

Each Class Member seeking reimbursement under this Agreement must submit a claim form within ninety (90) days of Final Approval. The Settlement Administrator will make and communicate a decision about whether any claim for reimbursement will be reimbursed within ninety (90) days of receiving such a claim. The Settlement Administrator will distribute each Class Member's settlement check within sixty (60) days of the completion of the reconsideration process set forth in Paragraph 20 below.

After the Reimbursement Claim process is complete and the total amounts payable to Class Members under this paragraph is known, Aetna will within 30 days provide the necessary funding for the Settlement Checks to the Settlement Administrator so that the Settlement Administrator can timely issue and distribute the Settlement Checks in accordance with this Agreement.

Each Class Member will have one hundred and eighty (180) days from the date appearing on the face of the check issued by the Settlement Administrator to negotiate the payment for that Class Member's Reimbursement Claim. The Settlement Administrator will retain any remaining funds transferred to the Settlement Administrator by Aetna for payments under this paragraph for a period of ten (10) days after the last 180-day deadline has passed. Thereafter, the Settlement Administrator will return to Aetna any remaining funds provided by Aetna for payments under this paragraph.

Aetna will play no role in, and will have no liability for, the Settlement Administrator's determinations as to the sufficiency of each Reimbursement Claim or the amounts payable under each Reimbursement Claim.

Any reimbursement request that is denied, in whole or in part, will be subject to the reconsideration process in paragraph 20.

Class Members who had Lipedema Surgery after September 1, 2022, will not be entitled to reimbursement for that Lipedema Surgery under the terms of the Agreement, but will not release any claims against Aetna.

18.     **New Requests for Coverage for Current Members of Aetna.** Class Members who are covered under an Aetna Plan as of the Effective Date and have not yet had Lipedema Surgery can submit new coverage requests for Lipedema Surgery pursuant to the terms of their current Aetna Plan and the New Clinical Policy Bulletin. Aetna will review those coverage

requests for Lipedema Surgery in accordance with the New Clinical Policy Bulletin and the terms of the Class Members' existing Aetna Plans. Any post-service reimbursement for Lipedema Surgery will be made in accordance with Class Members' existing Aetna Plans. The benefit determinations will be made within the timeframes set forth in the member's Aetna Plan in effect at the time. Any new coverage request that is denied, in whole or in part, will be subject to the appeal or review process in the Class Member's current Aetna Plan, and ERISA law and regulations.

19.    **Statute of Limitations Tolling.** Class Members who do not have health coverage insured or administered by Aetna as of the filing of the preliminary approval motion, and who have not had Lipedema Surgery, are not eligible to submit new requests for coverage under paragraph under paragraph 18. But these Class Members release no claims, and any statute of limitations that may apply to their individual ERISA claims relating to Aetna's adjudication of their coverage requests, if any, is tolled from May 9, 2019 (the date Plaintiff filed the Kazda Action) to the Effective Date.

20.    **Reconsideration of Reimbursement and New Coverage Claims.** If the Settlement Administrator denies a Reimbursement Claim on the basis that the Class Member has not supplied a required piece of documentation, *e.g.*, a medical bill or medical record, the Settlement Administrator will advise the Class Member of the deficiency and will give the Class Member sixty (60) days to cure it. Class Members who receive an unfavorable decision in whole or in part on a Reimbursement or New Coverage decision by the Settlement Administrator may seek reconsideration of the decision. The Class Member will have sixty (60) days to notify the Settlement Administrator of their intent to seek reconsideration in writing by letter or email, or by telephone. The Settlement Administrator will promptly notify both Class Counsel and Aetna's

Counsel of any request for reconsideration. If a Class Member seeks reconsideration, Class Counsel and Aetna's Counsel will meet and confer within thirty (30) days of receiving the request and attempt to resolve it. If the issue remains unresolved, Class Counsel and Aetna's Counsel will, within thirty (30) days of the unsuccessful meet and confer, jointly present the matter to the Court for a final resolution in a joint statement no longer than 5 pages per side, excluding any exhibits. The Court's decision on the Class Member's request will be final. Neither the Class Member nor Aetna may appeal or contest the Court's resolution.

## RELEASE OF CLAIMS

21.     Plaintiff and each Class Member, on behalf of themselves and their current, former and future spouses, heirs, beneficiaries, executors, administrators, successors, predecessors, representatives, attorneys, agents and assigns, hereby fully, finally, and forever compromises, settles, releases, resolves, relinquishes, waives, and discharges any and all Released Claims against the Released Parties. The obligations incurred under this Settlement will be the full and final disposition of all Released Claims against the Released Parties.

22.     Effective immediately, Plaintiff and each Class Member, on behalf of themselves and their current, former and future spouses, heirs, beneficiaries, executors, administrators, successors, predecessors, representatives, attorneys, agents and assigns, agree and covenant not to sue or prosecute, or institute or cooperate in the institution, commencement, filing, or prosecution of any suit or proceeding in any forum based upon any Released Claim(s) against any Released Party, except that nothing in this Agreement shall be deemed to limit Plaintiff's or any Class Member's rights to enforce this Agreement. Plaintiff and each Class Member expressly agree that this release may be raised as a complete defense to, and will preclude any action or proceeding relating to, the Released Claims.

23.     The Class Representatives represent and warrant that they are the sole and exclusive owners of the claims they are releasing under this Agreement. The Class Representatives further acknowledge that they have not assigned, pledged, or in any manner whatsoever sold, transferred, assigned, or encumbered any right, title, interest, or claim arising out of or in any way whatsoever pertaining to the Litigation, including, without limitation, any claim for benefits, proceeds, or value under the Litigation.

## ATTORNEYS' FEES AND COSTS

24.     Class Counsel will apply to the Court for an award of total attorneys' fees in an mount not to exceed $675,000.00 and litigation costs in an amount not to exceed $46,162.84, which includes any fees and costs incurred through Final Approval. Any award of attorneys' fees and costs shall be paid separate and apart from the settlement consideration awarded to the Class.

25.     Aetna and the other Released Parties will not oppose any application for payment of attorneys' fees in an amount up to $675,000.00 or reimbursement of litigation costs in an amount up to $46,162.84. Nothing in this Settlement prevents Aetna from opposing any requests for fees or costs above these amounts on any grounds.

26.     The attorneys' fees and litigation costs approved by the Court will be paid by wire transfer to Class Counsel within thirty (30) days of the Final Approval and Aetna's receipt of an IRS W-9 tax form in the name of the payees.

## INCENTIVE AWARD FOR CLASS REPRESENTATIVES

27.     Class Counsel will seek Court approval of an incentive award in the amount of $17,000 for Plaintiff Michala Kazda, based on the time and effort she devoted to the Litigation. Aetna and the other Released Parties will not oppose any application for payment of any incentive award to the Class Representatives, up to the amounts stated in this paragraph. Nothing

in this Settlement prevents Aetna from opposing any requests for incentive awards above these amounts on any grounds. The incentive award approved by the Court will be paid to Plaintiff within thirty (30) days of the Final Approval and Aetna's receipt of an IRS W-9 tax form in the name of the payee.

### NOTICE OF PENDENCY AND PROPOSED SETTLEMENT

28.    No later than thirty-five (35) days after the entry of the Preliminary Approval Order, the Settlement Administrator will mail notices of the proposed Settlement to the Class Members. Aetna will provide to the Settlement Administrator a list of the last known addresses of each Class Member available from its records no later than twenty (20) days after the entry of the Preliminary Approval Order. The Preliminary Approval Order will, among other things, authorize Aetna and its counsel to disclose PHI from its records necessary for settlement administration to the Settlement Administrator in order to effectuate notice and implement the Settlement.

29.    Before Aetna's disclosure of Class Member names and last known addresses to the Settlement Administrator, the Settlement Administrator will sign an acknowledgment and agreement to be bound by the November 1, 2019, Stipulated Protective Order entered in the Kazda Action, and will enter into a Business Associate Agreement with Aetna under 45 C.F.R. Part 164. The Settlement Administrator will keep PHI of Class Members confidential from all persons, except as authorized in writing by a Class Member or as ordered by the Court. The Settlement Administrator will maintain a unique member identifier system so that it can communicate with Class Members, Class Counsel, Aetna, and Aetna's counsel to the extent needed to facilitate settlement administration. Any permitted disclosures of Class Member information under this section or any other section of the Settlement will be limited to the minimum necessary to satisfy the requirements of the Settlement. Within sixty (60) days after completion of all duties under this

Settlement, the Settlement Administrator will destroy all identifiable Class Member information and any PHI related to the Settlement and will provide a written certification of same to Class Counsel and Aetna's counsel.

30.    The Settlement Administrator will send notice using the Court-approved Notice, sent by first-class mail (the "Mailed Notice").

31.    The Settlement Administrator will check and update the mailing list using the National Change of Address database maintained by the United States Postal Service before mailing the Mailed Notice.

32.    The Settlement Administrator will perform a skip-trace search for persons whose notices are returned as undeliverable and will re-send returned mail to new addresses found for those persons.

33.    Each Class Member will be deemed to have submitted to the jurisdiction of the Court regarding his or her participation in the Settlement.

34.    Aetna will pay the cost of administering the Settlement, including the cost of providing notice to Class Members and to state and federal officials as required by 28 U.S.C. Section 1715.

35.    All controversies and proceedings regarding the administration of the Settlement and distribution of attorneys' fees and costs to Class Counsel are subject to the jurisdiction of the Court.

**REQUESTS FOR EXCLUSION FROM THE CLASS**

36.    Each Class Member will be bound by all determinations and judgments in the Litigation concerning the Settlement unless the member sends to the Settlement Administrator, by first-class mail, a written request for exclusion from the Class. To be valid, the request for exclusion

must: (1) be postmarked no later than sixty (60) days from the date the Class Notice was sent to the Class; and (2) state all of the following: (a) the name, address, and telephone number of the person requesting exclusion; and (b) a clear and unequivocal statement that the person wishes to be excluded from the Class.

37.     All persons who submit valid and timely requests for exclusion in the manner described in Paragraph 36 will have no rights under this Agreement, will not share in the Settlement, and will not be bound by the Agreement or the Judgment.

38.     The Settlement Administrator will scan and email copies of each request for exclusion in PDF format (or any other agreed format) to Aetna's Counsel and to Class Counsel not more than five (5) business days after the Settlement Administrator receives such a request. As part of the motion papers in support of Final Approval of the Settlement, the Settlement Administrator or Class Counsel will provide a list of all the persons who have requested exclusion from the Class.

39.     If more than five (5) Class Members submit a timely request for exclusion, Aetna may, in its sole discretion, nullify this Agreement. If Aetna exercises this option, the Settlement and this Agreement will become null and void and will have no further force and effect, and the terms of Paragraphs 48 and 49 will apply.

**OBJECTIONS TO SETTLEMENT**

40.     Any Class Member who wishes to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement must deliver to Class Counsel and to Aetna's Counsel, and file with the Court, no later than sixty (60) days from the date the Class Notice was sent to the Class, or as the Court otherwise may direct, a written statement of the objection(s), as well as the specific reason(s), if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence or other information

the Class Member wishes to introduce in support of the objection(s). Class Members may object either on their own or through an attorney retained at their own expense. The written objection must also contain the Class Member's name, address, signature, and telephone number.

41.    Any Class Member who files and serves a written objection, as described in Paragraph 40, may appear at the Final Approval Hearing, either in person or through counsel retained at the Class Member's expense, to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement. Class Members or their attorneys who intend to make an appearance at the Final Approval Hearing must deliver a notice of intention to appear to Class Counsel and to Aetna's Counsel and file that notice with the Court, no later than forty-five (45) calendar days before the Final Approval Hearing, or as the Court may otherwise direct.

42.    Any Class Member who fails to comply with the provisions of this Section will waive and forfeit any and all rights he or she may have to appear separately and object and will be bound by all the terms of this Agreement and by all proceedings, orders, and judgments, including, but not limited to, the Release in the Litigation.

43.    Any Class Member who objects to the Settlement will be entitled to all of the benefits of the Settlement if it is approved, as long as the objecting Class Member complies with all requirements of this Agreement.

## CLASS ACTION FAIRNESS NOTICE

44.    Aetna will comply with 28 U.S.C. Section 1715 by serving or arranging to serve, not later than ten (10) days after the proposed settlement of a class action is filed in court, notice of the proposed settlement upon the appropriate state officials of each state in which a class member resides and the appropriate federal official.

18

## PRELIMINARY APPROVAL ORDER

45.     Class Counsel will promptly file the Agreement and its exhibits with the Court and apply for entry of the Preliminary Approval Order substantially in the form attached here as Exhibit B.

## SETTLEMENT PROCESS SCHEDULE

46.     The dates for the events contemplated by this Settlement Agreement are as follows:

| Event | Event Date |
|---|---|
| Aetna provides the notice required under 28 U.S.C. Section 1715. | Within 10 days after Plaintiff files a motion for preliminary approval |
| Aetna provides a list of the last known addresses of each person in the Class available from its records to the Settlement Administrator | 20 days after the date of the Preliminary Approval Order |
| The Administrator mails the notice of the proposed Settlement | 35 days after the date of the Preliminary Approval Order |
| Class Counsel files a motion for an award of attorneys' fees and costs | 35 days after the date of the Preliminary Approval Order |
| Deadline for postmarking of exclusions, objections, and requests to be heard at the Final Approval Hearing | 95 days after the date of the Preliminary Approval Order |
| Class Counsel to file notice specifying those who have objected, together with a declaration of the Settlement Administrator | 105 days after the date of the Preliminary Approval Order |
| Class Counsel to file motion for final approval | 28 days prior to the Final Approval Hearing |
| Final Approval Hearing | To be set by the Court, at least 132 days after the date of the Preliminary Approval Order |

## TERMINATION OF THE SETTLEMENT

47.     Either Party will have the option to terminate this Agreement on ten (10) days' notice to the other if any of the following occurs:

a.      The Court enters any order that is materially inconsistent with the terms of this Agreement;

b.      The Court does not enter the Preliminary Approval Order;

c.      The Court does not approve the Settlement or any material part of it as reflected in this Agreement (although the Parties do not concede that every term of the Settlement or of this Agreement is material for these purposes);

d.      The Court does not enter the Judgment;

e.      The Judgment is vacated, modified, or reversed in any material respect by an appellate court of competent jurisdiction; or

f.      The Effective Date does not occur for any reason.

48.     If this Agreement is terminated, the Settlement and this Agreement will become null and void and will have no further force and effect.

49.     If this Agreement is terminated, the Parties to this Agreement will be deemed to have reverted *nunc pro tunc* to their respective status in the Litigation as of the date and time immediately before the execution of this Agreement. Except as otherwise expressly provided, the Parties will proceed in all respects as if this Agreement and any related orders had not been entered and without any prejudice in any way from the negotiation, fact, or terms of the Settlement or this Agreement, and this Agreement may not be used in the Litigation or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of this Agreement will be treated as vacated, *nunc pro tunc*.

## NO ADMISSION OF WRONGDOING

50.     Whether or not the Settlement is approved by the Court, and whether or not it is consummated, the fact and terms of this Agreement, including the exhibits, all negotiations, discussions, drafts, and proceedings in connection with the Settlement, and any act performed, or document signed in connection with the Settlement:

a.     may not be construed, offered, or received against Aetna or any other Released Party as a presumption, concession, or admission about the truth of any fact alleged by Plaintiff, the validity of any claim that was or could have been asserted in the Litigation or in any litigation, that the Class should have been certified, or the deficiency of any defense that was or could have been asserted in the Litigation or in any litigation; and

b.     may not be construed, offered, or received against Plaintiff or any Class Member as a presumption, concession, or admission that any of their claims are or were without merit or that any damages recoverable under the Complaint would not have exceeded any benefits provided under this Settlement.

51.     Once approved by the Court, the Settlement reflected in this Agreement may be pleaded as a full and complete defense by any of the Released Parties to any action, suit, or other proceeding that may be instituted, prosecuted, or attempted regarding any of the Released Claims. The Released Parties may offer the Agreement or the Judgment from the Litigation in any other action that may be brought against them by any identified Class Member in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good-faith settlement, judgment bar or reduction, or any similar defense or counterclaim.

## MISCELLANEOUS PROVISIONS

52.     The Parties agree to work together in good faith to accomplish, as soon as reasonably practical, all of the prerequisites for the Effective Date, including the Preliminary Approval Order, approval by the Court of the Settlement, and the Judgment.

53.     The headings and paragraph titles in this Agreement are used for the purpose of convenience only and are not meant to have legal effect.

54.     All of the exhibits attached to the Agreement are incorporated by reference. If there is a conflict or inconsistency between the terms of this Agreement and the terms of any exhibit, the terms of this Agreement will prevail.

55.     This Agreement may not be modified or amended, nor may any of its provisions be waived, except by a writing signed by all Parties or their successors-in-interest.

56.     The Parties to this Agreement intend the Settlement to be a final and complete resolution of all disputes asserted or that could be asserted by Plaintiff and the Class Members against any of the Released Parties with respect to the Released Claims.

57.     The Parties to this Agreement agree that the terms of the Settlement were negotiated at arm's length in good faith by the Parties and reflect a settlement that was reached voluntarily based on adequate information and after consultation with experienced legal counsel.

58.     The waiver by one Party of any breach of this Agreement by any other Party will not be deemed a waiver of any other prior or subsequent breach of this Agreement.

59.     This Agreement and its exhibits constitute the entire agreement among the Parties regarding the Settlement and supersede all prior and contemporaneous arrangements, oral and written agreements, and discussions or negotiations between or among the Parties or their agents or attorneys. No promise, representation, or warranty by any Party, or attorney or agent of any

Party, regarding the Settlement that is not expressly contained or referred to in this Agreement or its exhibits will be valid or binding on that Party. The Parties have included this paragraph to preclude the introduction of parole evidence to vary, supplement, or contradict the terms of this Agreement.

60.    This Agreement may be executed by electronic signature (as indicated by an "s/"), and in one or more counterparts, including by signature transmitted by facsimile, or by a .pdf or .tiff image of the signature transmitted by email. All executed counterparts will be deemed to be one and the same instrument.

61.    The Parties and their respective counsel agree that they will use their best efforts to obtain all necessary approvals of the Court required for the Settlement by this Agreement.

62.    Each person signing this Agreement represents that they have all necessary authority to sign this Agreement and bind the Party on whose behalf they sign.

63.    This Agreement will be binding on the Parties, including any and all Released Parties and any corporation, partnership, or other entity into or with which any Party may merge, consolidate, or reorganize. No assignment will relieve any Party of any obligation under this Settlement.

64.    Notices required by this Agreement (other than the Mailed Notice) will be submitted both (1) by email and (2) either by (a) any form of overnight mail or (b) in person to:

Joshua S. Davis
GIANELLI & MORRIS, A Law Corporation
12121 Wilshire Blvd, Suite 505
Los Angeles, CA 90025
joshua.davis@gmlawyers.com
*Attorneys for Plaintiff*

and

Earl Austin
Baker Botts, LLP
30 Rockefeller Plaza
New York, NY 10112-4498
earl.austin@bakerbotts.com
*Attorneys for Defendant*

Notice will be deemed effective on sending the notice as described in this paragraph.

65.    The administration, consummation, and enforcement of the Settlement in this Agreement will be under the authority of the Court, and the Parties intend that the Court retain jurisdiction for the purpose of entering orders, providing for approval of attorneys' fees and costs to Class Counsel, and enforcing the terms of the Settlement and this Agreement.

66.    The construction, interpretation, operation, effect, and validity of this Agreement, and all documents necessary to effectuate it, will be governed by the laws of the State of California without regard to conflicts of law principles.

67.    This Agreement will not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties. This Agreement is the result of arm's length negotiations between the Parties and all Parties have contributed substantially and materially to the preparation of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates written below.

**ACCEPTED AND AGREED:**

Date: _Oct 16, 2025_    **Plaintiff Michala Kazda**

Signed: _____

Date: _____    **Defendant Aetna Life Insurance Company**

Signed: _____

Name: _____

Title: _____

Approved as to Form:

**GIANELLI & MORRIS, A Law Corporation**

Dated: _10/27/25_    _____

Joshua S. Davis
Counsel for Plaintiff

**BAKER BOTTS LLP**

Dated: _____    _____

Earl Austin
Counsel for Defendant
Aetna Life Insurance Company

**ACCEPTED AND AGREED:**

Date: _____                 **Plaintiff Michala Kazda**

                                       Signed:_____

Date: _10/16/25_____                  **Defendant Aetna Life Insurance Company**

                                       Signed:_____

                                       Name: __Sara Goldfarb_____

                                       Title: __Vice President & Senior Legal Counsel__

Approved as to Form:

                                       **GIANELLI & MORRIS, A Law Corporation**

Dated: _____                 _____
                                       Joshua S. Davis
                                       Counsel for Plaintiff

                                       **BAKER BOTTS LLP**

Dated: _10/21/25_____                 _____
                                       Earl Austin
                                       Counsel for Defendant
                                       Aetna Life Insurance Company

# [EXHIBIT A]

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If you had a pre-authorization request or post-service claim for lipedema surgery denied by Aetna, you could receive benefits from a class action settlement.

*A court authorized this notice. You are not being sued. This is not a solicitation from a lawyer.*

- Aetna has changed its clinical policy bulletin regarding liposuction to treat lipedema ("Lipedema Surgery").

- Effective September 1, 2020, Aeta revised its "cosmetic" coverage position with respect to suction lipectomy. Aetna's coverage position now explains when liposuction is medically necessary to treat lipedema, and when Aetna will cover Lipedema Surgery.

- Persons who paid out-of-pocket for Lipedema Surgery after cosmetic, experimental or investigational denial between May 9, 2015 and September 1, 2020 are eligible for reimbursement under a settlement agreement with Aetna, for surgeries that took place prior to September 1, 2022.

- Persons who were denied Lipedema Surgery by Aetna during the same time period, but have not yet undergone the surgery, and are Aetna members, are hereby notified that they can submit new coverage requests for Lipedema Surgery. Aetna will review those requests in accordance with criteria in the new coverage policy bulletin.

- Court-appointed lawyers for the class of Aetna members will ask the Court for up to $675,000 in attorney's fees and $46,162.84 in expenses to be paid separately by Aetna for investigating the facts, litigating the case, and negotiating the settlement.

- Your legal rights are affected whether you act or don't act. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **DO NOTHING** | If you do nothing, you will remain a Class Member and you will be able to seek reimbursement for out-of-pocket expenses incurred for Lipedema Surgery |
| **EXCLUDE YOURSELF** | If you choose to exclude yourself, you will lose the ability to seek coverage for Lipedema Surgery under the terms of the settlement, but you can bring your own lawsuit. |
| **OBJECT** | Write to the Court about why you don't like the settlement. |

i

| GO TO A HEARING | Ask to speak in Court about the fairness of the settlement. |
| APPEAR THROUGH AN ATTORNEY | If you desire, you may enter an appearance in this case through an attorney at your own expense. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlement. Benefits under the settlement will be provided if the Court approves the settlement, if any appeals relating to the settlement are resolved, and after claim forms and supporting documentation are provided.  Please be patient.

## WHAT THIS NOTICE CONTAINS

**PAGE**

**BASIC INFORMATION** ................................................................................................ **1**
    1.    Why did I get this notice package?.......................................................... 1
    2.    What is this lawsuit about?....................................................................... 1
    3.    Why is this a class action?....................................................................... 1
    4.    Why is there a settlement?....................................................................... 1

**WHO IS IN THE SETTLEMENT?** ............................................................................. **2**
    5.    How do I know if I am part of the settlement?........................................ 2
    6.    I'm still not sure if I'm included ............................................................ 2

**THE SETTLEMENT BENEFITS—WHAT YOU GET** ............................................. **2**
    7.    What does the settlement provide?.......................................................... 2

**HOW YOU GET AUTHORIZATION FOR A FUTURE LIPEDEMA SURGERY OR
SEEK REIMBURSEMENT FOR A PRIOR LIPEDEMA SURGERY** ....................... **2**
    8.    How do I seek reimbursement for a Lipedema Surgery? ...................... 3
    9.    Can I appeal if my request for reimbursement is Denied? .................... 3
    10.   How can I get approval for a future Lipedema Surgery if I am a Current
         Aetna Member? ....................................................................................... 3
    11.   What am I giving up to stay in the Class? ............................................... 4

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ......................................... **3**
    12.   How do I get out of the settlement?........................................................ 3
    13.   If I do not exclude myself, can I sue Aetna for the same thing later? ..... 3
    14.   If I exclude myself, can I get benefits from this settlement?.................. 3

**THE LAWYERS REPRESENTING YOU** ................................................................ **4**
    15.   Do I have a lawyer in this case? ............................................................. 4
    16.   How will the lawyers get paid? ............................................................... 4

**OBJECTING TO THE SETTLEMENT** ..................................................................... **5**
    17.   How do I tell the Court I don't like the settlement? ............................... 5
    18.   What is the difference between objecting and excluding? ...................... 5

**THE COURT'S FAIRNESS HEARING** ................................................................... **5**
    19.   When and where will the Court decide whether to approve the settlement? .......... 5
    20.   Do I have to come to the hearing?.......................................................... 6
    21.   May I speak at the hearing?..................................................................... 6

**GETTING MORE INFORMATION** .......................................................................... **6**
    22.   Are there more details about the settlement?.......................................... 6

**IMPORTANT DATES** .............................................................................................. **6**
    23.   What are the important dates and deadlines relating to this settlement?.................. 6

# BASIC INFORMATION

| 1. | Why did I get this notice package? |
|---|---|

You are or were covered under an ERISA-governed plan issued or administered by Aetna Life Insurance Company ("Aetna"), and previously had  either a pre-service authorization request or post-service claim for Lipedema Surgery denied as cosmetic, experimental or investigational. The Court sent you this notice because you have a right to know about a proposed settlement of a class action lawsuit, and about all your options, before the Court decides whether to approve the settlement.  This package explains the lawsuit, the settlement, your legal rights, what benefits may be available to you, who is eligible for them, and how to get them.

The Court in charge of this lawsuit is the United States District Court for the Northern District of California, and the case is known as *Kazda v. Aetna Life Insurance Company*, Case No. *3:19-cv-02512-WHO* (the "Litigation").

| 2. | What is this lawsuit about? |
|---|---|

This lawsuit concerns Aetna's alleged practice to deny coverage for Lipedema Surgery on the basis that it was cosmetic, experimental or investigational.

| 3. | Why is this a class action? |
|---|---|

In this class action lawsuit, Michala Kazda, called the "Class Representative", brought a lawsuit on behalf of other people who allegedly have a similar claim. The people together are a "Class" or "Class Members." Ms. Kazda, and all the Class Members like them— are called the Plaintiff. The company they sued (in this case, Aetna]) is called the Defendant. One court resolves the issues for all Class Members, except for those who exclude themselves from the Class.  The Honorable William H. Orrick is in charge of this class action.

| 4. | Why is there a settlement? |
|---|---|

The Court did not decide in favor of Plaintiff or Defendant.  Instead, both sides agreed to a settlement.  That way, they avoid the cost of a trial, and Class Members may be entitled to relief. The Class Representative and the attorneys think the settlement is best for everyone whose claims for Lipedema Surgery have been denied.

# WHO IS IN THE SETTLEMENT?

To see if you will get relief from the settlement, including potential monetary benefits, you first have to decide if you are a Class Member.

| **5.** | **How do I know if I am part of the settlement?** |
|---|---|

The Court decided that everyone who fits the below description is a Class Member under this settlement:

All persons covered under ERISA Health plans, self-funded or fully insured, that are administered by Aetna and whose pre-authorization or post-service claims for Lipedema Surgery were denied as cosmetic, experimental or investigational between May 9, 2015, and September 1, 2020, and who are mailed this Notice.

| **6.** | **I'm still not sure if I'm included** |
|---|---|

If you are still not sure whether you are included, you can ask for free help. You can call _____ and ask the Settlement Administrator for further information to help you determine whether you are a Class Member.

# THE SETTLEMENT BENEFITS—WHAT YOU GET

| **7.** | **What does the settlement provide?** |
|---|---|

Effective September 1, 2020, Aetna revised its coverage policy bulletin 0211 on suction lipectomy, which previously provided it was cosmetic. Aetna's revised coverage policy bulletin 0211 now expressly provides that Lipedema Surgery is medically necessary in persons with pain and disability from lipedema who have failed to respond to three or more months of conservative management (compression or manual therapy) and who meet certain specified diagnostic criteria for lipedema.

Class Members who paid out of pocket for Lipedema Surgery for surgeries that took place after and as a result of the member's request for Lipedema Surgery that Aetna denied on or before September 1, 2020 (and while the member had coverage under an Aetna plan), and which surgery occurred on or before September 1, 2022, may seek reimbursement under this settlement, to the extent that the Class Member's out-of-pocket payments have not been paid or reimbursed by other health plans, insurers, Medicare, or other reimbursement sources for which the Class Members owe no reimbursement obligation. If a Class Member's Lipedema Surgery was covered by another health plan, insurer, or Medicare, the Class Member's copay or coinsurance obligation under that separate coverage will not qualify as a reimbursable out-of-pocket expense.

Class Member reimbursement claims are subject to an aggregate cap of $650,000.00 ("Aggregate Cap"). If, at the completion of the claim process the total funds payable on reimbursement claims

is greater than the Aggregate Cap, each Class Member's payment will be reduced by an equal percentage sufficient to reduce the sum of reimbursement claims payments to the Aggregate Cap.

Class members who are current Aetna members and have yet to undergo the surgery, may request the surgery under the terms of their current Aetna Plan and the new Clinical Policy Bulletin.

Class members who have not yet had the surgery and are no longer covered under a plan issued or administered by Aetna cannot make a request for the surgery, but they release no claims.

| 8. | How do I seek reimbursement for Lipedema Surgery that I paid for? |
|---|---|

If the Court approves this settlement, you will be mailed a claim form that informs you about the final approval and the deadline to seek reimbursement.

If you paid out-of-pocket for Lipedema Surgery, you can then make a claim for reimbursement by (1) submitting the claim form that will be mailed to you after the Court grants final approval of the Settlement; (2) submitting documentation sufficient to show that you had a Lipedema Surgery prior to September 1, 2022 (such as an operative report, other clinical records, or sufficiently detailed payment records); (3) proof of payment (checks, wire transfer receipts, invoices reflecting actual payment, or other reasonable proof substantiating payment) showing net out-of-pocket payments to medical providers for the surgery, and (4) a statement of the specific amount of unreimbursed out-of-pocket costs for which the you seek reimbursement.

A Settlement Administrator (Administrator) will review and communicate a decision about whether a claim for reimbursement will be reimbursed within ninety (90) days of receiving such a claim.

If the Administrator denies a reimbursement for lack of sufficient documentation, the Administrator will advise you of the deficiency and give you sixty (60) days to provide additional sufficient documentation.

| 9. | Can I Appeal if my Request for Reimbursement is Denied? |
|---|---|

The Settlement includes a streamlined appeal process.

You will have sixty (60) days to request reconsideration of any unfavorable decision. You may seek reconsideration of the decision by notifying the Administrator by email, telephone or mail. Class Counsel and Aetna's Counsel will meet and confer within thirty (30) days of receiving the request and attempt to resolve it. If the issue remains unresolved, Class Counsel and Aetna's Counsel will, within thirty (30) days of the unsuccessful meet and confer, jointly present the matter to the Court for a final resolution. The Court's decision on the Class Member's request will be final. Neither the Class Member nor Aetna may appeal or contest the Court's resolution.

| 10. | How can I get approval for a future Lipedema Surgery if I am a Current Aetna Member? |
|---|---|

To receive approval for a future Lipedema Surgery, you must request the authorization from or submit a claim to Aetna under the procedures outlined in your current Aetna plan. Aetna will review the request or claim using the new coverage policy and in accordance with the terms of your current Aetna plan. Aetna will review the request or claim using the new clinical policy bulleting, a copy of which can be viewed on the website www. _____ or requested from the Administrator at the address set forth in Question and Answer 17. What am I giving up to stay in the Class?

| 11. | What am I giving up to stay in the class? |
|---|---|

Unless you exclude yourself, you will be releasing Aetna from the following claims:

Any and all actual or potential claims, actions, demands, rights, obligations, liabilities, damages, attorneys' fees, expenses, costs, and causes of action, whether arising under local, state, or federal law, whether by statute, contract, common law, equity, or otherwise, whether brought in an individual or representative capacity whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen that occurred prior to September 1, 2020 only, that:

(i) are based on the facts alleged in the Litigation specifically, by reason of or arising out of Aetna's denial of any request (whether pre-service or post-service) for Lipedema Surgery on the grounds that the procedure is cosmetic, experimental or investigational under ERISA-governed plans, either fully insured or self-insured;

(ii) would be barred by the principles of res judicata or collateral estoppel had the claims asserted in the Litigation, been fully litigated and resulted in a final judgment; or

(iii) seek attorneys' fees or costs related to the Litigation in addition to the Attorneys' Fees and Costs specified in the Class Notice.

Released Claims do not include: (i) any reimbursement claims or requests for coverage, as described below, that were initially denied by Aetna after September 1, 2020, (ii) any request for reimbursement for a Lipedema Surgery that took place after September 1, 2022, or (iii) any request for coverage by a former Aetna member, as described below, who has not yet had Lipedema Surgery.

If you want to know more about this release of claims, you should review the Settlement Agreement which can be viewed on the website www. _____ or requested from the Administrator as set forth in Question and Answer 17.

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want to be included in this settlement and you want to keep the right to sue or continue to sue Aetna on your own about the legal issues in this case, then you must take steps to get out of this case. This is called excluding yourself ("opting out") of the Class.

| **12.     How do I get out of the settlement?** |
| --- |

To exclude yourself from the settlement, you must send a letter by first class mail clearly stating that you want to be excluded from *Kazda v. Aetna Life Insurance Company*, Case No. *3:19-cv-02512-WHO*. Be sure to include your name, address, telephone number, and your signature. You must mail your exclusion request, postmarked no later than _____, 2025, to:

Settlement Administrator
P.O. Box _____
_____, CA _____

If you ask to be excluded, you cannot get any benefits under the settlement, and you cannot object to the settlement. You will not be legally bound by anything that happens in this lawsuit.

| **13.     If I do not exclude myself, can I sue Aetna for the same thing later?** |
| --- |

No. Unless you exclude yourself, you give up any right to sue Aetna for a previous denial of a request for Lipedema Surgery. If you have a pending lawsuit, speak to your lawyer in that case immediately. You must exclude yourself from *this* Class to continue your own lawsuit. Remember, the exclusion deadline is _____, 2025. This lawsuit, however, does not resolve any disputes you may have with Aetna over any denial of Lipedema Surgery in the future.

| **14.     If I exclude myself, can I get benefits from this settlement?** |
| --- |

No. If you exclude yourself, you will not be able to seek coverage or reimbursement for expenses incurred for a prior Lipedema Surgery through the settlement.

# THE LAWYERS REPRESENTING YOU

| **15.     Do I have a lawyer in this case?** |
| --- |

Yes. The court appointed the following attorneys as Class Counsel: Gianelli & Morris. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

| 16. | How will the lawyers get paid? |
| --- | --- |

Class Counsel will ask the Court for attorneys' fees up to in $650,000 in attorneys' fees and $46,162.84 in litigation expenses.   Class Counsel will also ask the Court for an incentive payment of $17,000 for Class Representative Michaela Kazda.  The fees would pay Class Counsel for their fees and expenses in investigating the facts, litigating the case, and negotiating the settlement.  The Court may award less than these amounts.  Aetna will pay the fees, expenses, and incentive awards. These amounts will not reduce the relief available to Class Members. Aetna has agreed not to oppose these fees, expenses and incentive awards. Aetna will also separately pay the costs to administer the settlement.

# OBJECTING TO THE SETTLEMENT

You can tell the Court that you don't agree with the settlement or some part of it.

| **17.    How do I tell the Court I don't like the settlement?** |
|---|

You can ask the Court to deny approval by filing an objection. You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out, and the lawsuit will continue. If that is what you want to happen, you should object.

Any objection to the proposed settlement must be in writing and must clearly identify your name, address, telephone number, and signature. If you file a timely written objection, you may, but are not required to, appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must (a) clearly identify the case name and number (*Kazda v. Aetna Life Insurance Company*, Case No. *3:19-cv-02512-WHO)*, (b) be submitted to the Court either by filing them electronically or in person at any location of the United States District Court for the Northern District of California or by mailing them to the Class Action Clerk, United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, and (c) be filed or postmarked on or before _____.

| **18.    What is the difference between objecting and excluding?** |
|---|

Objecting is simply telling the Court that you do not like something about the settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

# THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement. You may attend and you may ask to speak, but you don't have to.

| **19.    When and where will the Court decide whether to approve the settlement?** |
|---|

The Court will hold a fairness hearing at _____ on _____, _____, 2025 in San Francisco Courthouse, Courtroom 2 – 17th Floor., 450 Golden Gate Avenue, San Francisco, CA 94102. At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court will listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to

approve the settlement.  The Court will also decide how much to award to Class Counsel and the Class Representatives.  We do not know how long these decisions will take.

## 20.    Do I have to come to the hearing?

No.  Class Counsel will answer questions the Court may have.  But you are welcome to come, at your own expense.  If you send an objection, you don't have to come to Court to talk about it.  As long as you mailed your written objection on time, the Court will consider it.  You may also pay your own lawyer to attend, but it is not necessary.

## 21.    May I speak at the hearing?

You may ask the Court for permission to speak at the fairness hearing.  To do so, you must send a letter stating that it is your "Notice of Intention to Appear in *Kazda v. Aetna Life Insurance Company*, Case No. *3:19-cv-02512-WHO.*"  Be sure to include your name, address, telephone number, and signature.  Your Notice of Intention to Appear must be postmarked no later than _____, 2025 and be sent to the Settlement Administrator at the address stated above in response to question 12.  You cannot speak at the hearing if you have excluded yourself from the Class.

Please check the Settlement website at _____ or the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.canduscourts.gov before appearing to confirm the final approval hearing date has not changed.

# GETTING MORE INFORMATION

## 22.    Are there more details about the settlement?

This Notice summarizes the proposed settlement.  More details are in the settlement agreement. You can get a copy of the settlement agreement through the website at _____, by contacting Class Counsel at Gianelli & Morris, 12121 Wilshire Blvd, Suite 505, Los Angeles, California, Tel. 213-489-1600, by accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.canduscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, , located at 450 Golden Gate Avenue, San Francisco, CA 94102 between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT OR THE CLAIM PROCESS.

# IMPORTANT DATES

| 23. | What are the important dates and deadlines relating to this settlement? |
|-----|-----|

| Deadline | Event |
|----------|-------|
| _____, 2025 | Class Counsel will file a motion for approval of attorneys' fees and costs and request for a service award for the Class Representative. |
| _____, 2025 | Last day to submit a request for exclusion from the proposed Settlement. |
| _____, 2025 | Last day to serve Class Counsel and Aetna's Counsel with objections to the proposed settlement. |
| _____, 2025 | Last day to file Notice of Intent to Appear. |
| _____, 2025 | Final Approval Hearing |

Dated: _____        _____

Honorable William Orrick.
United States District Court Judge

# [EXHIBIT B]

ROBERT S. GIANELLI, #82116
JOSHUA S. DAVIS, #193187
ADRIAN J. BARRIO, #219266
GIANELLI & MORRIS, A Law Corporation
12121 Wilshire Boulevard, Suite 505
Los Angeles, California 90025
Tel: (213) 489-1600; Fax: (213) 489-1611
rob.gianelli@gmlawyers.com
joshua.davis@gmlawyers.com
adrian.barrio@gmlawyers.com

Attorneys for Plaintiff
MICHALA KAZDA,
on behalf of herself and all others
similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHALA KAZDA, on behalf of herself and all others similarly situated, ) ) ) ) ) Plaintiff, ) ) v. ) ) AETNA LIFE INSURANCE ) COMPANY, ) ) Defendant. ) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | Case No.: 3:19-cv-02512 WHO Assigned to Hon. William H. Orrick, D2 **[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT** |

The Motion of Plaintiff Michala Kazda, on behalf of herself and the proposed Class, for preliminary approval of the proposed class action Settlement reached with Defendant Aetna Life Insurance Company ("Aetna") in this lawsuit (the "Litigation"), came on for hearing before this Court on _____. After considering the Settlement Agreement, the moving papers, arguments of counsel, and all other matters presented to the Court, the Court finds that:

1.  The Complaint in the Litigation was filed on May 9, 2019.  A First Amended Complaint was filed on September 26, 2019. The First Amended Complaint alleges (1) denial of ERISA plan benefits and for clarification of rights; and (2) breach of fiduciary duty and equitable relief under an ERISA plan, and seeks declaratory and injunctive relief on behalf of the class pursuant to 29 U.S.C. section 1132(a)(1)(B) and 29 U.S.C. section 1132(a)(3).

2.  On April 26, 2022, the Court certified a class of Aetna members, covered under ERISA plans, self-funded or fully-insured, whose claims for liposuction to treat lipedema ("Lipedema Surgery) were denied as cosmetic, under Rules 23(b)(1) and 23(b)(2) following a contested class certification proceeding. (Dkt. 99.)

3.  Aetna denies each and every claim and contention alleged or otherwise made or pursued against it by Plaintiff in this Litigation. Aetna denies all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts, or omissions alleged, or that could have been alleged, in the Litigation.

4.  The proposed Settlement resulted from multiple arms-length settlement negotiations, and was concluded only after Plaintiffs and Aetna conducted their own investigations and evaluations of the factual and legal issues raised by Plaintiffs' claims and Aetna's defenses.

5.  Plaintiff and Class Counsel have agreed to settle the Litigation after considering such factors as (a) the benefits to Plaintiff and the Class provided by the Agreement; (b) the risks and uncertainty of litigation, especially in complex actions

such as this, as well as the difficulties and delays inherent in such litigation; and (c) the desirability of consummating the Agreement in order to provide relief to Plaintiff and the Class.

6.    The Parties have entered into a Settlement Agreement ("the Settlement") previously filed with this Court.

7.    The Court has reviewed the Settlement (and all of the attachments thereto) and determined the proposed Settlement to be fair, reasonable, adequate, and within the range of possible approval. The proposed Settlement does not improperly grant preferential treatment to the Plaintiff or any segment of the Class. The proposed Settlement is sufficient to warrant sending notice to the Class Members. The procedures for establishing and administering the benefits provided by the proposed Settlement and for notice of the proposed Settlement, exclusion from the proposed Settlement, and objections to the proposed Settlement are fair, reasonable, and in the best interests of the Class.

8.    Based on Plaintiff's motion, the Memorandum of Points and Authorities, the Agreement, and all supporting exhibits and attachments, the Court preliminarily certifies for settlement purposes the Class, as defined in the Agreement, pursuant to Rules 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2).  The Court hereby finds for settlement purposes that:

(a)    the numerosity requirement of Rule 23(a)(1) is satisfied because The proposed settlement class, comprises at least 25 persons enrolled in ERISA-governed plans, issued or administered by Aetna, whose pre-authorization or post-service claims for Lipedema Surgery were denied as cosmetic, experimental or investigational between May 9, 2015 and September 1, 2020, satisfies the requirement that a class be sufficiently numerous such that joinder of all members is impractical; and

(b)    the commonality requirement of Rule 23(a)(2) is satisfied because the  propriety of Aetna's denial of Lipedema Surgery as cosmetic, experimental or investigational during the relevant time period is a common issue;

(c)    the typicality requirement of Rule 23(a)(3) is satisfied because the Class Representative and all the proposed class members have suffered the same or similar injury: they have been denied Lipedema Surgery for their medical conditions;

(d)    the adequacy requirement of Rule 23(a)(4) is satisfied because (i) Class Counsel are qualified and competent to prosecute the Action vigorously, (ii) Class Representative's interests are not antagonistic to the interests of the Class, and (iii) Class Counsel and Class Representative have fairly and adequately protected the interests of the Class;

(e)    Rule 23(b)(1)(A) is satisfied because prosecution of separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class;

(f)    Rule 23(b)(1)(B) is satisfied because adjudications with respect to individual class members would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; and

(g)    Rule 23(b)(2) is satisfied because Aetna has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

9.      The Court has reviewed the notice provisions of Paragraphs 28-35 of the Settlement and the form of the Notice of Proposed Settlement of Class Action and Final Approval Hearing attached to the Settlement as Exhibit A. The Court has determined that mailing the Notice to the last known addresses of the Class Members:

(a)      constitutes the best practicable notice under the circumstances;

(b)      is reasonably calculated to apprise Class Members of the pendency of the Litigation and of their right to object to or exclude themselves from the proposed Settlement;

(c)      is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and

(d)      meets all applicable requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution, and its Amendments.

Accordingly, it is hereby **ORDERED AND DECREED AS FOLLOWS:**

1.      The Motion for Preliminary Approval is GRANTED. The Court preliminarily approves the proposed Settlement. All defined terms in the foregoing findings and this Order shall have the same meanings as in the Settlement Agreement.

2.      A hearing (the "Final Approval Hearing") will be held on _____, before the undersigned in the United States District Court for the Northern District of California to consider the fairness, reasonableness, and adequacy of the proposed Settlement and whether it should be finally approved by the Court.

3.      The Court approves the proposed Notice and the plan for giving notice.

4.      Aetna and Class Counsel are authorized to:

(a)      establish the means necessary to administer the proposed Settlement, in accordance with the terms of the Agreement; and

(b)      retain a Settlement Administrator to help administer the proposed Settlement, including the Notice.

5.     The Court appoints _____ as the Settlement Administrator, to administer the Settlement, including the Notice.

6.     The Settlement Administrator shall mail the Notices to each Class Member by first-class mail, postage prepaid, to his or her last known address no later than 35 days after entry of this Order, as described in the Settlement.

7.     The Settlement Administrator shall file proof of the mailing of the Notices at or before the Final Approval Hearing.

8.     Class Counsel shall file their petition for approval of Class Counsel's fees, expenses, and class representative service award no later than 35 days after entry of this Order.

9.     Each Class Member who wishes to exclude himself or herself from the Class must submit an appropriate, timely written request for exclusion, postmarked no later than 60 calendar days from the date the Notices were sent to the Class Members, to the address provided in the Notices, which states all of the following: (a) the name, address, and telephone number of the person requesting exclusion; and (b) a clear and unequivocal statement that the person wishes to be excluded from the Class.

10.     Any Class Member who does not submit a timely, written request for exclusion in the form set forth in this Order shall be bound by all proceedings, orders, and judgments in the Litigation, even if such Class Member has previously initiated or subsequently initiates individual litigation or other proceedings against Aetna relating to the denial of a request for authorization or claim for reimbursement for Lipedema Surgery during the Class period.

11.     Each Class Member who wishes to object to the fairness, reasonableness, or adequacy of the Agreement, the proposed Settlement, or to the award of attorneys' fees and expenses shall send to the Administrator, no later than 60 calendar days from the date Notices were sent to the Class Members, a written statement of the objections, as well as the specific reason(s), if any, for each

objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence or other information the Class Member wishes to introduce in support of the objections. Class Members may object either on their own or through an attorney retained at their own expense. The written objection must also contain the Class Member's name, address, signature, and telephone number.

12.     Any Class Member who files and serves a written objection, as described in Paragraph 11 above, may appear at the Final Approval Hearing, either in person or through counsel hired at the Class Member's expense, to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement. Class Members or their attorneys who intend to make an appearance at the Final Approval Hearing must deliver a notice of intention to appear to Class Counsel and to Aetna's Counsel, and file that notice with the Court, no later than sixty (60) calendar days from the date Notice was sent to the Class Members.

13.     Any Class Member who fails to file a timely objection in accordance with and containing the information required by this Order, will waive and forfeit any all rights he or she may have to appear separately and object, and will be bound by all the terms of this Agreement and by all proceedings, orders, and judgments, including but not limited to the Release, in the Litigation.

14.     Any Class Member who objects to the Settlement will be entitled to all of the benefits of the Settlement if it is approved, as long as the objecting Class Member complies with all requirements of the Agreement.

15.     The Settlement Administrator will scan and email copies of each request for exclusion in PDF format (or any other agreed format) to Aetna's Counsel and to Class Counsel not more than five (5) business days after the Settlement Administrator receives such a request.

16.     As part of the motion papers in support of Final Approval of the Settlement, the Settlement Administrator or Class Counsel will provide a list of all the persons who have requested exclusion from the Class.

17.    Any Class Member may retract a prior request for exclusion by providing to Class Counsel and to Aetna's Counsel a written notice stating his or her desire to retract the request for exclusion from the Class by 12:00 p.m., Pacific Standard Time, five calendar days before the Final Approval Hearing. Any written notice retracting the request for exclusion also must include a statement that the Class Member makes the retraction freely and of his or her own volition, without coercion by anyone. Any Class Member who validly retracts a request for exclusion under this Paragraph will not be excluded from the Class, will be deemed to be a Class Member, and will be bound by the Settlement.

18.    All proceedings in the Litigation are stayed until further order of the Court, except as may be necessary to implement the proposed Settlement or to comply with the terms of the Agreement.

19.    This Order shall become null and void, and shall be without prejudice to the rights of the Parties, all of whom shall be restored to their respective positions existing immediately before this Court entered this Order, if: (a) the proposed Settlement is not finally approved by the Court, or does not become final, pursuant to the terms of the Agreement; or (b) the Settlement is terminated in accordance with the terms of Agreement.  In the event this occurs, the Settlement and Agreement shall become null and void and be of no further force and effect, and neither the Agreement nor this Order may be used in the Litigation or in any other proceeding for any purpose.

20.    In no event shall the Settlement or any of its provisions, or any negotiations, statements, or proceedings relating to it be offered as, received as, used as, or deemed to be evidence in the Litigation, any other action, or in any other proceeding, except in a proceeding to enforce the Agreement. Without limiting the foregoing, neither the Agreement nor any related negotiations, statements, or proceedings shall be offered as, used as, or deemed to be evidence or an admission or

concession by any person of any matter, including but not limited to any liability or wrongdoing on the part of Aetna.

21.    The Court reserves the right to continue the Final Approval Hearing without further written notice to the Class but will notify counsel for the Parties and any objectors or their counsel who have timely filed a notice of intention to appear in these proceedings. Unless the Court specifically orders otherwise, any such continuance shall not be interpreted to expand or change any deadlines contained in this Order or the Agreement.


IT IS SO ORDERED.


DATED: _____          By: _____

                                       Judge William H. Orrick
                                       United States District Court Judge

# [EXHIBIT C]

ROBERT S. GIANELLI, #82116
JOSHUA S. DAVIS, #193187
ADRIAN J. BARRIO, #219266
GIANELLI & MORRIS, A Law Corporation
12121 Wilshire Boulevard, Suite 505
Los Angeles, California 90025
Tel: (213) 489-1600; Fax: (213) 489-1611
rob.gianelli@gmlawyers.com
joshua.davis@gmlawyers.com
adrian.barrio@gmlawyers.com

Attorneys for Plaintiff
MICHALA KAZDA,
on behalf of herself and all others
similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHALA KAZDA, on behalf of herself and all others similarly situated, | Case No.: 3:19-cv-02512 WHO<br>Assigned to Hon. William H. Orrick, D2 |
| Plaintiff, | **[PROPOSED] FINAL ORDER APPROVING CLASS ACTION SETTLEMENT AND JUDGMENT** |
| v. | |
| AETNA LIFE INSURANCE COMPANY, | |
| Defendant. | |

The Motion of Plaintiff Michala Kazda ("Plaintiff") on behalf of herself and the Class, for final approval of the class action Settlement reached with Defendant Aetna Life Insurance Company ("Aetna") in this lawsuit (the "Litigation") came on for hearing before this Court on _____. Plaintiff and Aetna are collectively referred to herein as the "Parties." After considering the Settlement, the moving papers, arguments of counsel, and all other matters presented to the Court, it is hereby ORDERED, ADJUDGED, AND DECREED, as follows:

1.    The Motion for Final Approval of Class Action Settlement is hereby GRANTED.

2.    This Final Order Approving Class Action Settlement and Judgment ("Final Order and Judgment") incorporates and makes part hereof: (a) the Parties' Settlement Agreement filed on [insert date], including Exhibits A to E [Dkt. Nos. _____] (collectively the "Agreement"); and (b) the Court's findings and conclusions contained in its Order Granting Motion for Preliminary Approval of Class Action Settlement [Dkt. _____] (the "Preliminary Approval Order"). All defined terms in this Final Order and Judgment shall have the same meanings as in the Agreement.

3.    All preliminary findings and conclusions in the Court's Preliminary Approval Order are hereby made final.

4.    The Court has personal jurisdiction over all members of the Class. The Court has subject matter jurisdiction over the claims asserted in this Litigation to approve the Settlement, and all exhibits attached thereto. Venue is proper. The Settlement is fair, reasonable and adequate, and consistent and in compliance with the applicable provisions of the United States Constitution, its Amendments, and the Federal Rules of Civil Procedure, as to, and in the best interests of, the Settlement Class. The Court also finds that the was concluded only after Plaintiff and Aetna conducted their own investigations and evaluations of the factual and legal issues raised by Plaintiff's claims, as well as Aetna's defenses, and is the result of arms-

1

length negotiations. The Court has considered and denied all objections filed in this Litigation. Accordingly, the Settlement is hereby finally approved.

5.      The Court hereby directs the Parties and their counsel to implement and consummate the Settlement according to its terms and provisions.

6.      Pursuant to the Court's Preliminary Approval Order, the notice requirement was satisfied in that the Class Administrator sent the Notices to each Class Member in the Class, no later than 35 days after entry of the Preliminary Approval Order, by first-class mail, postage prepaid, to each Class Member's last known address, and where necessary, further steps were taken in accordance with the Agreement to obtain updated addresses when the mail was returned as undelivered and to re-send the Notice. Class Members had the opportunity to object to the Settlement and the Agreement, or to exclude themselves from the Class, and they were informed of the date, time, and location of the Final Approval Hearing and had the opportunity to appear at the Final Approval Hearing. These procedures afforded protections to persons in the Class and provide the basis for the Court to make an informed decision on approval of the Settlement based on the responses of Class Members.

7.      The Notices and all other instruments provided to the Class Members:

(a)      constituted the best practicable notice under the circumstances;

(b)      constituted notice that was reasonably calculated to apprise Class Members of the pendency of the Litigation, their right to object to or exclude themselves from the proposed Settlement and to appear at the Final Approval Hearing;

(c)      were reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and

(d)      met all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution, and its Amendments, including the Due Process Clause.

8.      Class Counsel and Plaintiff adequately represented the Class for purposes of entering into and implementing the Settlement.

9.      [No Class Members have requested exclusion from the Class] or [The list of those Class Members who have requested exclusion from the Class in accordance with the terms of the Agreement and the Preliminary Approval Order has been filed with the Court, is attached to this Order, and is hereby approved. Those persons are hereby excluded from the Class. The Court finds that it is a complete list of all Class Members who have timely requested exclusion from the Class, and accordingly, such Class Members shall not be bound by this Final Order and Judgment or the Agreement.]

10.     Class Counsel are hereby awarded attorneys' fees and costs in the amount of $_____ ("Class Counsel Payment"). This amount covers any and all claims for attorneys' fees, expenses, and costs incurred by any and all Class Counsel in connection with the Settlement of the Litigation and the administration of such Settlement. Class Counsel Payment shall be provided by Aetna to Gianelli & Morris in accordance with Paragraph 26 of the Settlement.

11.     As an incentive award for participation as Class Representative in the Litigation, the Court awards $_____ to Plaintiff Michala Kazda.  Aetna shall pay the incentive award in addition to any relief that Plaintiff is entitled to receive as a Class Member.

12.     The release of claims set forth in Paragraph 18, definition (t), and Paragraphs 24-26 of the Settlement is incorporated herein and effective as of the date of this Final Order and Judgment, and forever discharges the Released Parties from any claims or liabilities arising from or related to the Released Claims.

13.     Without affecting the finality of this Final Order and Judgment for purposes of appeal, the Court shall retain jurisdiction as to all matters relating to administration, consummation, enforcement, and interpretation of the Settlement and this Order, and for any other necessary purpose; *provided, however,* that nothing in

this paragraph shall restrict the ability of the Parties to exercise their rights under Paragraphs 16, 17, and 18 of this Final Order and Judgment. The Parties submit to the jurisdiction of the Court for purposes of administration, construction, consummation, enforcement, and interpretation of the Settlement.

14.     The Settlement is binding on, and has *res judicata* and preclusive effect in, all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiff and any other Class Members, as well as their Related Parties that allege Released Claims, as defined in the Settlement.

15.     Neither this Final Order and Judgment, nor the Settlement, nor any other document referred to herein or therein, nor any action taken to carry out this Final Order and Judgment or the Settlement is, may be construed as, or may be used as an admission or concession by or against Aetna of the validity of any claim or any actual or potential fault, wrongdoing or liability whatsoever. Entering into or carrying out the Settlement, and any negotiations or proceedings relating to it, shall not in any event be construed as, or deemed evidence of, an admission or concession as to Plaintiff's claims or Aetna's denials or defenses, and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the Settlement or to enforce the provisions of this Final Order and Judgment or the Settlement; provided, however, that this Final Order and Judgment and the Settlement may be filed in any action against or by Aetna or the Class Members to support a defense of *res judicata*, collateral estoppel, release, waiver, good-faith Settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim to the extent allowed by law.

16.     The Parties are authorized, without further approval from the Court, to agree to and adopt such non-substantive amendments, modifications, or expansions of the Settlement and all exhibits attached thereto that are consistent with this Final

Order and Judgment, and that do not limit the rights of persons in the Settlement Class. Any substantive amendments, modifications, or expansions of the Settlement and the exhibits attached thereto shall require prior approval by the Court.

17.     Any work product retained by Plaintiff or Class Counsel that is based on or incorporates information designated as Confidential Material pursuant to the terms of the Protective Order previously entered in this case and provided by Aetna shall be deemed Confidential Material pursuant to the terms of the Protective Order, and the disclosure or use of such materials shall be subject to the same restrictions as Confidential Materials pursuant to the terms of the Protective Order previously entered in this case.

18.     Each and every Class Member who has not been excluded from the Settlement, and their Related Parties, are forever barred and enjoined from commencing, instituting, or continuing to prosecute any action or proceeding in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind, asserting any of the Released Claims against any of the Released Parties, except for claims to enforce the Settlement.

19.     Section 1715(b) of the Class Action Fairness Act of 2005 requires a settling defendant to "serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official" a specified group of documents describing the settlement. Pursuant to section 1715(d), final approval cannot be issued earlier than 90 days after notice is given under section 1715(b). Aetna served the necessary documents upon the appropriate officials on December 10, 2021. This order is signed more than 90 days after Aetna served the documents. The Court therefore finds that Aetna is in full compliance with the Class Action Fairness Act, 28 U.S.C. section 1715.

20.     There being no just reason for delay, the Court, in the interests of justice, expressly directs the Clerk of the Court to enter this Final Order and Judgment, and hereby decrees that, upon entry, it be deemed a final judgment.

IT IS SO ORDERED.


DATED: _____              By: _____
                                        Judge William H. Orrick
                                        United States District Court Judge

# [EXHIBIT D]

9/3/25, 3:26 PM　　Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair - Medical Clinical Policy Bulletins | Aetna

Case 3:19-cv-02512-WHO　　Document 185-1　　Filed 10/30/25　　Page 68 of 136

-->



(https://www.aetna.com/)

# Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair

Clinical Policy Bulletins　|　Medical Clinical Policy Bulletins

**Number: 0211**

## Table Of Contents

Policy

Applicable CPT / HCPCS / ICD-10 Codes

Background

References

### Policy History

Last Review　⧉
 04/17/2025
Effective: 03/16/1998
Next Review: 02/12/2026

Review History　⧉

Definitions　⧉

### Additional Information

Clinical Policy Bulletin
Notes　⧉

## Policy

### Scope of Policy

This Clinical Policy Bulletin addresses abdominoplasty, suction lipectomy, and ventral hernia repair.

   I. Medical Necessity

      A. Aetna considers panniculectomy/apronectomy medically necessary according to the following criteria:

1. Panniculus hangs below level of pubis (below the distal end of the symphysis pubis), documented by high-quality color frontal-view and side-view photographs; *and*

2. The medical records document that the panniculus causes chronic intertrigo (dermatitis occurring on opposed surfaces of the skin, skin irritation, infection or chafing) that consistently recurs over 3 months while receiving appropriate medical therapy (e.g., oral or topical prescription medication), or remains refractory to appropriate medical therapy over a period of 3 months; *and*

3. Documentation of high-quality color frontal-view and side-view photographs with pannus lifted to document presence of intertrigo.

B. Aetna considers repair of a true incisional or ventral hernia medically necessary.

C. Aetna considers liposuction medically necessary in persons with pain and disability from lipedema who have failed to respond to three or more months of conservative management (compression or manual therapy) and who meet the following diagnostic criteria for lipedema:

1. *Medical History*

   a. Pain and hypersensitivity to touch in lipedema affected areas;
   b. History of easy bruising or bruising without apparent cause in lipedema affected areas;
   c. Relative lack of effect of weight loss on lipedema affected areas;
   d. Lack of effect of limb elevation on reducing swelling;

2. *Physical examination findings (documentation of high-quality color photographs should accompany requests):*

   a. Disproportional fat distribution (e.g., lower body disproportionately large compared to upper body). **Note:** As a significant proportion of persons with lipedema will not have disproportional fat distribution, especially earlier on in disease progression, the requirement for

disproportionate fat distribution can be waived for persons who meet the other listed diagnostic criteria;

   b. Thickened subcutaneous fat in the affected extremities bilaterally and symmetrically (legs, thighs, hips or buttocks, or occasionally arms are affected);

   c. Tenderness and nodularity of fat deposits in lipedema affected areas (dimpled or orange peel texture);

   d. Stemmer sign negative (Stemmer's sign is negative when a fold of skin can be pinched and lifted up at the base of the second toe or at the base of the middle finger) (unless the member has comorbid lymphedema);

   e. Absence of pitting edema (no "pitting" when finger or thumb pressure is applied to the area of fat) (unless the member has comorbid lymphedema);

   f. Evidence of "cuffing" (tissue enlargement ends abruptly at ankles or wrists, with sparing of hands and feet) (also called "braceleting" or "inverse shouldering"). **Note**: A minority of persons with lipedema may not exhibit cuffing or shouldering. This criterion may be waived for persons who meet the other listed diagnostic criteria.

D. Aetna considers suction lipectomy of the trunk medically necessary for lipedema when the following criteria are met:

   1. There is specific documentation of pain and hypersensitivity to touch in lipedema affected areas of the trunk;

   2. History of easy bruising or bruising without apparent cause in lipedema affected areas of the trunk;

   3. Relative lack of effect of weight loss on lipedema affected areas of the trunk;

   4. Tenderness and nodularity of fat deposits in lipedema affected areas of the trunk (dimpled or orange peel texture);

   5. Symptoms have been refractory to conservative treatment for greater than or equal to 3 months.

E. Aetna considers suction lipectomy cosmetic for indications other than lipedema and lymphedema.

F. Aetna considers repair of a diastasis recti, defined as a thinning out of the anterior abdominal wall fascia, not medically necessary because, according to the clinical literature, it does not represent a "true" hernia and is of no clinical significance.

G. Aetna considers surgical correction of adult acquired buried penis medically necessary when the following selection criteria are met:

   1. The buried penis engulfs the entire penis, documented by high-quality color frontal-view and side-view photographs; *and*

   2. The medical records document that the buried penis causes *either* of the following:

      a. Chronic intertrigo (dermatitis occurring on opposed surfaces of the skin, skin irritation, infection or chafing) that consistently recurs over 3 months while receiving appropriate medical therapy (e.g., oral or topical prescription medication), or remains refractory to appropriate medical therapy over a period of 3 months; *or*

      b. Lichen sclerosis with or without urethral meatal stenosis.

   **Note:** Correction of congenital buried penis is considered medically necessary if/when it is performed with/without other surgery on the penis (e.g., circumcision, meatotomy) to prevent complications such as cicatrix formation.

## II. Experimental, Investigational, or Unproven

A. Aetna considers panniculectomy/apronectomy experimental, investigational, or unproven for minimizing the risk of hernia formation or recurrence.

   There is inadequate evidence that pannus contributes to hernia formation. The primary cause of hernia formation is an abdominal wall defect or weakness, not a pulling effect from a large or redundant pannus.

9/3/25, 3:26 PM          Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Obese or Clinical Policy Bulletins | Aetna

Case 3:19-cv-02512-WHO   Document 185-1   Filed 10/30/25   Page 72 of 136

B. The following procedures are considered experimental, investigational, or unproven because of insufficient evidence of its effectiveness:

1. Abdominal lipectomy and/or correction of buried penis for the treatment of metabolic syndrome, or as an adjunctive procedure to assist with long-term weight loss following bariatric surgery;
2. Adipose derived stem cell-assisted lipotransfer;
3. Correction of buried penis for the treatment of erectile dysfunction;
4. Enhanced-view totally extra-peritoneal repair for ventral hernia;
5. Epigastric VHR through vaginal Natural Orifice Transluminal Endoscopic Surgery (NOTES);
6. Laparoscopic intracorporeal rectus aponeuroplasty for VHR;
7. Panniculectomy for the treatment of back pain;
8. Peritoneal flap hernioplasty for VHR;
9. Trans-abdominal pre-peritoneal repair with concurrent rectus aponeuroplasty (TAPPRA) for incisional and recurrent ventral hernia.

III. Cosmetic

The following procedures are considered cosmetic:

A. Abdominoplasty or lipoabdominoplasty;
B. Abdominoplasty combined with hip expansion by fat grafting for waistline contouring;
C. Panniculectomy/apronectomy when criteria are not met;
D. Suction lipectomy, for indications other than lipedema and lymphedema. For liposuction for lymphedema, see CPB 0069 - Lymphedema (../1_99/0069.html).

IV. Related Policies

- CPB 0031 - Cosmetic Surgery and Procedures (../1_99/0031.html)
- CPB 0069 - Lymphedema (../1_99/0069.html)

# Applicable CPT / HCPCS / ICD-10 Codes

*Abdominoplasty, Suction Lipectomy other than for lymphedema, and Ventral Hernia Repair:*

| Code | Code Description |
|------|------------------|
| CPT codes covered if selection criteria are met: | |
| 0437T | Implantation of non-biologic or synthetic implant (eg, polypropylene) for fascial reinforcement of the abdominal wall (List separately in addition to code for primary procedure) |
| 15830 | Excision, excessive skin and subcutaneous tissue (including lipectomy); abdomen, infraumbilical panniculectomy [documentation required] |
| 49591 | Repair of anterior abdominal hernia(s) (ie, epigastric, incisional, ventral, umbilical, spigelian), any approach (ie, open, laparoscopic, robotic), initial, including implantation of mesh or other prosthesis when performed, total length of defect(s); less than 3 cm, reducible |
| 49592 | less than 3 cm, incarcerated or strangulated |
| 49593 | 3 cm to 10 cm, reducible |
| 49594 | 3 cm to 10 cm, incarcerated or strangulated |
| 49595 | greater than 10 cm, reducible |
| 49596 | greater than 10 cm, incarcerated or strangulated |
| 49613 | Repair of anterior abdominal hernia(s) (ie, epigastric, incisional, ventral, umbilical, spigelian), any approach (ie, open, laparoscopic, robotic), recurrent, including implantation of mesh or other prosthesis when performed, total length of defect(s); less than 3 cm, reducible |
| 49614 | less than 3 cm, incarcerated or strangulated |
| 49615 | 3 cm to 10 cm, reducible |
| 49616 | 3 cm to 10 cm, incarcerated or strangulated |
| 49617 | greater than 10 cm, reducible |

| Code | Code Description |
| --- | --- |
| 49618 | greater than 10 cm, incarcerated or strangulated |
| 49623 | Removal of total or near total non-infected mesh or other prosthesis at the time of initial or recurrent anterior abdominal hernia repair or parastomal hernia repair, any approach (ie, open, laparoscopic, robotic) (List separately in addition to code for primary procedure) |
| CPT codes not covered for indications listed in the CPB: | |
| *Epigastric VHR through vaginal natural orifice transluminal endoscopic surgery (NOTES), enhanced-view totally extra-peritoneal repair, laparoscopic intracorporeal rectus aponeuroplasty, peritoneal flap hernioplasty, trans-abdominal pre-peritoneal repair with concurrent rectus aponeuroplasty (TAPPRA) - No specific codes* | |
| 15778 | Implantation of absorbable mesh or other prosthesis for delayed closure of defect(s) (ie, external genitalia, perineum, abdominal wall) due to soft tissue infection or trauma |
| + 15847 | Excision, excessive skin and subcutaneous tissue (includes lipectomy), abdomen (e.g. abdominoplasty) (includes umbilical transposition and fascial plication) (List separately in addition to code for primary procedure) [documentation required] |
| 15877 | Suction assisted lipectomy; trunk |
| HCPCS codes covered if selection criteria are met: | |
| C7565 | Repair of anterior abdominal hernia(s) (ie, epigastric, incisional, ventral, umbilical, spigelian), any approach (ie, open, laparoscopic, robotic), recurrent, including implantation of mesh or other prosthesis when performed, total length of defect(s) less than 3 cm, reducible with removal of total or near total non-infected mesh or other prosthesis at the time of initial or recurrent anterior abdominal hernia repair or parastomal hernia repair |
| ICD-10 codes covered if selection criteria are met: | |
| E65 | Localized adiposity [abdomen] [documentation required] |
| K43.0 - K43.9 | Ventral hernia |
| L30.4 | Erythema intertrigo [chronic, documentation required] |
| L98.7 | Excessive and redundant skin and subcutaneous tissue |

| Code | Code Description |
|------|------------------|
| M79.3 | Panniculitis [abdomen] |
| R60.9 | Edema, unspecified [lipedema] |
| ICD-10 codes not covered for indications listed in the CPB: | |
| E88.810 - E88.819 | Metabolic syndrome |
| M54.2 | Cervicalgia |
| M54.30 - M54.32 | Sciatica |
| M54.40 - M54.42 | Lumbago with sciatica |
| M54.50 - M54.59 | Low back pain |
| M54.6 | Pain in thoracic spine |
| M54.81 - M54.9 | Other and unspecified dorsalgia |
| M62.08 | Separation of muscle, (non-traumatic) other site [diastasis recti] |
| Q79.59 | Other congenital malformations of abdominal wall [congenital diastasis recti] |
| *Lipectomy for lymphedema:* | |
| CPT codes covered if selection criteria are met: | |
| 15830 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); abdomen, infraumbilical panniculectomy |
| 15832 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); thigh |
| 15833 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); leg |
| 15834 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); hip |
| 15835 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); buttock |
| 15836 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); arm |

| Code | Code Description |
|------|------------------|
| 15837 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); forearm or hand |
| 15838 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); submental fat pad |
| 15839 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); other area |
| 15847 | Excision, excessive skin and subcutaneous tissue (includes lipectomy), abdomen (eg, abdominoplasty) (includes umbilical transposition and fascial plication) (List separately in addition to code for primary procedure) |
| 15876 | Suction assisted lipectomy; head and neck |
| 15877 | Suction assisted lipectomy; trunk |
| 15878 | Suction assisted lipectomy; upper extremity |
| 15879 | Suction assisted lipectomy; lower extremity |
| ICD-10 codes covered if selection criteria are met: | |
| R60.9 | Edema, unspecified [lipedema] |
| *Correction of adult buried penis:* | |
| CPT codes covered if selection criteria are met: | |
| 15839 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); other area [Correction of adult acquired buried penis] |
| 54300 | Plastic operation of penis for straightening of chordee (eg, hypospadias), with or without mobilization of urethra [Correction of adult acquired buried penis] |
| Other CPT codes related to the CPB: | |
| 43632 | Gastrectomy |
| 43644 - 43645 | Laparoscopy, surgical, gastric |
| 43770 - 43775 | Bariatric surgery - laparoscopy |
| 43843 - 43888 | Gastric restrictive procedure |
| 53020 | Meatotomy, cutting of meatus (separate procedure); except infant |
| 54150 | Circumcision, using clamp or other device with regional dorsal penile or ring block |

| Code | Code Description |
|---|---|
| 54160 | Circumcision, surgical excision other than clamp, device, or dorsal slit; neonate (28 days of age or less) |
| 54161 | Circumcision, surgical excision other than clamp, device, or dorsal slit; older than 28 days of age |
| ICD-10 codes covered if selection criteria are met: | |
| L30.4 | Erythema intertrigo [chronic, documentation required] |
| L90.0 | Lichen sclerosus et atrophicus |
| Q55.64 | Hidden penis |
| Z98.84 | Bariatric surgery status |
| ICD-10 codes not covered for indications listed in the CPB: | |
| N52.01 - N52.9 | Male erectile dysfunction |
| *Abdominoplasty combined with hip expansion:* | |
| CPT codes not covered for indications listed in the CPB: | |
| *Abdominoplasty combined with hip expansion* - No specific code | |
| Other CPT codes related to the CPB: | |
| 15771 | Grafting of autologous fat harvested by liposuction technique to trunk, breasts, scalp, arms, and/or legs; 50 cc or less injectate |
| 15772 | Grafting of autologous fat harvested by liposuction technique to trunk, breasts, scalp, arms, and/or legs; each additional 50 cc injectate, or part thereof |
| 15830 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); abdomen, infraumbilical panniculectomy |
| 15847 | Excision, excessive skin and subcutaneous tissue (includes lipectomy), abdomen (eg, abdominoplasty) (includes umbilical transposition and fascial plication) |
| 15877 | Suction assisted lipectomy; trunk |
| ICD-10 codes not covered for indications listed in the CPB: | |
| Z41.1 | Encounter for cosmetic surgery |

## Background

In order to distinguish a ventral hernia repair from a purely cosmetic abdominoplasty, Aetna requires documentation of the size of the hernia, whether the ventral hernia is reducible, whether the hernia is accompanied by pain or other symptoms, the extent of diastasis (separation) of rectus abdominus muscles, whether there is a defect (as opposed to mere thinning) of the abdominal fascia, and office notes indicating the presence and size of the fascial defect.

Abdominoplasty, known more commonly as a "tummy tuck," is a surgical procedure to remove excess skin and fat from the middle and lower abdomen and to tighten the muscles of the abdominal wall.  The procedure can improve cosmesis by reducing the protrusion of the abdomen.  However, abdominoplasty is considered by Aetna to be cosmetic because it is not associated with functional improvements.

Danilla et al (2013) examined if suction-assisted lipectomy (SAL) decreases the incidence of early cardiovascular disease risk factors or its biochemical and clinical risk indicators.  A systematic review of the literature was performed by conducting a pre-defined, sensitive search in MEDLINE without limiting the year of publication or language.  The extracted data included the basal characteristics of the patients, the surgical technique, the amount of fat extracted, the cardiovascular risk factors and the biochemical and clinical markers monitored over time.  The data were analyzed using pooled curves, risk ratios and standardized means with meta-analytical techniques.  A total of 15 studies were identified involving 357 patients.  In all of the studies, measurements of pre-defined variables were recorded before and after the SAL procedure.  The median follow-up was 3 months (interquartile range (IQR) 1 to 6, range of 0.5 to 10.5).  The mean amount of extracted fat ranged from 2,063 to 16,300 ml, with a mean ± standard deviation (SD) of 6,138 ± 4,735 ml.  After adjusting for time and body mass index (BMI), leptin and fasting insulin were the only markers that were significantly associated with the amount of aspirated fat.  No associations were observed for high sensitive C-reactive protein (hCRP), interleukin-6 (IL-6), adiponectin, resistin, tumor necrosis factor-alpha (TNF-α), Homeostasis Model of Assessment (HOMA), total cholesterol, high-density lipoprotein (HDL), low-density lipoprotein (LDL), triglycerides, free

fatty acids or systolic blood pressure. The authors concluded that based on the results of this analysis, the authors concluded that there is no evidence to support the hypothesis that subcutaneous fat removal reduces early cardiovascular or metabolic disease, its markers or its risk factors.

Aboelatta and colleagues (2014) stated that lipoabdominoplasty is nearly a daily aesthetic procedure. Despite the emergence of laser-assisted liposuction, to-date, it has not been clearly evaluated combined with abdominoplasty. This prospective study aimed to evaluate the safety and effectiveness of laser-assisted liposuction relative to traditional liposuction combined with high-lateral-tension abdominoplasty. This study investigated 36 consecutive female patients who underwent high-lateral-tension abdominoplasty combined with liposuction of the upper central abdomen and both flanks. The patients were divided into 3 equal groups based on the technique used for liposuction: (i) Group 1 underwent conventional liposuction with abdominoplasty, (ii) Group 2 underwent a mixture of conventional and laser-assisted liposuction with abdominoplasty, and (iii) Group 3 underwent laser-assisted liposuction with abdominoplasty. Patients in groups 2 and 3 had a better aesthetic outcome than those in group 1 with regard to abdominal contour and skin tightness. No major complications were observed in groups 1 and 2. The patients in group 3 had a higher incidence of complications (3 seromas, 3 central necroses and dehiscence), and 1 patient underwent secondary sutures. The authors concluded that laser-assisted liposuction combined with abdominoplasty in the lateral abdomen seems to be a safe technique with good aesthetic outcomes. Although the combined use of laser-assisted liposuction in the lateral and central abdomen can achieve relatively better aesthetic results, it is associated with significant complications, and its use cannot be supported. Moreover, they stated that proper laser parameters in the central abdominal area still need further study.

van Schalkwyk and associates (2018) noted that umbilical hernia is a common finding in patients undergoing abdominoplasty, especially those who are post-partum with rectus divarication. Concurrent surgical treatment of the umbilical hernia at abdominoplasty presents a "vascular challenge" due to the disruption of dermal blood supply to the umbilicus,

leaving the stalk as the sole axis of perfusion. To-date, there have been no surgical techniques described to adequately address large umbilical herniae during abdominoplasty. These investigators presented a safe and effective technique that can address large umbilical herniae during abdominoplasty. A prospective series of 10 consecutive patients, undergoing concurrent abdominoplasty and laparoscopic umbilical hernia repair between 2014 and 2017 were included in the study. All procedures were performed by the same general surgeon and plastic surgeon at the Macquarie University Hospital in North Ryde, NSW, Australia. At 12-month follow-up, there were no instances of umbilical necrosis, wound complications, seroma, or recurrent hernia. The mean BMI was 23.8 kg/m2 (range of 16.1 to 30.1 kg/m2). Rectus divarication ranged from 35 to 80 mm (mean of 53.5 mm). Umbilical hernia repair took a mean of 25.9 mins to complete (range of 18 to 35 mins). The authors presented a technique that avoids incision of the rectus fascia, minimizes dissection of the umbilical stalk and is able to provide a gold standard hernia repair with mesh. This procedure is particularly suited to post-partum patients with large herniae (greater than 3 to 4 cm diameter) and wide rectus divarication, where mesh repair with adequate overlap is the recommended treatment. Level of evidence = 4.

Lari and colleagues (2019) performed a retrospective evaluation of patients who underwent concomitant abdominoplasty with laparoscopic umbilical hernia repair from 2007 to 2017. All patients were followed-up and evaluated for complications, including the incidence of umbilical skin necrosis. A total of 47 patients were included in this study. The average operative duration was 3.3 hours with an average hospital stay of 2.5 days. No cases of post-operative umbilical necrosis were encountered. A mean follow-up period of 2.4 years showed no cases of hernia or rectus abdominis diastasis recurrence. Minor complications included 4 cases of dehiscence, 1 hematoma; there was no major complications. The authors concluded that the combined use of laparoscopic umbilical hernia repair and abdominoplasty is a feasible approach to reduce the risks of umbilical de-vascularization, especially in larger hernias and in patients with higher risk of recurrence.

### Abdominal Lipectomy for the Treatment of Metabolic Syndrome

In a systematic and meta-analysis, Seretis et al (2015) examined the effect of abdominal lipectomy on metabolic syndrome components and insulin sensitivity in women. A pre-determined protocol, established according to the Cochrane Handbook's recommendations, was used. An electronic search in MEDLINE, Scopus, the Cochrane Library and CENTRAL electronic databases was conducted from inception to May 14, 2015. This search was supplemented by a review of reference lists of potentially eligible studies and a manual search of key journals in the field of plastic surgery. Eligible studies were prospective studies with greater than or equal to 1month of follow-up that included females only who underwent abdominal lipectomy and reported on parameters of metabolic syndrome and insulin sensitivity. The systematic review included 11 studies with a total of 271 individuals. Conflicting results were revealed, though most studies showed no significant metabolic effects after lipectomy. The meta-analysis included 4 studies with 140 subjects. No significant changes were revealed between lipectomy and control groups. The authors concluded that this meta-analysis provided evidence that abdominal lipectomy in females did not affect significantly the components of metabolic syndrome and insulin sensitivity. They stated that further high quality studies are needed to elucidate the potential metabolic effects of abdominal lipectomy.

### Panniculectomy for the Treatment of Back Pain

An UpToDate review on "Subacute and chronic low back pain: Surgical treatment" (Chou, 2016) does not mention panniculectomy as a therapeutic option.

### Adipose Derived Stem Cell-Assisted Lipotransfer

Grabin and colleagues (2015) stated that because of their easy accessibility and versatile biological properties, mesenchymal stem cells taken from fatty tissue (adipose-derived stem cells, ADSC) are attractive for various potential clinical uses. For example, ADSC can be added to fatty tissue before transplantation in the hope of improving the outcome of autologous lipotransfer: The modified procedure is called cell-assisted lipotransfer (CAL). The clinical use and commercial promotion of this

novel stem-cell treatment (and others) are spreading rapidly, even though there is not yet any clear clinical evidence for its safety and effectiveness.  In cooperation with the German Cochrane Center, these researchers systematically searched the literature according to the Preferred Reporting Items for Systematic Reviews and Meta-Analyses (PRISMA) criteria; 8 major medical databases were searched.  The retrieved publications were examined by 2 independent reviewers and assessed using objective criteria.  After screening of the 3,161 retrieved publications by title, abstract, and (where appropriate) full text, 78 were still considered relevant; 13 of these were reports of clinical studies; only 3 of the 13 met criteria for grade II or III evidence.  The studies that were analyzed involved a total of 286 CAL procedures with a longest follow-up time of 42 months.  Oncological safety was not demonstrated.  The authors concluded that the studies published to-date have not shown that CAL is generally superior to conventional autologous lipotransfer.  They dealt with safety aspects inappropriately or not at all.  These investigators stated that the case of CAL illustrated the indispensability of high-quality clinical evidence before the introduction of novel stem-cell-based treatments.

Huang and associates (2016) stated that CAL has been widely used in various clinical applications, including breast augmentation following mammectomy, soft-tissue reconstruction and wound healing.  However, the clinical application of CAL has been restricted due to the transplanted fat tissues being readily liquefied and absorbed.  These investigators examined 57 previously published studies involving CAL, including fat grafting or fat transfer with human adipose-stem cells in all known databases.  Of these 57 articles, 7 reported the clinical application of CAL.  In the 57 studies, the majority of the fat tissues were obtained from the abdomen via liposuction of the 7 clinical studies, 4 were performed in patients requiring breast augmentation, 1 in a patient requiring facial augmentation, 1 in a patient requiring soft tissue augmentation/reconstruction and 1 in a patient requiring fat in their upper arms.  The authors stated that the therapeutic effect of CAL in cosmetics and aesthetics remains controversial, most likely because of the lack of a standard method for isolating pure ADSCs.  Currently, the explanation for why adding ADSC to adipose tissues for transplantation allows improved grafting, compared with using adipose tissue only, remains to be elucidated.  Quantitative and qualitative investigations, comparing the

therapeutic effects of using pure ADSC and a mixture of ADSC with certain types of fat components or other components are needed to confirm the previous conclusion.  Certain studies have hypothesized that the robust ectopic adipogenesis of ADSC in-vivo relies on their pre-differentiation induced in-vitro prior to their transplantation.  The induced differentiation of ADSC in-vitro may be replaced by supplying adipogenic stimuli to transplanted ADSC, in a process referred to as in-situ adipogenesis.  These investigators also noted that the limited proliferation capacity of ADSC also prevented their widespread clinical use; ADSC lack telomerase and their telomeres are short; thus they can only proliferate in-vitro for a limited period of time.  Studies have shown that the ADSC isolated from aged patients have reduced proliferation capacity and stability.  Therefore, it is reasonable to perform allografts using the ADSC from younger individuals.  The authors concluded that other questions require addressing before CAL being used widely in clinical settings include: (i) how the proliferation and differentiation process of ADSC can be regulated in-vitro and in-vivo; (ii) which factors control the proliferation and differentiation of ADSC; (iii) the predominant factors controlling the proliferation and differentiation process of ADSC; (iv) which factors stimulate ADSC to secrete paracrine factors; (v) whether transplanted ADSC are tumorigenic; and (vi) what causes ADSC to become liquefied in-vivo.  Furthermore, the authors stated that criteria and guidelines are needed for the clinical application of CAL technology.

Toyserkani and colleagues (2016) noted that autologous lipotransfer is seen as an ideal filler for soft tissue reconstruction.  The main limitation of this procedure is the unpredictable resorption and volume loss of the fat graft.  In the recent decade, an increasing amount of research has focused on the use of ADSC to enrich the fat graft, a procedure known as CAL.  These investigators reviewed the current pre-clinical and clinical evidence for the effectiveness of CAL compared with conventional lipotransfer.  They performed a systematic search on PubMed and other databases to identify all pre-clinical and clinical studies where CAL with ADSC was compared with conventional lipotransfer.  A total of 20 pre-clinical studies and 7 clinical studies were included in the review.  The pre-clinical studies consisted of 15 studies using immuno-deficient animal models and 5 studies using immuno-competent studies; 17 studies

examined weight/volume retention of which 15 studies favored CAL over conventional lipotransfer; 1 clinical study did not find any effectiveness of CAL and the remaining 6 studies favored CAL.  The authors concluded that the present evidence suggested that there is a big potential for CAL in reconstructive surgery; however, the present studies are so far still of low quality with inherent weaknesses.  Several aspects regarding CAL still remain unknown such as the optimal degree of cell enrichment and also its safety.  They stated that further high-quality studies are needed to establish if CAL can live up to its potential.  (Level of Evidence = 5).  Moreover, the authors stated that "More studies are needed to examine if CAL and lipotransfer are correlated with increased cancer recurrence risk in relevant patient populations … The published human studies so far show promising results, and further properly designed clinical trials are needed in relevant patient groups to establish in which cases this technique could be relevant and superior to two separate regular lipotransfers".

Moustaki  and associates (2017) stated that autologous fat is considered the ideal material for soft-tissue augmentation in plastic and reconstructive surgery.  The primary drawback of autologous fat grafting is the high resorption rate.  The isolation of mesenchymal stem cells from adipose tissue inevitably led to research focusing on the study of combined transplantation of autologous fat and ADSCs and introduced the theory of "cell-assisted lipotransfer".  Transplantation of ADSCs is a promising strategy, due to the high proliferative capacity of stem cells, their potential to induce paracrine signaling and ability to differentiate into adipocytes and vascular cells.  The current study examined the literature for clinical and experimental studies on CAL to assess the efficacy of this novel technique when compared with traditional fat grafting.  A total of 30 studies were included in the present review.  The authors concluded that the current study demonstrated that CAL has improved efficacy compared with conventional fat grafting.  Moreover, they stated that a number of questions, including the long-term safety of CAL regarding previous cancer diagnosis and treatment, remain unanswered; and long-term and larger studies are needed to confirm previously documented favorable results in CAL.

9/3/25, 3:26 PM    Autologous Fat Grafting, Subcutaneous (Off-Label) and Adbominal Hernia Repair Use - Medical Clinical Policy Bulletins | Aetna

Case 3:19-cv-02522-WHO    Document 185-1    Filed 10/30/25    Page 85 of 136

Laloze and co-workers (2018) performed a meta-analysis of the efficacy of CAL with data analysis concerning fat survival rate. The incidence of complications and the need for multiple procedures were evaluated to determine the safety of CAL. These investigators identified 25 studies (a total of 696 patients) that were included in the systematic review; 16 studies were included in the meta-analysis to evaluate the efficacy of CAL. The fat survival rate was significantly higher with CAL than non-CAL (64 % versus 44 %, p < 0.0001) independent of injection site (breast and face). This benefit of CAL was significant for only injection volumes of less than 100 ml (p = 0.03). The 2 groups did not differ in frequency of multiple procedures after fat grafting, but the incidence of complications was greater with CAL than non-CAL (8.4 % versus 1.5 %, p = 0.0019). The CAL method is associated with better fat survival rate than with conventional fat grafting but only for small volumes of fat grafting (less than 100 ml). Nonetheless, the new technique is associated with more complications and did not reduce the number of surgical procedures needed after the first fat grafting. The authors concluded that more prospective studies are needed to draw clinical conclusions and to demonstrate the real benefit of CAL as compared with common autologous fat grafting.

Chen and colleagues (2018) analyzed factors related to lipotransfer for localized scleroderma, and examined the feasibility of CAL for localized scleroderma treatment. Abdominal fat samples were taken from 6 scleroderma patients without corticosteroid therapy, 5 scleroderma patients with corticosteroid therapy, and 10 normal liposuction patients. Their quantity, morphology, and proliferation ability were measured. Blood flow was measured by laser speckle contrast imaging in localized scleroderma lesions and normal contralateral regions for 8 localized scleroderma patients. Bleomycin-induced skin fibrosis nude mice were also used to examine differences between lipotransfer and CAL. Fat weight was measured, and expression of transforming growth factor (TGF)-β1 and type III collagen in the injected skin was determined by immunohistochemistry. The number of stem cells from scleroderma patients with corticosteroid treatment was significantly reduced. Mean blood perfusion in localized scleroderma lesions was not significantly different than in the contralateral normal regions. In normal nude mice, there were no significant changes in TGF-β1 and type III collagen between the control, lipotransfer, and CAL groups, whereas in bleomycin-

induced skin fibrosis nude mice, lipotransfer and CAL reduced TGF-β1 and type III collagen expression.  The authors concluded that for scleroderma patients, fewer adipose-derived stem cells, because of a history of corticosteroid therapy and a local inflammatory microenvironment, were more important factors, whereas blood supply showed no significant change.  Thus, CAL not only improved the survival rate of transplanted fat, but also improved skin texture in bleomycin-induced skin fibrosis nude mice.  These preliminary findings need to be validated by well-designed studies.

### Abdominal Lipectomy as an Adjunctive Procedure to Assist with Long-Term Weight Loss Following Bariatric Surgery

Abbed and colleagues (2017) stated that abdominal lipectomy after bariatric surgery is recommended because of residual excess skin resulting in difficulty with maintaining hygiene, recurrent infections, and functional impairment, interfering with daily activities.  There is a dearth of literature examining weight loss outcomes in patients undergoing abdominal lipectomy post-sleeve gastrectomy (SG).  In a retrospective study, these researchers examined whether post-SG patients who received abdominal lipectomy achieved greater percent excess weight loss (% EWL) than post-SG patients who did not receive abdominal lipectomy.  Patients who underwent minimally invasive SG at the University of Illinois Hospital and Health Sciences System from March 2008 to June 2015 were included in this study.  The cohort was divided into 2 groups: (i) patients who underwent abdominal lipectomy after SG (PS-SG), and (ii) patients who underwent SG alone (SG); demographics, co-morbidities, and % EWL were examined.  A total of 29 patients were included in the PS-SG group versus 287 patients in the SG group.  Significant differences were found in % EWL at 24 (p < 0.0001), 36 (p < 0.005), and more than 36 months (p < 0.005) follow-up between groups, with a greater % EWL in patients in the PS-SG group versus the SG group.  The authors concluded that the findings of this preliminary study showed that patients in the PS-SG group achieved greater % EWL than patients with SG alone.  Moreover, they stated that although larger studies are needed, this study supports using abdominal lipectomy as an adjunctive procedure to assist with long-term weight loss as part of the overall treatment of bariatric surgery patients.

Liposuction for the Treatment of Lipedema

Lipedema is a painful disorder in women characterized by abnormal deposition of adipose tissue in the lower extremities leading to circumferential bilateral lower extremity enlargement typically seen extending from the hips to the ankles resulting in edema, pain and bruising; with secondary lymphedema and fibrosis during later stages. The pathogenesis is unknown and no curative treatment is available. Conservative therapy consisting of lymphatic drainage and compression stockings is often recommended, which is effective against the edema. Some patients showed a short-term improvement when treated in this way. Combined decongestive therapy (CDT, namely manual lymphatic drainage, compression garments) is the standard of care in most countries. Since the introduction of tumescent technique, liposuction has been used as a surgical therapeutic option.

Rey and colleagues (2018) stated that lipedema is a progressive disease; the signs are limited to the lower limbs. Early signs are non-specific. Later, pain and heaviness of lower limbs become predominant. Finally, at an advanced stage, tissue fibrosis is associated with significant edema. At the early stage, the treatment is conservative. The authors state that liposuction is indicated at the onset of pain. The authors stated that late stages require surgeries combining dermo-lipectomy as well as liposuction.

In a review of lipedema, Buck and Herbst (2016) noted that "From a surgical perspective, the least invasive means of removing the painful fat of lipedema is through the use of suction lipectomy. It is important to note, however, that the techniques employed for lipectomy of lipedema fat are different from the techniques used for cosmetic liposuction. Specifically, the techniques employed for lipedema liposuction utilize devices that remove fat in a gentler manner, such as the vibrating cannula associated with power-assisted liposuction or water-assisted liposuction."

Rapprich and colleagues (2011) stated that the removal of the increased fat tissue of lipedema has become possible by employing advanced liposuction techniques, which utilize vibrating micro-cannulas under tumescent local anesthesia. These investigators examined the effectiveness of this approach to lipedema. A total of 25 patients were

9/3/25, 3:26 PM          Suction Lipectomy, Suction-Assisted Lipectomy and Surgical Hernia Repair - Medical Clinical Policy Bulletins | Aetna

Case 3:19-cv-02552-WHO   Document 185-1   Filed 10/30/25   Page 88 of 136

examined before liposuction and 6 months thereafter. The survey included the measurement of the volume of the legs and several parameters of typical pain and discomfort. The parameters were measured using visual analogue scales (VAS, scale 0 to 10). The volume of the leg was reduced by 6.99 %. Pain, as the predominant symptom in lipedema, was significantly reduced from 7.2 ± 2.2 to 2.1 ± 2.1 (p < 0.001). Quality of life (QOL) as a measure of the psychological strain caused by lipedema improved from 8.7 ± 1.7 to 3.6 ± 2.5 (p < 0.001). Other parameters also showed a significant improvement and the over-all severity score improved in all patients. The authors concluded that liposuction reduced the symptoms of lipedema significantly.

Schmeller and associates (2012) examined the efficacy of liposuction concerning appearance and associated complaints after a long-term period. A total of 164 patients who had undergone conservative therapy over a period of years, were treated by liposuction under tumescent local anesthesia with vibrating micro-cannulas. In a monocentric study, 112 could be re-evaluated with a standardized questionnaire after a mean of 3 years and 8 months (range of 1 year and 1 month to 7 years and 4 months) following the initial surgery and a mean of 2 years and 11 months (8 months to 6 years and 10 months) following the last surgery. All patients showed a distinct reduction of subcutaneous fatty tissue (average of 9,846 ml per person) with improvement of shape and normalization of body proportions. Additionally, they reported either a marked improvement or a complete disappearance of spontaneous pain, sensitivity to pressure, edema, bruising, restriction of movement and cosmetic impairment, resulting in a tremendous increase in QOL; all these complaints were reduced significantly (p < 0·001). Patients with lipedema stage II and III showed better improvement compared with patients with stage I. Physical decongestive therapy could be either omitted (22.4 % of cases) or continued to a much lower degree. No serious complications (wound infection rate 1.4 %, bleeding rate 0.3 %) were observed following surgery. The authors concluded that tumescent liposuction was a highly effective treatment for lipedema with good morphological and functional long-term results.

Peled and co-workers (2012) stated that diagnosis of lipedema is often challenging, and patients frequently undergo a variety of unsuccessful therapies before receiving the proper diagnosis and appropriate

management. Patients may experience pain and aching in the lower extremity in addition to distress from the cosmetic appearance of their legs and the resistance of the fatty changes to diet and exercise. These researchers reported a case of a patient with lipedema who was treated with suction-assisted lipectomy and use of compression garments, with successful treatment of the lipodystrophy and maintenance of improved aesthetic results at 4-year post-operative follow-up.

Wollina and associates (2014) noted that In advanced stages of lipedema, reduction of adipose tissue is the only available effective treatment.  In elderly patients with advanced lipedema, correction of increased skin laxity has to be considered for an optimal outcome. These investigators reported on a tailored combined approach to improve advanced lipedema in elderly women with multiple co-morbidities. Micro-cannular laser-assisted liposuction of the upper legs and knees was performed under tumescent anesthesia. Medial thigh lift and partial lower abdominoplasty with minimal undermining were used to correct skin laxity and prevent intertrigo (intertriginous dermatitis). Post-surgical care with non-elastic flat knitted compression garments and manual lymph drainage were used. These researchers reported on 3 women aged 55 to 77 years with advanced lipedema of the legs and multiple co-morbidities. Using this step-by-step approach, a short operation time and early mobilization were possible. Minor adverse effects were temporary methemoglobinemia after tumescent anesthesia and post-surgical pain. No severe adverse effects were observed; and patient satisfaction was high. The authors concluded that a tailored approach may be useful in advanced lipedema and was applicable even in elderly patients with multiple co-morbidities.

Atiyeh and colleagues (2015) stated that liposuction is the most common cosmetic surgical procedure worldwide.  It has evolved from being designed primarily for body contouring to becoming essential adjunct to various other aesthetic procedures, greatly enhancing their outcome. Despite its hard clear differentiation between an aesthetic and therapeutic indication for some pathologic conditions, liposuction has been increasingly used in various disorders as a therapeutic tool or to improve function. In fact, liposuction has ceased to define a specific procedure and has become synonymous to a surgical technique or tool similar to the surgical knife, laser, electrocautery, suture material, or even wound-

dressing products. At present, there appeared to be an enormous potential for the application of liposuction in ablative and reconstructive surgery outside the realm of purely aesthetic procedures. These investigators considered the various non-aesthetic applications of liposuction; implications of this new definition of liposuction should induce 3rd-party public payers and insurance carriers to reconsider their remuneration and reimbursement policies.

Dadras and associates (2017) examined the outcome of liposuction used as treatment for lipedema.  A total of 25 patients who received 72 liposuction procedures for the treatment of lipedema completed a standardized questionnaire. Lipedema-associated complaints and the need for CDT were assessed for the pre-operative period and during 2 separate post-operative follow-ups using a VAS and a composite CDT score. The mean follow-up times for the 1st post-operative follow-up and the 2nd post-operative follow-up were 16 months and 37 months, respectively. Patients showed significant reductions in spontaneous pain, sensitivity to pressure, feeling of tension, bruising, cosmetic impairment, and general impairment to QOL from the pre-operative period to the 1st post-operative follow-up, and these results remained consistent until the 2nd postoperative follow-up. A comparison of the pre-operative period to the last post-operative follow-up, after 4 patients without full pre-operative CDT were excluded from the analysis, indicated that the need for CDT was reduced significantly.  An analysis of the different stages of the disease also indicated that better and more sustainable results could be achieved if patients were treated in earlier stages. The authors concluded that liposuction was effective in the treatment of lipedema and led to an improvement in QOL and a decrease in the need for conservative therapy.

Reich-Schupke and co-workers (2017) noted that the revised guidelines on lipedema were developed under the auspices of and funded by the German Society of Phlebology (DGP). The recommendations were based on a systematic literature search and the consensus of 8 medical societies and working groups.  The guidelines contain recommendations with respect to diagnosis and management of lipedema.  The diagnosis is established on the basis of medical history and clinical findings. Characteristically, there is a localized, symmetrical increase in subcutaneous adipose tissue in arms and legs that is in marked

disproportion to the trunk.  Other findings include edema, easy bruising, and increased tenderness.  Further diagnostic tests are usually reserved for special cases that require additional work-up.  Lipedema is a chronic, progressive disorder marked by the individual variability and unpredictability of its clinical course.  Treatment consists of 4 therapeutic mainstays that should be combined as necessary and address current clinical symptoms: complex physical therapy (manual lymphatic drainage, compression therapy, exercise therapy, and skin care), liposuction and plastic surgery, diet, and physical activity, as well as psychotherapy if necessary.  Surgical procedures are indicated if, despite thorough conservative treatment, symptoms persist, or if there is progression of clinical findings and/or symptoms.  If present, morbid obesity should be therapeutically addressed prior to liposuction.

Halk and Damstra (2017) noted that in 2011, the Dutch Society of Dermatology and Venereology organized a task force to create guidelines on lipedema, using the International Classification of Functioning, Disability and Health of the World Health Organization (WHO).  Clinical questions on significant issues in lipedema care were proposed, involving: making the diagnosis of lipedema; clinimetric measurements for early detection and adequate follow-up; and treatment.  A systematic review of literature published up to June 2013 was conducted.  Based on available evidence and experience of the task force, answers were formed and recommendations were stated.  The guidelines defined criteria to make a medical diagnosis of lipedema, a minimum data set of (repeated) clinical measurements that should be used to ensure early detection and an individually outlined follow-up plan, pillars on which conservative treatment should be based and recommendations on surgical therapeutic options.  The authors concluded that little consistent information concerning either diagnostics or therapy could be found in the literature.  It is likely that lipedema is frequently mis-diagnosed or wrongly diagnosed as only an aesthetic problem and therefore under- or mis-treated.  Treatment is divided into conservative and chirurgic treatment.  The only available technique to correct the abnormal adipose tissue is surgery.  To ensure early detection and an individually outlined follow-up, the committee advised the use of a minimum data set of (repeated) measurements of waist circumference, circumference of involved limbs, body mass index (BMI) and scoring of the level of daily practice and psychosocial distress.  Promotion of a healthy lifestyle with individually

adjusted weight control measures, graded activity training programs, edema reduction, and other supportive measures are pillars of conservative therapy. Tumescent liposuction is the treatment of choice for patients with a suitable health profile and/or inadequate response to conservative and supportive measures.

An assessment of surgery for lipedema by the Canadian Agency for Drugs and Technologies in Health (CADTH, 2019) (Peprah and MacDougall, 2019) reached the following conclusions: "Evidence of limited quality from five uncontrolled before-and-after studies suggests that liposuction may be effective in reducing the size of the extremities and complaints associated with lipedema such as spontaneous pain, easy bruising, sensitivity to pressure, impairment in quality of life, restrictions to mobility, edema, feeling of tension and general impairment. The findings have to be interpretated with caution, given that they are from single arm, non-randomized studies based on patients' self-assessment data collected using tools that have not been validated for the assessment lipedema-related complaints. One clinical practice guideline [citing Dutch guidelines described above] recommends tumescent liposuction, performed by a skilled healthcare professional at a specialized facility, as the treatment of choice for patients with a suitable health profile and/or inadequate response to conservative and supportive measures. The strength of the recommendations in the clinical guidelines and links to supporting evidence were not provided."

### Lipoabdominoplasty (Liposuction-Assisted Abdominoplasty) with Rectus Plication for Donor-Site Closure in Abdominal-Based Free Flap Breast Reconstruction

Kotsougiani-Fischer and colleagues (2021) noted that the aesthetic and functional outcomes of the donor site following abdominal-based free flap breast reconstruction have been suboptimal. These researchers examined a modified liposuction-assisted abdominoplasty (lipoabdominoplasty) technique combined with rectus plication (LPARSP) adopted from cosmetic abdominoplasty practice. All abdominal-based free flap breast reconstructions from January 2017 to March 2019 were reviewed. Patients with central fullness and sufficient tissue surplus on the abdomen, thighs and flanks who received LPARSP and rectus plication were identified (LPARSP group) and matched for age and BMI

with patients who underwent conventional abdominoplasty (CA group). Abdominal skin sensation, objective functional and aesthetic measures of the abdomen, as well as patient-reported outcomes (Breast-Q), were analyzed. A total of 28 patients were included; groups were similar in demographics. The mean amount of lipoaspirate in the LPARSP group was 1,054 ± 613.5 ml. The post-operative course was similar in both groups. The LPARSP technique resulted in a lower positioned horizontal scar (p = 0.03). The aesthetic outcome was superior in the LPARSP group (p < 0.0001). Furthermore, the LPARSP group presented with a decreased bulging rate (p = 0.05), and secondary refinement procedures were less frequently demanded (p = 0.02). Furthermore, the abdominal wall sensation of the flanks was improved in the LPARSP group (p = 0.05), whereby patient-reported outcome measures did not differ between groups. The authors concluded that lipoabdominoplasty with rectus plication represented a safe approach for donor-site closure in selected patients undergoing abdominal-based free flap breast reconstruction. Superior functional and aesthetic results paired with improved abdominal wall sensation were achieved compared to CA. Level of Evidence = IV.

## Surgical Correction of Adult Acquired Buried Penis

Ho and Gelman (2018) stated that adult acquired buried penis (AABP), a condition where the penis is hidden by abdominal or suprapubic skin or fat, represents the clinical manifestation of a wide spectrum of pathology due to a variety of etiologies. It can be related to obesity, a laxity in connective tissue, lichen sclerosis (LS), complications from penile/scrotal enlargement surgery, scrotal lymphedema, or hidradenitis suppurativa (HS). Buried penis can be associated with poor cosmesis and hygiene, voiding dysfunction, and sexual dysfunction. It is an increasingly common problem seen by reconstructive urologists and these researchers presented several frequently seen scenarios of buried penis and management options. The authors detailed the causes of buried penis, and their approach for surgical repair of buried penis in complex cases. Management can be challenging and is largely depends on the etiology of buried penis as well as the degree that local tissues are affected. While these procedures are often associated with a high incidence of wound complications, these are often self-limited and patients experienced significant improvement in QOL measures post-operatively. When combined with post-operative weight loss, surgical

repair of buried penis can greatly benefit patients by improving urinary and sexual function in addition to their mental and psychological well-being.

Smith-Harrison et al (2020) noted that ABP is a urologic condition that has significant morbidity and negative effect on QOL, including but not limited to sexual function, hygiene, micturition, and self-image. This disease process is characterized by a wide degree of variability and severity that requires a patient-specific approach and significant flexibility on the surgeon's behalf. These investigators reviewed the current evaluation and surgical management of this rare and complex patient population. They carried out a structured review of the English language literature from 1970 to June 2018 using the PubMed and Medline medical databases. Queried terms included "buried penis", "concealed penis", "hidden penis", "adult buried penis", "cicatricial penis" ,"trapped penis", "inconspicuous penis", "scrotoplasty and obesity", "penile release", "penile skin graft", "penile reconstruction", and "pubic lift". Papers were individually reviewed for their utility and applicability to the management of adult ABP. Manuscripts focusing on pediatric patients were excluded. Current surgical management options for adult ABP are heterogenous but focus on preserving shaft length while improving cosmesis and voiding function. Surgical versatility remains critical for successful outcomes. However, recent advances in surgical techniques for correction of adult ABP focus on the use of skin grafting to cover the shaft, along with lipectomy and/or scrotoplasty to further aid penile exposure. Collaboration with multiple surgical services is often needed to achieve optimal outcomes. The authors concluded that ABP is a complex urologic condition with equally complex surgical therapeutic options. Care must be taken when planning a surgical intervention, and support from plastic or general surgery may be required. However, with careful selection, surgical correction frequently resulted in significant improvement in function and QOL.

Cohen et al (2021) stated that in adult men, buried penis occurs as an acquired condition most commonly caused by morbid obesity. These researchers described the clinical characteristics of 3 obese men with AABP and the associated features of the buried penis. In addition to morbid obesity, a buried penis can result from other etiologies, such as HS, iatrogenic causes such as elective surgeries, infections, LS,

penoscrotal lymphedema, and traumatic events. Lower urinary tract symptoms (LUTS), such as voiding, and post-voiding problems are the most common presenting complaints; however, bacterial and fungal infections, phimosis, psychological issues, and sexual dysfunction, are also buried penis-related symptoms. The evaluation of a man with AABP begins with a detailed history for condition-related symptoms. Examination of the patient, both standing and supine with an attempt to demonstrate the penis using digital compression of the surrounding skin and fat, should be performed to determine the extent of the problem and whether co-morbid conditions such as infection and LS are present. Both buried penis and LS can predispose to the development of penile squamous cell carcinoma (SCC); the diagnosis of this tumor can be delayed in men with AABP since an adequate penile examination is difficult or impossible. A multi-disciplinary approach including surgeons, primary care physician, registered dietitian nutritionist, and psychiatrist should be considered for a patient with a buried penis. The surgical management is individualized and based on not only the extent of the problem but also whether an associated condition, such as urethral stricture, is present. Most patients are pleased with the functional and aesthetic outcome following surgery.

On behalf of the European Association of Urology (EAU) Guidelines Working on Male Sexual and Reproductive Health and EAU-Young Academic Urologists (EAU-YAU) Sexual and Reproductive Health Working Group, Falcone et al (2023) examined the literature to determine the benefits and harms of the surgical techniques used for the correction of AABP. This systematic review was carried out according to the PRISMA guidelines. The Pariser system was used to classify surgical procedures. A total of 170 studies were identified and screened, and 21 studies (570 patients) were included. In general, high-complexity reconstructive procedures (category greater than III) were performed, with split-thickness skin grafts for shaft reconstruction. The pooled mean operating time was 192.2 mins and the mean estimated blood loss (EBL) range was 57 to 326 ml. No intra-operative complications were recorded. The incidence of post-operative complications varied across studies (0 to 80.8 %), with greater than grade-4 complications reported in 3.1 % to 3.7 % of cases. Wound infection and genital lymphedema were reported in 4.7 % to 33 % and 7.1 % to 60 % of cases, respectively. The incidence of graft contracture and partial/total loss was 2.4 % to 14.3 %

9/3/25, 3:26 PM          Summary of Pry, Suction-Assisted Lipectomy) and Ventral Hernia Repair: Medical Clinical Policy Bulletins | Aetna of Adult

Case 3:19-cv-02522-WHO   Document 185-1   Filed 10/30/25   Page 96 of 136

and 1.5 % to 21 %, respectively.  The incidence of recurrence was not systematically reported and ranged from 5.2 % to 13 %.  Post-operative evaluation of functional outcomes showed significant improvements in sexual function, urinary function and cosmesis.  Assessment of risk of bias demonstrated a high-risk of bias across all studies.  The authors concluded that surgical management of AABP had a high incidence of complications but resulted in satisfactory outcomes, with significant improvement in patients' QOL.  The high incidence of graft-related complications should be taken into account when counselling patients and AABP care should be centralized to high-volume centers.

### Abdominoplasty with Scarpa Fascia Preservation

Inforzato et al (2020) stated that the number of bariatric surgeries for the treatment of morbid obesity has increased, and there is growing demand for post-bariatric abdominoplasty.  In a comparative, randomized study, these researchers examined the impacts of Scarpa's fascia preservation on total drainage volume, time to drain removal, and seroma formation in anchor-line abdominoplasty.  A total of 42 post-bariatric patients were randomly assigned to 2 groups and underwent anchor-line abdominoplasty.  Scarpa's fascia was not preserved during abdominoplasty in 1 group (n = 21) but was preserved in the other group (n = 21).  A suction drain was left in place until the drainage volume was less than 30 ml/24 hour.  Seroma formation was evaluated by abdominal ultrasound (US) on the 20th post-operative day; only fluid collections greater than 30 ml were considered seromas.  The time to drain removal was shorter, and the total drainage volume was lower in the fascial preservation group than in the fascial dissection group.  However, no difference in the seroma formation rate was observed between the 2 groups.  The authors concluded that Scarpa's fascia preservation decreased the drainage volume and the time to drain removal but not the rate of seroma formation.  Moreover, these researchers stated that further investigations with a larger number of patients, as well as anatomical and histological studies, are needed to better understand the impact of fascial preservation on seroma formation.  Level of Evidence = II.

The authors stated that the small sample size (n = 21 in each group) was a drawback of this study and may prevent generalization of the results. The internal pilot study design was used to re-calculate the final sample

size of the main study based on data from the first 32 recruited patients. This approach may obviate or negate a type I error and has the advantage of allowing a more accurate sample size calculation without increasing the time needed to perform the full trial. Other drawbacks were that only fluid collections greater than 30 ml detected on US were considered seromas and that reduction in treatment costs or number of visits with the earliest removal of the aspiration drain was not evaluated.

Wijaya et al (2022) noted that scarpa fascia preservation has been proposed to minimize complications associated with conventional abdominoplasty; however, its effectiveness is unclear. In a systematic review and meta-analysis, these investigators examined the influence of preserving scarpa fascia on reducing post-abdominoplasty complications. They carried out a comprehensive search of Medline Ovid, PubMed, Web of Science, and the Cochrane CENTRAL databases from the inception till June 2021. Eligible studies were prospective, controlled studies examining post-operative complications following scarpa fascia preservation after abdominoplasty. Stata 15.1 software was used for the meta-analysis. The meta-analysis included 7 studies with 682 abdominoplasty patients. Abdominoplasty with scarpa fascia preservation could significantly reduce incidence of seroma (OR = -1.34, 95 % CI: -2.09 to -0.59, p < 0.05), hospital length of stay (LOS) (SMD = -1.65; 95 % CI: -3.50 to 0.20; p = 0.08), time to drain removal (SMD = -3.64; 95 % CI: -5.76 to -1.52; p < 0.05), and total drain output (SMD = -401.60; 95 % CI: -593.75 to -209.44; p < 0.05) compared with that of conventional abdominoplasty. However, it failed to achieve a statistically significant reduction in hematoma (OR= -1.30, 95 % CI: -2.79 to 0.18, p = 0.08), infection (OR = -1.03; 95 % CI: -2.17 to 0.12; p = 0.08), skin necrosis (OR = 0.63; 95 % CI: -1.20 to 2.45; p = 0.50), and wound dehiscence (OR = 0.28; 95 % CI: -0.28 to 0.83; p = 0.33). The seroma incidence rate was lower when a scalpel was used for dissection rather than electrocautery (3 % (95 % CI: 1 % to 7 %) versus 11 % (95 % CI: 5 % to 18 %)). The authors concluded that preservation of scarpa fascia during abdominoplasty might reduce the likelihood of post-operative seroma, hospital LOS, time to drain removal, and total drain output. However, it did not significantly affect the incidence of hematoma, infection, skin necrosis, and wound dehiscence. Level of Evidence = III.

Biologic Mesh for Ventral Hernia Repair

Harris et al (2021) noted that more than 400,000 ventral hernia repairs
are performed in the U.S yearly.  Although the most effective method for
repairing ventral hernias involves using mesh, whether to use biologic
mesh versus synthetic mesh is controversial.  In a single-blind,
randomized-controlled clinical trial, these researchers determined which
mesh type would yield lower recurrence and complication rates following
ventral hernia repair.  This study was carried out from March 2014
through October 2018; a total of 165 patients enrolled with an average
follow-up of 26 months.  Patients were randomized 1:1 to have their
ventral hernias repaired using either a biologic (porcine) or synthetic
(polypropylene) mesh.  The primary outcome measure was hernia
recurrence at 2 years.  A total of 165 patients (68 men), mean age of 55
years, were included in the study with a mean follow-up of 26 months.  An
intention-to-treat (ITT) analysis noted that hernias recurred in 25 patients
(39.7 %) assigned to biologic mesh and in 14 patients (21.9 %) assigned
to synthetic mesh (p = 0.035) at 2 years.  Subgroup analysis identified an
increased rate of hernia recurrence in the biologic versus the synthetic
mesh group under contaminated wound conditions (50.0 % versus 5.9 %;
p for interaction = 0.041).  Post-operative complication rates were similar
for the 2 mesh types.  The authors concluded that the risk of hernia
recurrence was significantly higher for patients undergoing ventral hernia
repair with biologic mesh compared to synthetic mesh, with similar rates
of post-operative complications.  These researchers stated that these
findings indicated that the use of synthetic mesh over biologic mesh to
repair ventral hernias was effective and could be endorsed, including
under contaminated wound conditions.

Rosen et al (2022) noted that biologic mesh is widely used for reinforcing
contaminated ventral hernia repairs; however, it is expensive and has
been associated with high rates of long-term hernia recurrence.
Synthetic mesh is a lower-cost alternative; however, its effectiveness has
not been rigorously studied in individuals with contaminated hernias.  In a
randomized, single-blinded, multi-center study, these researchers
examined if synthetic mesh would result in superior reduction in risk of
hernia recurrence compared with biologic mesh during the single-stage
repair of clean-contaminated and contaminated ventral hernias.  This trial
was carried out from December 2012 to April 2019 with a follow-up

duration of 2 years. The trial was completed at 5 academic medical centers in the U.S. with specialized units for abdominal wall reconstruction. A total of 253 adult patients with clean-contaminated or contaminated ventral hernias were enrolled in this trial. Follow-up was completed in April 2021. Interventions were retro-muscular synthetic or biologic mesh at the time of fascial closure. The primary outcome was the superiority of synthetic mesh versus biologic mesh at reducing risk of hernia recurrence at 2 years based on ITT analysis. Secondary outcomes included mesh safety, defined as the rate of surgical site occurrence requiring a procedural intervention, and 30-day hospital direct costs and prosthetic costs. A total of 253 patients (median IQR age, 64 [55 to 70] years; 117 [46 %] male) were randomized (126 to synthetic mesh and 127 to biologic mesh) and the follow-up rate was 92 % at 2 years. Compared with biologic mesh, synthetic mesh significantly reduced the risk of hernia recurrence (hazard ratio [HR] of 0.31; 95 % confidence interval [CI]: 0.23 to 0.42; p < 0.001). The overall ITT hernia recurrence risk at 2 years was 13 % (33 of 253 patients). Recurrence risk with biologic mesh was 20.5 % (26 of 127 patients) and with synthetic mesh was 5.6 % (7 of 126 patients), with an absolute risk reduction of 14.9 % with the use of synthetic mesh (95 % CI: -23.8 % to -6.1 %; p = 0.001). There was no significant difference in overall 2-year risk of surgical site occurrence requiring a procedural intervention between the groups (odds ratio [OR] of 1.22; 95 % CI: 0.60 to 2.44; p = 0.58). Median (IQR) 30-day hospital direct costs were significantly greater in the biologic group versus the synthetic group ($44,936 [$35,877 to $52,656] versus $17,289 [$14,64 to -$22,901], respectively; p < 0.001). There was also a significant difference in the price of the prosthetic device between the 2 groups (median [IQR] cost biologic, $21,539 [$20,285 to $23,332] versus synthetic, $105 [$105 to $118]; p < 0.001). The authors concluded that synthetic mesh demonstrated a significantly superior hernia recurrence risk compared with biologic mesh in the single-stage repair of contaminated ventral hernias with similar safety outcomes. Furthermore, the secondary endpoint of cost was greatly reduced with the use of synthetic mesh (the price of biologic mesh was over 200 times that of synthetic mesh for these outcomes), suggesting that synthetic mesh should be the device of choice for the repair of contaminated ventral hernias.

9/3/25, 3:26 PM    Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Medically Necessary Circumstances - Medical Clinical Policy Bulletins | Aetna

Case 3:19-cv-02512-WHO    Document 185-1    Filed 10/30/25    Page 100 of 136

In a prospective, non-randomized, single-arm, multi-center study, DeNoto et al (2022) examined the performance of OviTex 1S (a reinforced biologic; TELA Bio Inc., Malvern, PA) over 24 months when used for ventral hernia repair. This trial included 92 patients with ventral hernias. The surgical approach (open, laparoscopic, or robotic) and plane of placement (retro-rectus, intra-peritoneal, or pre-peritoneal) were at the discretion of the surgeon. Patients were characterized as high-risk for a surgical site occurrence (SSO) based on the following co-morbidities: BMI between 30 and 40, active smoker, chronic obstructive pulmonary disease (COPD), diabetes mellitus (DM), coronary artery disease (CAD), advanced age (75 years or older). Subjects underwent physical examinations to assess safety events and completed QOL surveys at 1 months, 3 months, 12 months, and 24 months post-surgery. A total of 65 of the 92 enrolled patients (70.7 %) completed 24-month follow-up. The Kaplan Meier estimate for risk of recurrence at day 730 (24 months) was 2.6 %; among subjects who completed their 24-month visit or had a previous recurrence, the unadjusted rate of recurrence was 4.5 % (3/66). SSOs were observed in 38.0 % of patients (35/92). The most prevalent SSO was surgical site infection occurring in 20.7 % (19/92) of patients, followed by seroma formation, which occurred in 13.0 % of patients; however, only 3.3 % required intervention. HerQLes and EQ-5D assessments showed improvement from baseline as soon as 3 months post-surgery. Continued improvement was observed through 24 months. The authors concluded that the BRAVO study showed that use of the ovine reinforced tissue matrix OviTex 1S was a viable option for use in ventral hernia repair. Moreover, these researchers stated that additional studies with longer term follow-up data are needed to draw definitive conclusions regarding the use of OviTex 1S.

The authors stated that this study had several drawbacks. First, this was a non-randomized, observational study with no comparisons to a direct control. Addition of a control arm could aid in definitively determining any direct effects of ventral hernia repair with a reinforced biologic. Second, this trial did not require a single surgical technique or plane of placement that may have contributed to varying results. Third, assessment of recurrence was based primarily on clinical examination, potentially missing asymptomatic recurrences. Fourth, due to the heterogeneity of ventral hernia repair patients and the unique study design for each clinical trial, comparisons with results published in the literature should be made

9/3/25, 3:26 PM    Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair Wound Closure, Clinically Infected - Medical Clinical Policy Bulletins | Ael

Case 3:19-cv-02512-WHO    Document 185-1    Filed 10/30/25    Page 101 of 136

with caution. Fifth, long-term follow-up visits occurred during the period of March 2020 through August 2021 when COVID 19 was having significant impacts on healthcare facilities and staff. To account for higher than expected lost to follow-up, Kaplan Meier analysis was used; and these results were displayed alongside unadjusted observed results.

de Figueiredo et al (2023) stated that ventral hernia repair is one of the most common operations performed worldwide, and using mesh is standard of care (SOC) to lower recurrence. Biologic meshes are increasingly employed to minimize complications associated with synthetic mesh, but with significantly higher cost and unclear effectiveness. Until recently, most of the evidence supporting the use of biologic meshes was from retrospective cohorts with high heterogeneity and risk of bias. In a meta-analysis, these researchers examined randomized controlled trials (RCTs) comparing the outcomes of synthetic and biologic mesh in elective open ventral hernia repair. They carried out a literature search of PubMed, Embase, and Cochrane Library databases to identify RCTs comparing biologic and synthetic mesh in elective open ventral hernia repairs. The post-operative outcomes were evaluated by means of pooled analysis and meta-analysis. Statistical analysis was conducted using RevMan 5.4; heterogeneity was assessed with I2 statistics. A total of 1,090 studies were screened, and 22 were fully reviewed. A total of 4 RCTs and 632 patients were included in the meta-analysis; 58 % of patients had contaminated wounds (Wound Classification II to IV). Hernia recurrence (OR of 2.75; 95 % CI: 1.76 to 4.31; p < 0.00001; I2 = 0 %) and surgical site infections (OR of 1.53; 95 % CI: 1.02 to 2.29; p = 0.04; I2 = 0 %) were significantly more common in patients with biologic mesh. The rates of seroma, hematoma, and mesh removal were similar in both groups. The authors concluded that as compared to synthetic mesh, biologic meshes resulted in increased hernia recurrences and surgical site infections. These researchers stated that available evidence supports macroporous, uncoated synthetic mesh as the implant of choice for elective open ventral hernia repair, and its use should be considered even in contaminated cases.

Fascial Defect Closure During Ventral Hernia Repair

Jeong et al (2023) stated that during minimally invasive ventral hernia repair (VHR), it is unclear if a fascial defect closure, as opposed to a bridged repair (current care), is beneficial for patients.  In a systematic review and meta-analysis, these investigators examined the available evidence on the role of fascial defect closure during minimally invasive VHR.  PubMed, Embase, Scopus, Cochrane, and Clinicaltrials.gov were reviewed for RCTs that compared fascial defect closure with bridged repair.  The primary outcome was major complications defined as deep/organ-space surgical site infections (SSIs), re-operations, hernia recurrences, or deaths.  Secondary outcomes included SSI, seroma, eventration, hernia recurrence, post-operative pain, and QOL.  Pooled risk ratios (RRs) with 95 % CIs were obtained via random effect meta-analyses.  Of 579 screened studies, 6 publications of 5 RCTs were included.  No significant difference in major complications (10.6 % versus 10.4 %, RR = 1.05, 95 % CI: 0.51 to 2.14, p = 0.90) or recurrences (9.0 % versus 10.6 %, RR = 0.92, 95 % CI: 0.32 to 2.61, p= 0.87) were found between groups.  Fascial defect closure decreased the risk of seromas (22.9 % versus 34.2 %, RR = 0.60, 95 % CI: 0.37 to 0.97, p = 0.04) and may decrease the risk of eventrations (6.7 % versus 9.0 %, RR = 0.74, 95 % CI: 0.37 to 1.50, p = 0.41) at the expense of potentially increasing the risk of SSI (3.2 % versus 1.4 %, RR = 1.89, 95 % CI: 0.60 to 5.93; p = 0.28).  Reporting of pain and QOL scores was inconsistent.  The authors concluded that while fascial defect closure has sound physiologic rationale, the current evidence is inadequate to make a strong recommendation.  These researchers stated that more high-quality, well-designed, multi-center studies with standardization of technique and improved reporting and analysis of clinical and patient-centered outcomes are needed.

The authors stated that this systematic review had several drawbacks.  First, due to the heterogeneity and quality of reported evidence regarding patient centered outcomes in existing RCTs, these investigators were unable to carry out meta-analysis of these outcomes.  Second, substantial limitations and heterogeneity among the studies made it inadvisable to use results of the meta-analysis for informing clinical patient care.  Rather, the results should be used for estimates of future trials.  Researchers examining this intervention should come to

consensus on standardized reporting of surgical techniques, surgeon experience, and clinical and patient centered outcome measures.  Third, the total number of studies and patients on this topic is limited.

## Heavy-Weight Mesh in Ventral Hernia Repair

Trindade et al (2024) noted that there is considerable variability among surgeons regarding the type of mesh used in VHR.  There has been an increasing incidence of mesh fractures with light-weight (LW) and medium-weight (MW) meshes; however, height-weight (HW) mesh has been associated with a greater foreign body sensation and chronic pain.  In a systematic review and meta-analysis, these investigators compared the outcomes of HW and non-HW (NHW) meshes in VHR.  They systematically reviewed the PubMed, Embase, Cochrane, and Scopus databases to identify studies comparing HW with NHW meshes in VHR.  Outcomes analyzed included hernia recurrence, seroma, hematoma, foreign body sensation, post-operative pain, and wound infection.  These researchers carried out 2 subgroup analyses focusing on RCTs and open retro-muscular repairs.  Statistical analysis was carried out using RevMan 5.4.  They screened 1,704 studies; 9 studies were finally included in this meta-analysis and comprised 3,001 patients from 4 RCTs and 5 non-RCTs.  The majority of patients (57.1 %) underwent open retro-muscular repair.  HW mesh was significantly associated with increased in foreign body sensation (OR 3.71; 95 % CI: 1.40 to 9.84; p = 0.008); however, there was no difference in other outcomes.  In RCTs analysis, there was no difference between meshes.  In open retro-muscular repairs, HW mesh was associated with more seromas (OR 1.48; 95 % CI: 1.01 to 2.17; p = 0.05).  The authors concluded that this study found that HW mesh was associated with more foreign body sensation.  Furthermore, open retro-muscular repairs analysis demonstrated that HW was associated with more seromas.  These researchers stated that further randomized studies are needed to better understand the role of HW mesh in VHR.

## Routine Surgical Wound Drainage After Ventral Hernia Repair

Arora et al (2022) noted that drain practices in minimally invasive retro-muscular VHRs have largely been transferred over from open surgery without significant review.  In a retrospective study, these researchers

9/3/25, 3:26 PM    Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Obese Patients: Clinically Indicated or Cosmetically Desirable?

Case 3:19-cv-02512-WHO    Document 185-1    Filed 10/30/25    Page 104 of 136

examined the role of drains in these repairs.  Using the Abdominal Wall Reconstruction Surgical Collaborative (AWRSC) registry, patients with ventral hernias who underwent enhanced-view totally extra-peritoneal (eTEP) repairs between February 2016 and September 2019 were evaluated.  Patients with contamination or active infection within the surgical field, those who underwent an emergent or hybrid repair, or received a concomitant procedure were excluded.  Propensity score matching based on the defect size, previous hernia repair status, and the use of posterior component separation (PCS) was used to match patients with drains to patients without drains.  These investigators evaluated 180-day outcomes in terms of SSIs, surgical site occurrence (SSO), and recurrence.  A total of 308 patients met the inclusion criteria.  After propensity score matching, 48 patients with drains and 72 without drains were included in the analysis cohort.  Those with drains were older with a greater likelihood of an incisional hernia, but were broadly similar for other relevant demographic and hernia-related variables.  While there was no difference in the incidence of SSOs and SSIs between the 2 groups, these investigators reported a higher risk of SSOs needing procedural intervention (SSOPI) and recurrence, with a lengthened hospital stay in the cohort that received surgical drains.  The authors concluded that the use of surgical drains in "clean" eTEP repairs of ventral hernias appeared to be common, with a selection bias for more complex cases.  Based on this meat-analysis, these investigators found the use of drains was associated with longer hospital stays.  The use of drains did not change the likelihood of suffering an SSI or SSO; however, the incidence of SSOPIs was higher despite the use of drains, which raised questions regarding their protective role in these repairs.

In a systematic review and meta-analysis, Mohamedahmed et al (2023) examined outcomes of drain use versus no-drain use during VHR.  These investigators carried out a PRISMA-compliant systematic review using the following databases: PubMed, Scopus, Cochrane database, the Virtual Health Library, Clinical trials.gov and Science Direct.  Studies comparing use of drains with no-drain during VHR (primary or incisional) were included.  Wound-related complications, operative time, need for mesh removal and early recurrence were the evaluated outcome parameters.  A total of 8 studies reporting a total number of 2,468 patients (drain group = 1,214; no-drain group = 1,254) were included.  The drain group had a significantly higher rate of SSIs and longer operative time

compared with the no-drain group (OR: 1.63, p = 0.01) and (mean difference [MD]: 57.30, p = 0.007), respectively.  Overall wound-related complications (OR: 0.95, p = 0.88), seroma formation [OR: 0.66, p = 0.24], hematoma occurrence [OR: 0.78, p = 0.61], mesh removal [OR: 1.32, p = 0.74] and early hernia recurrence [OR: 1.10, p = 0.94] did not differ significantly between the 2 groups.  The authors concluded that the available evidence does not appear to support the routine use of surgical drains during primary or incisional VHRs.  They were associated with increased rates of SSIs and longer total operative time with no significant advantage in terms of wound-related complications.

Marcolin et al (2023) stated that drain placement in retro-muscular VHR is controversial.  Although it may reduce seroma formation, there is a concern regarding an increase in infectious complications.  These investigators carried out a systematic review and meta-analysis on retro-muscular drain placement in retro-muscular VHR.  They carried out a literature search of Cochrane, Scopus and PubMed databases to identify studies comparing drain placement and the absence of drain in patients undergoing retro-muscular VHR.  Post-operative outcomes were assessed by pooled analysis and meta-analysis.  Statistical analysis was carried out using RevMan 5.4.  Heterogeneity was evaluated with I2 statistics.  A total of 3,808 studies were screened and 48 were thoroughly reviewed; 4 studies comprising 1,724 patients were included in the analysis.  These researchers found that drain placement was significantly associated with a decrease in seroma (OR 0.34; 95 % CI: 0.12 to 0.96; p = 0.04; I2 = 78 %).  Moreover, no differences were observed in SSI, hematoma, surgical site occurrences or surgical site occurrences requiring procedural intervention.  The authors concluded that based on the analysis of short-term outcomes, retro-muscular drain placement following retro-muscular VHR significantly reduced seroma and did not increase infectious complications.  Moreover, these researchers stated that further prospective RCTs are needed to confirm these findings, evaluate the optimal duration of drain placement, and report longer-term outcomes.

Abdominal Binder after Ventral Hernia Repair

Deerenberg et al (2022) noted that incisional hernia is a frequent
complication of abdominal wall incision.  Surgical technique is an
important risk factor for the development of incisional hernia.  The
objective of these updated guidelines (from the European Hernia Society
[EHS] and the American Hernia Society [AHS]) was to provide
recommendations to decrease the incidence of incisional hernia.  These
investigators carried out a systematic literature search of Medline,
Embase, and Cochrane CENTRAL on January 22, 2022. The Scottish
Intercollegiate Guidelines Network instrument was used to examine
systematic reviews and meta-analyses, RCTs, and cohort studies. The
Grading of Recommendations, Assessment, Development and Evaluation
(GRADE) approach was used to appraise the certainty of the evidence. A
total of 39 studies were included covering 7 key questions, and weak
recommendations were made for all of these.  Laparoscopic surgery and
non-midline incisions were suggested to be preferred when safe and
feasible.  In laparoscopic surgery, suturing the fascial defect of trocar
sites of 10 mm and larger was advised, especially after single-incision
laparoscopic surgery and at the umbilicus.  For closure of an elective mid-
line laparotomy, a continuous small-bites suturing technique with a slowly
absorbable suture was suggested.  Prophylactic mesh augmentation
following elective mid-line laparotomy could be considered to reduce the
risk of incisional hernia; a permanent synthetic mesh in either the onlay or
retro-muscular position was advised. No recommendation could be made
for or against the use of post-operative binders owing to the lack of data
on their effect on incisional hernia or burst abdomen. The authors
concluded that these updated guidelines may aid surgeons in selecting
the optimal approach and location of abdominal wall incisions.

Ortiz et al (2023) stated that an abdominal binder (AB) is often prescribed
following open incisional hernia repair (IHR) to reduce pain; however, the
evidence is limited.  In a prospective, randomized, multi-center, pilot study
(the ABIHR-II Trial), these investigators examined the effectiveness of an
AB on post-operative outcome following open IHR.  This trial included 2
groups of patients (wearing an AB for 2 weeks during day-time versus not
wearing an AB following open IHR with the sublay technique). Patient
enrollment took place from July 2020 to February 2022.  The primary
endpoint was pain at rest on the 14th post-operative day (POD) using the

VAS. The use of analgesics was not systematically recorded.  Mixed-effects linear regression models were employed.  A total of 51 individuals were recruited (25 women, 26 men; mean age of 61.4 years; mean BMI of 30.65 kg/m2). The per-protocol analysis (PPA) included 40 cases (AB group, n = 21; No-AB group, n = 19). Neither group demonstrated a significant difference in terms of pain at rest, limited mobility, general well-being, and seroma formation and rate. Subjects in the AB group had a significantly lower rate of SSI on the 14th POD (AB group 4.8 % (n = 1) versus No-AB group 27.8 % (n = 5), p = 0.004). The authors concluded that wearing an AB did not have an impact on pain and seroma formation rate; but it may reduce the rate of post-operative SSI within the first 14 days after surgery.  Moreover, these researchers stated that further investigations are mandatory to confirm these findings.

The authors stated that this study had several drawbacks. First, the ABIHR-II Trial, which began in 2019, faced recruitment challenges due to the COVID-19 pandemic.  An amendment was requested in 2021 to reduce the pilot study's sample size from 60 to 50 patients due to the pandemic's impact on elective surgical programs in major hospitals in Germany.  The authors enrolled 54 patients and examined the effect on ABs following laparoscopic umbilical and epigastric hernia repair.  They enrolled 51 patients, unfortunately the drop-out rate was higher. However, from these investigators' perspective, they chose an appropriate sample size for a pilot study. Second, the SSI was not further differentiated due to a lack of a 30-day follow-up and the instruction to do so (the protocol stated: wound infection: yes or no). Third, the study relied on subjective measures, such as the VAS for pain at rest and mobility. Objective measures, such as pain medication intake and the six-min walk test (6MWT), could improve the study's reliability and generalizability. These investigators stated that future studies with power-calculated sample size, stratified randomization (hernia size) using the same mesh should consider these drawbacks to attain more robust and reliable results.

Graziani E Sousa et al (2024) noted that ABs consist of a wide compression belt that encircles the abdomen, theoretically supporting the abdominal wall; however, their use after VHR is controversial. In a systematic review and meta-analysis, these investigators examined the effectiveness of ABs in enhancing post-operative outcomes following VHR. They searched PubMed, Embase, and Cochrane Central for RCTs

9/3/25, 3:26 PM — Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Obese/Clinically Suspicious/Bulbous Medial

Case 3:19-cv-02512-WHO   Document 185-1   Filed 10/30/25   Page 108 of 136

comparing the effects of ABs after VHR. Outcomes included post-operative pain using the VAS, SSI, seroma formation and size, general well-being, activity limitation, forced expiratory volume in the first second (FEV1), and 6MWT. Statistical analysis was carried out with Review Manager 5.4.1 using a random-effects model. These researchers included 5 RCTs totaling 297 patients. Overall analysis showed decreased SSI rates (RR 0.21; 95 % CI: 0.07 to 0.59; p = 0.003; I2 = 0 %) and reduced pain 2 weeks after surgery (MD -0.89; 95 % CI: -1.41 to -0.37; p = 0.0008; I2 = 0 %) using ABs. For patients undergoing open VHR, it also showed reduced SSI, pain 4 weeks after surgery (MD -0.60; 95 % CI: -0.88 to -0.32; p < 0.0001; I2 = 66 %) and increased 6MWT performance 4 weeks after the procedure (MD 32.78 m; 95 % CI: 15.28 m to 50.29 m; p = 0.0002; I2 = 0 %). The authors concluded that ABs may decrease SSI, post-operative pain, and increase physical condition, especially in open VHR. Moreover, these researchers stated that further investigations are still needed to examine the role of ABs in minimally invasive techniques.

Michot et al (2024) stated that the incidence of incisional hernia after laparotomy varies between 2 % and 30 %. It is well-established that the need to control several risk factors before surgery exists (weight loss before surgery, diabetes control). Post-operative AB is frequently recommended by surgeons, yet evidence on this topic is lacking. In a systematic review, these investigators examined the available evidence on the use of AB after abdominal surgery. They carried out a comprehensive literature review between January and May 2024 using a range of search engines, including PubMed, Science Direct, Embase, Google Scholar, and Google. The following keywords were used: "abdominal binder", "abdominal support", "hernia", "girdle and hernia", "compression belt and hernia", and "abdominal support and hernia". A total of 16 studies were selected for further analysis (7 RCTs, 6 non-RCTs, and 3 meta-analyses). None of the studies reported a reduction in the incidence of abdominal dehiscence or incisional hernia. Post-operative use of the AB has been shown to reduce post-operative discomfort and pain for a limited period of up to 48 to 72 hours. There was no discernible difference in the incidence of SSI. The authors concluded that the available evidence showed that the use of AB following abdominal surgery was safe, although no benefit has been established (except for reduction in post-operative discomfort and pain for

9/3/25, 3:26 PM    Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Abdomen: Clinically Unnecessary - Medical Clinical Policy Bulletins | Aetna

Case 3:19-cv-02512-WHO    Document 185-1    Filed 10/30/25    Page 109 of 136

a limited period of up to 48 to 72 hours.  The natural history of incisional hernia and incisional hernia recurrence suggested that these events most commonly occur within 18 to 24 months after abdominal surgery, well beyond the time limit for wearing the AB.  These researchers stated that AB may enhance comfort in select patients; however, prospective, large, randomized, multi-center studies are needed to justify their routine use, with a particular focus on the medical and economic implications.

Guideline on ventral hernias from the Society of American Gastrointestinal and Endoscopic Surgeons (SAGES) (Earle, et al., 2016) state that "Cauterization of the hernia sac, the use of pressure dressings (such as abdominal binders), or suture closure of the hernia defect may be utilized to reduce the incidence of postoperative seroma. (Low quality, Weak recommendation)." Similarly, guidelines from the International Endohernia Society (Bittner, et al., 2019) state that abdominal binders may decrease seroma formation.

### Epigastric Ventral Hernia Repair Through Vaginal Natural Orifice Transluminal Endoscopic Surgery (NOTES)

Vancanneyt et al (2024) stated that VHR is a frequently performed operation and can be executed by open or laparoscopic approach.  The search for even less invasive techniques continues; and natural orifice transluminal endoscopic surgery (NOTES) is a known method of minimally invasive surgery.  These researchers carried out an epigastric VHR through vaginal NOTES during a concurrent hysterectomy and bilateral salpingectomy.  They used the access to do a synchronous hernia repair with mesh augmentation.  The technique of repair was identical to the laparoscopic intra-peritoneal onlay mesh repair (Lap. IPOM).  These investigators reported a sufficient hernia repair without intra-operative complications.  Furthermore, post-operatively, no problems were encountered.  Follow-up after 4 weeks demonstrated a good and strong hernia repair.  The complaints of the patient were relieved; and CT scan 10 months after operation revealed no recurrence nor signs of mesh infection.  The authors concluded that VHR through vaginal NOTES can be considered a possible new and minimal invasive (scarless) technique for VHR; however, further investigations on a larger scale are needed to confirm the feasibility and safety of this new approach.

9/3/25, 3:26 PM — Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Morbidly Obese Individuals as Medically ...

Case 3:19-cv-02512-WHO   Document 185-1   Filed 10/30/25   Page 110 of 136

Enhanced-View Totally Extra-Peritoneal Repair for Ventral Hernia

Rasador et al (2024) stated that following concerns regarding an intra-peritoneal mesh, newer VHR approaches focus on placing the mesh outside of the peritoneal cavity.  The enhanced-view totally extraperitoneal (e-TEP) technique employed the retro-muscular space and is suggested to be associated with decreased post-operative pain compared to the intraperitoneal onlay mesh plus (IPOM +) approach.  In a systematic review and meta-analysis, these investigators compared the IPOM + with the e-TEP for VHR.  They searched for studies comparing endoscopic IPOM + and e-TEP in PubMed, Embase, and Cochrane data-bases from inception until September 2023.  Outcomes were VAS after 24 hours of surgery and between 7 and 10 days after surgery, operative time, LOS, seroma, recurrence, as well as re-admission. RStudio was used for statistical analysis; heterogeneity was assessed with I2 statistics, with random effect for I2 of greater than 25 %.  From 149 records, 7 were included, from which 3 were RCTs, 3 were retrospective studies, and 1 was a prospective, observational study.  A total of 521 patients were included (47 % received e-TEP, and 53 % received IPOM +); 1 study included only robotic surgeries, and 6 studies included only laparoscopy.  Mean defect width was 3.62 cm ± 0.9 in the e-TEP group, and 3.56 cm ± 0.9 in the IPOM + group.  IPOM + had higher VAS after 1 day of surgery (MD - 3.35; 95 % CI: - 6.44 to - 0.27; p = 0.033; I2 = 99 %) and between 7 and 10 days after surgery (MD - 3.3; 95 % CI: - 5.33 to - 1.28; p = 0.001; I2 = 99 %).  e-TEP repair showed longer operative time (MD 52.89 mins; 95 % CI: 29.74 to 76.05; p < 0.001; I2 = 92 %).  No differences were observed regarding LOS, seroma, recurrence, and re-admission.  The authors concluded that the e-TEP repair was associated with lower short-term post-operative pain following VHR compared to IPOM +, but with longer operative time.  Moreover, these researchers stated that further RCTs are needed to examine these findings with long-term follow-up and ascertain the role of e-TEP in the armamentarium of the abdominal wall surgeon.

Sholapur et al (2024) noted that primary ventral hernias are abnormal protrusions of abdominal viscera through the areas of weakness in the fascia of the abdominal wall.  In a prospective, comparative study, these researchers compared the benefits and complications, and the overall outcome in the e-TEP Rives-Stoppa (eTEP-RS) repair versus IPOM +

repair in the management of primary ventral hernias.  This trial was carried out in a tertiary-care hospital from December 2020 to January 2022.  A total of 50 patients presenting with primary ventral hernias were included in the study, of whom 25 underwent IPOM + and 25 underwent eTEP-RS repairs.  Group selection was carried out by simple randomization using the lottery method.  Patients more than 18 years of age with primary ventral hernias presenting with a hernial defect width less than 6 cm, consenting to the study, were included in the study.  Patients who did not fulfill the inclusion criteria, strangulated/obstructed hernias, recurrent/incisional hernias, connective tissue disorders, skin infections, enterocutaneous fistulas, pregnancy, morbid obesity, and parastomal hernias were excluded.  The mean intra-operative duration in the eTEP-RS group (192.3 ± 16.20 mins) was significantly higher than in the IPOM + group (102.6 ± 16.78 mins, p = 0.001).  The mean duration of hospital LOS in the IPOM + group (5.9 ± 2.19 days) was longer than in the eTEP-RS group (4.6 ± 3.17 days, p = 0.02).  The mean post-operative pain scores, from the VAS, on days 1, 7, and 90 were 3.2 ± 1.11, 2.64 ± 1.11, and 1.68 ± 1.46 in the IPOM + group, and 1.84 ± 0.688, 0.76 ± 0.66 and 0.08 ± 0.40 in the eTEP-RS group, respectively (p = 0.001).  The authors concluded that despite being a technically easy procedure requiring less intra-operative time, IPOM + had several disadvantages, such as increased post-operative pain, longer hospital LOS, higher chances of wound site seromas, and higher rates of post-operative paralytic ileus.  On the other hand, eTEP-RS was a more challenging procedure requiring more intra-operative time; however, it had several advantages: less post-operative pain, shorter hospital LOS, early recovery, and fewer chances of seromas and paralytic ileus.  Moreover, these researchers stated that a comparative, multi-center study with much more robust data are needed to compare and validate the differences between both procedures' short- and long-term outcomes. These investigators stated that this trial was a single-center study with a small sample size of 50.  Only primary ventral hernias were included in the study, and incisional hernias were not included.

Wieland et al (2024) stated that the e-TEP is a relatively new laparoscopic approach for VHR.  Since this technique is not widely used yet, the literature regarding its safety and effectiveness is limited, especially when compared to more established surgical techniques like IPOM.  In a retrospective, non-randomized, single-center study, these

9/3/25, 3:26 PM     Abdominoplasty, Suaction Lipectomy, and Ventral Hernia Repair Medically Clinically Page Builders Medical

Case 3:19-cv-02512-WHO    Document 185-1    Filed 10/30/25    Page 112 of 136

researchers compared the early outcomes of patients with ventral hernias that were treated with e-TEP or IPOM from 2019 to 2023. A total of 123 patients were analyzed -- 92 underwent e-TEP and 31 IPOM, respectively. Both groups were overall comparable. The IPOM group had a higher proportion of incisional hernias (61.29 % versus 21.74 %, p < 0.001). This was taken into account for in a subgroup analysis of only primary hernias. The IPOM group had a significantly longer admission time (e-TEP: 3 days, IPOM: 4 days, p < 0.001). The subgroup analysis showed a statistically significant shorter surgery time in IPOM (median of 66.5 mins versus 106.5 mins; p = 0,043) and a lower rate of post-operative complications in e-TEP (e-TEP: 4.17 %, IPOM: 25 %. p = 0.009). The e-TEP group reported lower post-operative pain, yet without statistical significance. The authors concluded that e-TEP for VHR appeared to be non-inferior to IPOM. Compared to IPOM it resulted in shorter post-operative hospital LOS and a potentially lower complication rate, despite a longer operation time. Moreover, these researchers stated that further investigations are needed to confirm these findings and examine long-term outcomes. These investigators stated that this trial had drawbacks that must be considered for interpreting the results. The most significant was the size difference between the IPOM and e-TEP groups, especially in the subgroup analysis. Due to the retrospective, non-randomized design and a decline in IPOM procedures at the authors' clinic, equal group sizes could not be achieved. The statistical power remained limited, posing a risk for type 2 errors. Furthermore, the retrospective nature of the study could result in information bias, and in some cases, not all medical data could be retrieved.

Saleh et al (2024) noted that the e-TEP repair has several theoretical advantages over the traditional IPOM repair for ventral hernias, including the use of less expensive non-barrier coated mesh and avoiding complications of intra-peritoneal mesh. However, one area in need of further investigation is cost and clinical comparisons following robotic e-TEP with IPOM. A retrospective, matched cohort study was carried out in patients with mid-line ventral hernias undergoing robotic e-TEP or IPOM at a single academic institution from November 2019 to August 2023. Participants were matched based on demographics, hernia defect size, and whether they underwent concomitant procedures. Primary outcomes included supply costs; and secondary outcomes included operative time, hospital LOS, complications, recurrence, as well as inpatient opioid use.

9/3/25, 3:26 PM    Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Conjunction with Abdominal Surgery - Medical Clinical Policy Bulletins | Aetna

Case 3:19-cv-02512-WHO    Document 185-1    Filed 10/30/25    Page 113 of 136

A total of 88 matched patients were included: 44 IPOM and 44 e-TEP. Mean age was 57 years, BMI was 35 kg/m2, and 54.5 % were men. Hernia size was similar for both groups: 25 (6 to 73) cm2 for the IPOMs versus 40 (14 to 68) cm2 for e-TEPs (p = 0.21).  There was no significant difference in total supply costs between IPOMs and e-TEPs: $2,338 (2,021 to 3,249) versus $2,082 (1,619 to 3,394) (p = 0.5), respectively. Mean operative time was significantly lower for IPOMs 159.6 ± 57.8 mins versus 198.0 ± 67.1 mins (p = 0.006), while the average hospital LOS was significantly longer for IPOMs: 1.7 ± 1.2 days versus 1.2 ± 1.3 days (p = 0.021).  Total inpatient milligram morphine equivalents (MME) utilized was greater for IPOM: 61 (36 to 102) MME versus 29 (10 to 64) MME (p = 0.003).  Post-operative complications and recurrence rate were similar. The authors concluded that there was no difference in total supply costs between patients undergoing robotic IPOM and e-TEP repairs for mid-line ventral hernias.  These investigators stated that although this trial found significant differences in total inpatient MME utilized and hospital LOS, it was debatable whether these were clinically significant.  These researchers stated that further investigations are needed to determine appropriate indications for e-TEP over IPOM.

## Laparoscopic Intracorporeal Rectus Aponeuroplasty (LIRA) for Ventral Hernia Repair

Balthazar da Silveira et al (2024) stated that laparoscopic intracorporeal rectus aponeuroplasty (LIRA) emerged as a method that combines benefits from minimally invasive and abdominal wall reconstruction with defect closure, restoring the mid-line without tension by folding the posterior aponeurosis of both abdominal rectus muscles and using intraperitoneal mesh repair.  In a systematic review, these investigators examined available evidence on LIRA results and potential applications. They carried out a thorough search of Cochrane Central, Scopus, SciELO, LILACS, and PubMed/Medline, focusing on studies that examined LIRA's possible applications and results.  Key outcomes evaluated included recurrence, seroma, hematoma, SSI, and hospital LOS.  These researchers included both analytic data and descriptive studies.  Out of 128 screened studies, 3 met the inclusion criteria and comprised 113 patients, of which 69 (61.1 %) were operated using LIRA. Three studies comprised 2 case series of conventional and robotic LIRA repair, and 1 comparative study of LIRA versus intraperitoneal underlay

mesh repair (IPUM plus).  No SSI were reported.  Seroma rates ranged between 11.1 % and 50 %, while no bleeding or hematoma was noted.  There were no patients presenting recurrence in a median follow-up ranging from 12 to 15 months, despite the comparative study reporting a 4.4 % rate of bulging without clinical recurrence.  The mean hospital LOS ranged from 12 hours to 36 hours.  LIRA presented no differences in post-operative complications compared to the IPUM plus technique.  The authors concluded that this systematic review of 3 studies and 113 patients showed that LIRA presented low SSI, hematoma and clinically relevant seroma rates, without registers of recurrence in a follow-up of up to 15 months.  A trend toward low hospital LOS and an increased operative time was evidenced for the robotic approach highlighting the potential of LIRA to improve patient outcomes.  Moreover, these researchers stated that it is important to point out the low number of patients and studies published on the literature; thus, further investigations with larger samples and an increased follow-up are needed to support the use of LIRA for VHR.

These investigators stated that among the studies included in this review, only 1 compared LIRA with another technique, and no studies compared LIRA with other minimally invasive surgery (MIS) techniques like TAPP (trans-abdominal pre-peritoneal), e-TEP, IPOM, and MILOS (mini- or less-open sublay operation).  Furthermore, the hernia characteristics between the studies were highly heterogeneous, entailing primary, incisional, recurrent hernias as well as distasis.  In addition, the learning curve for this new and not widely used technique needs to be better examined.  Finally, due to the limited number of studies, a meta-analysis to show pooled results, especially related to post-operative complications, was not feasible.  However, these findings also revealed a clinically important difference in important outcomes such as bulging rates, highlighting the need of more studies analyzing the LIRA technique.

Gomez-Menchero et al (2024) compared the post-operative outcomes of the LIRA technique to the IPOM + approach, in terms of recurrence and bulging rates at 1-year follow-up; secondary aim was to compare the post-operative complications, seroma, and pain at 30 days and 1-year after surgery.  Patients with mid-line ventral hernia of 4 to 10 cm in width were included.  Computed tomography (CT) scan was carried out before, 1 and 12 months after surgery; and pain was evaluated using the VAS.  A

total of 45 and 47 consecutive patients underwent LIRA and IPOM +, respectively.  Pre-operatively, smoke habits and COPD rates were statistically significantly higher in the LIRA group (p = 0.0001 and p = 0.012, respectively).  Two bulging (4.4 %) occurred in the LIRA group, while in the IPOM + group occurred 10 bulging (21.3 %) and 3 recurrences (6.4 %) (p = 0.017 and p = 0.085, respectively).  Post-operatively, 7 (15.6 %, Clavien-Dindo I) and 4 complications (8.5 %, 2 Clavien-Dindo I, 2 Clavien-Dindo III-b) occurred in the LIRA and in the IPOM plus group, respectively (p = 0.298).  One month after surgery, clinical seroma, occurred in 5 (11.1 %) and 8 patients (17 %) in the LIRA and in the IPOM + group, respectively (p = 0.416).  During follow-up, pain reduction occurred, without statistically significant differences.  The authors concluded that even if they analyzed a small series, LIRA showed lower bulging and recurrence rates in comparison to IPOM + at 1-year follow-up.  Moreover, these researchers stated that further prospective studies, with a large sample of patients and longer follow-up are needed to draw definitive conclusions.

## Peritoneal Flap Hernioplasty for Repair of Ventral Hernia

Regmi et al (2024) noted that primary closure of large ventral hernia is difficult and is usually complicated by post-operative mesh bulge, migration, and higher recurrence.  Techniques like component separation and bridging mesh, transversus abdominus release, da Silva triple-layer repair, as well as peritoneal flap hernioplasty (PFH) are common therapeutic options.  In a systematic review and meta-analysis, these investigators examined the early post-operative and long-term outcomes of PFH for large ventral hernias.  They carried out a systematic literature search on the electronic data-bases of PubMed, Web of Knowledge, and Scopus till July 28, 2024.  These researchers conducted a single-arm meta-analysis of non-comparative studies using OpenMeta[Analyst] software (Center for Evidence-Based Medicine, Brown University, RI).  A total of 5 studies including 432 patients (238 male and 194 female patients in a ratio of 1.23:1.0) underwent PFH for large ventral hernia. The estimated proportion of patients who may experience skin necrosis, seroma, hematoma, superficial SSI, and deep mesh infection were 1.2 % (95 % CI: 0.001 to 0.022; I2 = 0.53 %) 5.8 % (95 % CI: 0.036 to 0.080; I2 = 0 %), 3.7 % (95 % CI: 0.007 to 0.067; I2 = 59.32 %), 10.6 % (95 % CI: 0.077 to 0.135; I2 = 0 %), and 0.9 % (95 % CI: -0.004 to 0.022; I2 = 15.99

%) respectively.  Similarly, the estimated recurrence rate and chronic pain following PFH was 1.9 % (95 % CI: 0.005 to 0.033; I2 = 2 %) and 11.6 % (95 % CI: 0.032 to 0.200; I2= 83.43 %), respectively during the mean follow-up time of 33 months (95 % CI: 1.9 to 64.1).  The authors concluded that PFH appeared to be a safe and feasible procedure for the repair of complex or large ventral hernias where it was difficult to perform primary fascial closure.  Moreover, these researchers stated that further investigations with a direct comparison of PFH with component separation techniques are needed to validate these findings.

### Transabdominal Preperitoneal Ventral Hernia Repair With Rectus Aponeuroplasty (TAPPRA) for the Management of Incisional Hernia

Bosley et al (2024) noted that options for minimally invasive VHR continue to evolve as a function of the understanding of the abdominal wall and the development of new techniques.  In a retrospective study, these researchers described a robotic trans-abdominal pre-peritoneal repair with concurrent rectus aponeuroplasty (TAPPRA) for incisional and recurrent ventral hernias.  All patients in this trial underwent TAPPRA repair between October 2023 and March 2024.  These investigators examined intra-operative feasibility of the technique and evaluated immediate post-operative outcomes.  A total of 12 patients underwent TAPPRA repair for incisional and/or recurrent ventral hernias at an academic hernia center.  The median case duration was 135 mins with no significant intra-operative complications noted.  Average defect size for the hernias was 6.5 × 8.5 cm.  Polypropylene mesh was used to reinforce all defects, with the average dimensions being 19.7 × 21.5 cm; and 83 % of patients were discharged within 24 hours of their procedure.  No significant post-operative complications were noted.  The authors described the 1st use of a novel ventral hernia repair technique, TAPPRA, and showed that it was safe, feasible, and associated with appropriate short-term outcomes for repair of moderate sized incisional hernias.  Moreover, these researchers stated that further more robust investigations examining the optimal patient selection strategy and long-term outcomes are needed to examine if this technique can be more broadly applied.  These investigators are currently collaborating with other hernia centers to examine the use of this technique and compare it to other minimally invasive surgery (MIS) techniques for VHR.

The authors stated that this study had several notable drawbacks. First, it was a retrospective review of select cases carried out at a high-volume hernia center. The surgeons included in this trial has completed a formal fellowship in abdominal wall reconstruction and has overcome their initial learning curve in robotic ventral hernia repair. Second, this study exclusively examined feasibility of conducting these repairs with limited information on long-term outcomes. Although those findings will be paramount, this technique is a derivative of commonly performed operations that are well described in the hernia literature and have shown acceptable long-term results. These investigators were encouraged by the low rate of short-term complications and looked forward to long-term follow-up with these participants. Third, the operations were carried out using robotic surgical platform. Although these techniques can be performed with traditional laparoscopic instruments, robotic assisted surgery facilitates management of complex peritoneal flaps and may make broad adoption challenging.

### Abdominoplasty Combined with Hip Expansion by Fat Grafting for Waistline Contouring

Cortes et al (2024) stated that recent socio-cultural trends revealed many patients requesting more curvaceous profiles. Abdominoplasty techniques had evolved into a combination of fascial plication with liposuction of the lateral torso, but often left patients with "boxy" profiles. The senior author carried out 360-degree liposuction of abdomen and back, hip expansion with structural fat grafting, excision of redundant soft tissue, and wide plication of abdominal fascia to create the desired profile. These investigators carried out a retrospective review of patient charts and CosmetAssure claims of female patients treated from January 2014 through May 2022. They identified 1,125 patients with a minimum 6-month follow-up who underwent abdominoplasty using 360-degree liposuction of waist, back, and flanks; wide plication of the rectus abdominis muscle; and hip expansion with fat grafting. These researchers reviewed pre- and post-operative photographs to examine the technique's effectiveness. Hip expansion with fat grafting combined with abdominoplasty was successfully achieved in 1,125 cases. Average age was 38 years; average BMI was 29 kg per m2; average amount of aspirated fat was 1,896 ml; and average amount of fat injected into the bilateral hips was 493 ml. Complication rates were comparable to those

observed in similar abdominoplasty series reported in the literature. The authors concluded that abdominoplasty combining liposuction of the waist, back, abdomen, and flanks followed by wide fascial plication and expansion of the hips with fat grafting was a safe, reproducible technique for female patients. This technique prioritized the hip anatomical area as an aesthetic consideration in abdominoplasty and facilitated creating a harmonious hip-to-waist ratio characteristic of a feminine figure.

## Glossary of Terms

| Term | Definition |
|---|---|
| Diastasis recti | A thinning out of the anterior abdominal wall fascia |
| Intertrigo | Dermatitis occurring on opposed surfaces of the skin, skin irritation, infection or chafing |

## Appendix

### Diagnostic Criteria for Lipedema

The diagnosis is established when the member has the following findings from history (I) and physical examination (II). In equivocal cases, the extra findings (III) can establish the diagnosis.

  I. Medical history - *all* of the following (A, B, C, D and E):

    A. Disproporonate fat distribution; *and*
    B. Lack of influence of weight loss on disproporonate fat distribution; *and*
    C. Sensitivity to pain and easy bruising in fat distribution; *and*
    D. Sensivity to touch and fatigue in extremies; *and*
    E. No reduction of pain when raising extremies.

II. Physical examination - one or more of the following (A, B, C, or D):

    A. Upper leg:

        1. Disproportionate fat distribution; *and*
        2. Circularly thickened subcutaneous fat layer

    B. Lower leg:

        1. Proximal thickening of subcutaneous fat layer; *and*
        2. Distal thickened of subcutaneous fat, accompanied by slender instep (cuff-sign)

    C. Upper arm:

        1. Significantly thickened subcutaneous fat layer in comparison with vicinity; *and*
        2. Sudden stop at elbow

    D. Lower arm:

        1. Thickened subcutaneous fat; *and*
        2. Slender back of hand (cuff-sign).

III. Extra criteria - *either* of the following (A or B):

    A. Pain when applying bi-manual palpation; *or*
    B. Distal fat tissue tendrils of the knee (popliteus).

Source: Adapted from Halk & Demstra (2016).

# References

The above policy is based on the following references:

1. Abbed TM, Gonzalez-Heredia R, Sanchez-Johnsen L, et al. Impact of abdominal lipectomy on post-sleeve gastrectomy surgery weight loss. Ann Plast Surg. 2017;79(5):495-497.

2. Aboelatta YA, Abdelaal MM, Bersy NA. The effectiveness and safety of combining laser-assisted liposuction and abdominoplasty. Aesthetic Plast Surg. 2014;38(1):49-56.

3. Ahmad J, Eaves FF 3rd, Rohrich RJ, Kenkel JM. The American Society for Aesthetic Plastic Surgery (ASAPS) survey: Current trends in liposuction. Aesthet Surg J. 2011;31(2):214-224.

4. Aly AS, Cram AE, Chao M, et al. Belt lipectomy for circumferential truncal excess: The University of Iowa experience. Plast Reconstr Surg. 2003;111(1):398-413.

5. American Society for Dermatologic Surgery. Guiding principles for liposuction. Dermatol Surg. 1997;23(12):1127-1129.

6. American Society for Dermatologic Surgery. Update from the Ultrasonic Liposuction Task Force of the American Society for Dermatologic Surgery. Dermatol Surg. 1997;23(3):211-214.

7. Apfelberg DB. Results of multicenter study of laser-assisted liposuction. Clin Plast Surg. 1996;23(4):713-719.

8. Arora E, Mishra A, Mhaskar R, et al. Are drains useful in eTEP ventral hernia repairs? An AWR surgical collaborative (AWRSC) retrospective study. Surg Endosc. 2022;36(10):7295-7301.

9. Atiyeh B, Costagliola M, Illouz YG, et al. Functional and therapeutic indications of liposuction: Personal experience and review of the literature. Ann Plast Surg. 2015;75(2):231-245.

10. Balthazar da Silveira CA, Rasador ACD, Marcolin P, et al. The evolving applications of laparoscopic intracorporeal rectus aponeuroplasty (LIRA) in ventral hernia repair -- A systematic review. J Abdom Wall Surg. 2024;3:13497.

11. Bittner R, Bain K, Bansal VK, et al. Update of Guidelines for laparoscopic treatment of ventral and incisional abdominal wall hernias (International Endohernia Society (IEHS))-Part A. Surg Endosc. 2019;33(10):3069-3139.

12. Bosley ME, Felix Z, Salgado-Garza G, et al. Short-term outcomes of transabdominal preperitoneal ventral hernia repair with rectus aponeuroplasty (TAPPRA) for the management of incisional hernias. J Abdom Wall Surg. 2024;3:13195.

13. Bragg TW, Jose RM, Srivastava S. Patient satisfaction following abdominoplasty: An NHS experience. J Plast Reconstr Aesthet

Surg. 2007;60(1):75-78.

14. Bridenstine JB. Use of ultra-high frequency electrosurgery (radiosurgery) for cosmetic surgical procedures. Dermatol Surg. 1998;24(3):397-400.

15. Bromley M, Marrou W, Charles-de-Sa L. Evaluation of the number of progressive tension sutures needed to prevent seroma in abdominoplasty with drains: A single-blind, prospective, comparative, randomized clinical trial. Aesthetic Plast Surg. 2018;42(6):1600-1608.

16. Buck DW 2nd, Herbst KL. Lipedema: A relatively common disease with extremely common misconceptions. Plast Reconstr Surg Glob Open. 2016;4(9):e1043.

17. Cardenas-Camarena L, Gonzalez LE. Large-volume liposuction and extensive abdominoplasty: A feasible alternative for improving body shape. Plast Reconstr Surg. 1998;102(5):1698-1707.

18. Cassar K, Munro A. Surgical treatment of incisional hernia. Br J Surg. 2002;89(5):534-545.

19. Chen B, Wang X, Long X, et al. Supportive use of adipose-derived stem cells in cell-assisted lipotransfer for localized scleroderma. Plast Reconstr Surg. 2018;141(6):1395-1407.

20. Chou R. Subacute and chronic low back pain: Surgical treatment. UpToDate [online serial]. Waltham, MA: UpToDate; reviewed January 2016.

21. Cohen PR. Adult acquired buried penis: A hidden problem in obese men. Cureus. 2021;13(2):e13067.

22. Coleman WP 3rd, Lawrence N. Liposuction. Dermatol Surg. 1997;23(12):1125.

23. Cooter R, Robinson D, Babidge W, et al. Systematic review of ultrasound-assisted lipoplasty: Update and reappraisal. ASERNIP-S Report No. 17. North Adelaide, SA: Royal Australasian College of Surgeons, Australian Safety and Efficacy Register of New Interventional Procedures -Surgical (ASERNIP- S); 2002.

24. Core GB, Mizgala CL, Bowen JC 3rd, Vasconez LO. Endoscopic abdominoplasty with repair of diastasis recti and abdominal wall hernia. Clin Plast Surg. 1995;22(4):707-722.

25. Cortes W, Mather T, LoGiudice J, Dzwierzynski W. Abdominoplasty combined with hip expansion by fat grafting: An

evolution in waistline contouring. Plast Reconstr Surg Glob Open. 2024;12(8):e6059.

26. Dadras M, Mallinger PJ, Corterier CC, et al. Liposuction in the treatment of lipedema: A longitudinal study. Arch Plast Surg. 2017;44(4):324-331.

27. Danilla S, Longton C, Valenzuela K, et al. Suction-assisted lipectomy fails to improve cardiovascular metabolic markers of disease: A meta-analysis. J Plast Reconstr Aesthet Surg. 2013;66(11):1557-1563.

28. de Figueiredo SMP, Tastaldi L, Mao RMD, et al. Biologic versus synthetic mesh in open ventral hernia repair: A systematic review and meta-analysis of randomized controlled trials. Surgery. 2023;173(4):1001-1007.

29. Deerenberg EB, Henriksen NA, Antoniou GA, et al. Updated guideline for closure of abdominal wall incisions from the European and American Hernia Societies. Br J Surg. 2022;109(12):1239-1250.

30. den Hartog D, Dur AH, Tuinebreijer WE, Kreis RW. Open surgical procedures for incisional hernias. Cochrane Database Syst Rev. 2008;(3):CD006438.

31. DeNoto G, 3rd, Ceppa EP, Pacella SJ, et al. 24-month results of the BRAVO study: A prospective, multi-center study evaluating the clinical outcomes of a ventral hernia cohort treated with OviTex® 1S permanent reinforced tissue matrix. Ann Med Surg (Lond). 2022;83:104745.

32. Dumanian GA, Denham W. Comparison of repair techniques for major incisional hernias. Am J Surg. 2003;185(1):61-65.

33. Earle D, Roth S, Saber A, et al. Guidelines for Laparoscopic Ventral Hernia Repair. Los Angeles, CA: Society of American Gastrointestinal and Endoscopic Surgeons (SAGES); 2016.

34. Egea DA, Martinez JA, Cuenca GM, et al. Mortality following laparoscopic ventral hernia repair: Lessons from 90 consecutive cases and bibliographical analysis. Hernia. 2004;8(3):208-212.

35. Elbaz JS, Flageul G, Olivier-Masveyraud F. 'Classical' abdominoplasty. Ann Chir Plast Esthet. 1999;44(4):443-461.

36. Falcone M, Sokolakis I, Capogrosso P, et al; European Association of Urology (EAU) guidelines working on Male Sexual and Reproductive Health and EAU-Young Academic Urologists (EAU-YAU) Sexual and Reproductive Health Working Group. What are

the benefits and harms of surgical management options for adult-acquired buried penis? A systematic review. BJU Int. 2023;131(1):8-19.

37. Golladay ES. Abdominal hernias. eMedicine General Surgery Topic 2703. Omaha, NE: eMedicine.com; updated July 9, 2002. Available at: http://www.emedicine.com/med/topic2703.htm. Accessed April 22, 2004.

38. Gomez-Menchero J, Balla A, Garcia Moreno JL, et al. Laparoscopic intracorporeal rectus aponeuroplasty (LIRA) technique versus intraperitoneal onlay mesh (IPOM plus) for ventral hernia repair: A comparative analysis. Hernia. 2024;28(1):167-177.

39. Grabin S, Antes G, Bjorn Stark G, et al. Cell-assisted lipotransfer: A critical appraisal of the evidence. Dtsch Arztebl Int. 2015;112(15):255-261.

40. Graf R, de Araujo LR, Rippel R, et al. Lipoabdominoplasty: Liposuction with reduced undermining and traditional abdominal skin flap resection. Aesthetic Plast Surg. 2006;30(1):1-8.

41. Graziani E Sousa A, Bertolino EP, Godoi A, et al. Effect of an abdominal binder on postoperative outcomes after ventral hernia repair: A systematic review and meta-analysis of randomized controlled trials. Hernia. 2024;29(1):20.

42. Halbesma GJ, van der Lei B. The reverse abdominoplasty: A report of seven cases and a review of English-language literature. Ann Plast Surg. 2008;61(2):133-137.

43. Halk AB, Damstra RJ. First Dutch guidelines on lipedema using the international classification of functioning, disability and health. Phlebology. 2017;32(3):152-159.

44. Harris HW, Primus F, Young C, et al. Preventing recurrence in clean and contaminated hernias using biologic versus synthetic mesh in ventral hernia repair: The PRICE randomized clinical trial. Ann Surg. 2021;273(4):648-655.

45. Heller JB, Teng E, Knoll BI, Persing J. Outcome analysis of combined lipoabdominoplasty versus conventional abdominoplasty. Plast Reconstr Surg. 2008;121(5):1821-1829.

46. Ho TS, Gelman J. Evaluation and management of adult acquired buried penis. Transl Androl Urol. 2018;7(4):618-627.

47. Huang S, Zhao W, Wang Z, et al. Potential drawbacks in cell-assisted lipotransfer: A systematic review of existing reports

(Review). Mol Med Rep. 2016;13(2):1063-1069.

48. Hurvitz KA, Olaya WA, Nguyen A, Wells JH. Evidence-based medicine: Abdominoplasty. Plast Reconstr Surg. 2014;133(5):1214-1221.

49. Inforzato HCB, Garcia EB, Montano-Pedroso JC, et al. Anchor-line abdominoplasty with scarpa fascia preservation in postbariatric patients: A comparative randomized study. Aesthetic Plast Surg. 2020;44(2):445-452.

50. Jeong S, Anwoju TA, Olavarria OA, et al. Fascial defect closure during ventral hernia repair: A systematic review of randomized controlled trials. HCA Healthc J Med. 2023;4(4):267-278.

51. Kanjoor JR, Singh AK. Lipoabdominoplasty: An exponential advantage for a consistently safe and aesthetic outcome. Indian J Plast Surg. 2012;45(1):77-88.

52. Kannan K, Ng C, Ravintharan T. Laparoscopic ventral hernia repair: Local experience. Singapore Med J. 2004;45(6):271-275.

53. Koolen PG, Ibrahim AM, Kim K, et al. Patient selection optimization following combined abdominal procedures: Analysis of 4925 patients undergoing panniculectomy/abdominoplasty with or without concurrent hernia repair. Plast Reconstr Surg. 2014;134(4):539e-550e.

54. Kotsougiani-Fischer D, Sieber L, Fischer S, et al. Safety of a modified lipoabdominoplasty technique for donor-site cosure in abdominal-based free flap breast reconstruction. Aesthetic Plast Surg. 2021;45(4):1431-1440. .

55. Laloze J, Varin A, Gilhodes J, et al. Cell-assisted lipotransfer: Friend or foe in fat grafting? Systematic review and meta-analysis. J Tissue Eng Regen Med. 2018;12(2):e1237-e1250.

56. Lari A, Curings P, Person H, et al. Abdominoplasty with simultaneous laparoscopic umbilical hernia repair: A practical approach to preserve the umbilical vascularization. Ann Chir Plast Esthet. 2019;64(3):237-244.

57. Larson GM. Laparoscopic repair of ventral hernia. In: SAGES Primary Care Physician's Resource Center. Santa Monica, CA: Society of American Gastrointestinal Endoscopic Surgeons (SAGES); 2001. Available at: http://www.sages.org/primarycare/chapter35.html. Accessed July 16, 2002.

9/3/25, 3:26 PM — Abdominoplasty, Suction Lipectomy, and Ventral Hernia Repair in Medically Clinically Page Bulldogs of Media

Case 3:19-cv-02512-WHO   Document 185-1   Filed 10/30/25   Page 125 of 136

58. LeBlanc KA. Incisional hernia repair: Laparoscopic techniques. World J Surg. 2005;29(8):1073-1079.

59. Levesque AY, Daniels MA, Polynice A. Outpatient lipoabdominoplasty: Review of the literature and practical considerations for safe practice. Aesthet Surg J. 2013;33(7):1021-1029.

60. Lockwood T. Rectus muscle diastasis in males: Primary indication for endoscopically assisted abdominoplasty. Plast Reconstr Surg. 1998;101(6):1685-1691.

61. Marcolin P, de Figueiredo SMP, Constante MM, et al. Drain placement in retromuscular ventral hernia repair: A systematic review and meta-analysis. Hernia. 2023;27(3):519-526.

62. Matarasso A, Matarasso SL. When does your liposuction patient require an abdominoplasty? Dermatol Surg. 1997;23(12):1151-1160.

63. Mayer-Ferbas J, Jeindl R. Liposuction for the removal of subcutaneous (large) lipomas. Rapid Review No.: 009. Wein, Austria; Austrian Institute for Health Technology Assessment; 2024.

64. Messa Iv CA, Davis HD, Habarth-Morales TE, et al. Abdominoplasty with umbilical hernia repair: A long-term comparative analysis of clinical outcomes. Aesthet Surg J. 2024 Nov 12 [Online ahead of print].

65. Micheau P, Grolleau JL. Incisional hernia. Patient management. Approach to the future operated patients. Ann Chir Plast Esthet. 1999;44(4):325-338.

66. Michot N, Ortega-Deballon P, Karam E, et al. Is there a clinical benefit of abdominal binders after abdominal surgery: A systematic literature review. J Abdom Wall Surg. 2024;3:13506.

67. Mohamedahmed AYY, Zaman S, Ghassemi N, et al. Should routine surgical wound drainage after ventral hernia repair be avoided? A systematic review and meta-analysis. Hernia. 2023;27(4):781-793.

68. Moustaki M, Papadopoulos O, Verikokos C, et al. Application of adipose-derived stromal cells in fat grafting: Basic science and literature review. Exp Ther Med. 2017;14(3):2415-2423.

69. Nahas FX, Augusto SM, Ghelfond C. Should diastasis recti be corrected? Aesthetic Plast Surg. 1997;21(4):285-289.

Case 3:19-cv-02512-WHO    Document 185-1    Filed 10/30/25    Page 126 of 136

70. O'Brien JJ, Glasgow A, Lydon P. Endoscopic balloon-assisted abdominoplasty. Plast Reconstr Surg. 1997;99(5):1462-1463.

71. Ollapallil J, Koong D, Panchacharavel G, et al. New method of abdominoplasty for morbidly obese patients. ANZ J Surg. 2004;74(6):504-506.

72. Ortiz PR, Lorenz E, Meyer F, et al. The effect of an abdominal binder on postoperative outcome after open incisional hernia repair in sublay technique: A multicenter, randomized pilot trial (ABIHR-II). Hernia. 2023;27(5):1263-1271.

73. Patterson J. Outcomes of abdominoplasty. STEER: Succint and Timely Evaluated Evidence Reviews. Bazian Ltd., eds. London, UK: Wessex Institute for Health Research and Development, University of Southampton; 2003; 3(2):1-9.

74. Peled AW, Slavin SA, Brorson H. Long-term outcome after surgical treatment of lipedema. Ann Plast Surg. 2012;68(3):303-307.

75. Peprah K, MacDougall D. Liposuction for the treatment of lipedema: A review of clinical effectiveness and guidelines. CADTH Rapid Response Report: Summary with Critical Appraisal. Ottawa. ON: Canadian Agency for Drugs and Technologies in Health (CADTH); June 2019.

76. Petro CC, Zolin S, Krpata D, et al. Patient-reported outcomes of robotic vs laparoscopic ventral hernia repair with intraperitoneal mesh: The PROVE-IT randomized clinical trial. JAMA Surg. 2021;156(1):22-29.

77. Pham C, Middleton P, Watkin S, Maddern G. Laparoscopic ventral hernia repair: An accelerated systematic review. ASERNIP-S Report No. 41. North Adelaide, SA: Australian Safety and Efficacy Register of New Interventional Procedures - Surgical (ASERNIP-S); 2004.

78. Pring CM, Tran V, O'Rourke N, Martin IJ. Laparoscopic versus open ventral hernia repair: A randomized controlled trial. ANZ J Surg. 2008;78(10):903-906.

79. Ramirez OM. Abdominoplasty and abdominal wall rehabilitation: A comprehensive approach. Plast Reconstr Surg. 2000;105(1):425-435.

80. Rapprich S, Dingler A, Podda M. Liposuction is an effective treatment for lipedema-results of a study with 25 patients. J Dtsch Dermatol Ges. 2011;9(1):33-40.

81. Rasador ACD, Silveira CAB, Fernandez MG, et al. Minimally invasive intraperitoneal onlay mesh plus (IPOM +) repair versus enhanced-view totally extraperitoneal (e-TEP) repair for ventral hernias: A systematic review and meta-analysis. Surg Endosc. 2024 Nov 15 [Online ahead of print].

82. Regmi P, Sah VP, Sah BK, et al. Peritoneal flap hernioplasty for large ventral hernias: A systematic review and meta-analysis: PFH for large ventral hernia. Hernia. 2024;29(1):18.

83. Reich-Schupke S, Schmeller W, Brauer WJ, et al. S1 guidelines: Lipedema. J Dtsch Dermatol Ges. 2017;15(7):758-767.

84. Reichenberger MA, Stoff A, Richter DF. Dealing with the mass: A new approach to facilitate panniculectomy in patients with very large abdominal aprons. Obes Surg. 2008;18(12):1605-1610.

85. Rey LE, Koch N, Raffoul W. Surgical treatment for lipedema. Praxis (Bern 1994). 2018;107(20):1081-1084.

86. Rosen MJ, Krpata DM, Petro CC, et al. Biologic vs synthetic mesh for single-stage repair of contaminated ventral hernias: A randomized clinical trial. JAMA Surg. 2022;157(4):293-301.

87. Saleh T, Kastenmeier A, Lak K, et al. Comparing procedural costs and early clinical outcomes of robotic extended totally extraperitoneal (eTEP) with intraperitoneal onlay mesh (IPOM) repair for midline ventral hernias. Surg Endosc. 2024 Oct 28 [Online ahead of print].

88. Sanchez LJ, Bencini L, Moretti R. Recurrences after laparoscopic ventral hernia repair: Results and critical review. Hernia. 2004;8(2):138-143.

89. Schmeller W, Hueppe M, Meier-Vollrath I. Tumescent liposuction in lipoedema yields good long-term results. Br J Dermatol. 2012;166(1):161-168.

90. Seretis K, Goulis DG, Koliakos G, Demiri E. The effects of abdominal lipectomy in metabolic syndrome components and insulin sensitivity in females: A systematic review and meta-analysis. Metabolism. 2015;64(12):1640-1649.

91. Sholapur S, Shaikh A, Abhinav CG, et al. Intraperitoneal onlay mesh (IPOM Plus) repair versus extended-view totally extraperitoneal Rives-Stoppa (eTEP-RS) repair in primary ventral hernias: Experience with 50 cases in a tertiary care hospital. Cureus. 2024;16(4):e57678.

92. Simao TS. High definition lipoabdominoplasty. Aesthetic Plast Surg. 2020;44(6):2147-2157.

93. Smith-Harrison LI, Piotrowski J, Machen GL, Guise A. Acquired buried penis in adults: A review of surgical management. Sex Med Rev. 2020;8(1):150-157.

94. Staalesen T, Elander A, Strandell A, Bergh C. A systematic review of outcomes of abdominoplasty. J Plast Surg Hand Surg. 2012;46(3-4):139-144.

95. State of Minnesota, Health Technology Advisory Committee. Tumescent liposuction. Technology Assessment. St. Paul, MN: HTAC; 2002.

96. Toyserkani NM, Quaade ML, Sorensen JA. Cell-assisted lipotransfer: A systematic review of its efficacy. Aesthetic Plast Surg. 2016;40(2):309-318.

97. Trindade BO, Marcolin P, Brandao GR. Heavyweight versus non-heavyweight mesh in ventral hernia repair: A systematic review and meta-analysis. Hernia. 2024;28(2):291-300.

98. Umeadi UP, Ahmed AS, Murphy J, Slade RJ. Apronectomy in combination with major gynaecological procedures. J Obstet Gynaecol. 2008;28(5):516-518.

99. Van Geffen HJ, Simmermacher RK. Incisional hernia repair: abdominoplasty, tissue expansion, and methods of augmentation. World J Surg. 2005;29(8):1080-1085.

100. van Schalkwyk CP, Dusseldorp JR, Liang DG, et al. Concomitant abdominoplasty and laparoscopic umbilical hernia repair. Aesthet Surg J. 2018;38(12):NP196-NP204.

101. Vancanneyt N , Tollens T , Baekelandt J, et al. Epigastric ventral hernia repair through vaginal natural orifice transluminal endoscopic surgery. Surg Innov. 2024;31(6):627-629.

102. Vastine VL, Morgan RF, Williams GS, et al. Wound complications of abdominoplasty in obese patients. Ann Plast Surg. 1999;42(1):34-39.

103. Vila-Rovira R. Lipoabdominoplasty. Clin Plast Surg. 2008;35(1):95-104; discussion 105.

104. Wieland L, Alfarawan F, Bockhorn M, El-Sourani N. Comparison of eTEP and IPOM for ventral hernia surgery in the early postoperative period: A retrospective cohort study of a tertiary university centre. Hernia. 2024;28(6):2195-2206.

105. Wijaya WA, Liu Y, He Y, et al. Abdominoplasty with scarpa fascia preservation: A systematic review and meta-analysis. Aesthetic Plast Surg. 2022;46(6):2841-2852.

106. Wollina U, Heinig B, Nowak A. Treatment of elderly patients with advanced lipedema: A combination of laser-assisted liposuction, medial thigh lift, and lower partial abdominoplasty. Clin Cosmet Investig Dermatol. 2014;7:35-42.

107. Wounds UK. Best Practice Guidelines: The Management of Lipoedema. London, UK: Wounds UK; 2017



Copyright Aetna Inc. All rights reserved. Clinical Policy Bulletins are developed by Aetna to assist in administering plan benefits and constitute neither offers of coverage nor medical advice. This Clinical Policy Bulletin contains only a partial, general description of plan or program benefits and does not constitute a contract. Aetna does not provide health care services and, therefore, cannot guarantee any results or outcomes. Participating providers are independent contractors in private practice and are neither employees nor agents of Aetna or its affiliates. Treating providers are solely responsible for medical advice and treatment of members. This Clinical Policy Bulletin may be updated and therefore is subject to change.

Copyright © 2001-2025 Aetna Inc.

Language services can be provided by calling the number on your member ID card. For additional language assistance:  Español │ 中文 │ Tiếng Việt │ 한국어 │ Tagalog │ Русский │ العربية │ Kreyòl │ Français │ Polski │ Português │ Italiano │ Deutsch │ 日本語 │ فارسی │ Other Languages... │ [↗] (http://www.aetna.com/individuals-families/contact-aetna/information-in-other-languages.html)

# [EXHIBIT E]

## AETNA CLASS ACTION LIPEDEMA SURGERY CLAIM FORM

You are receiving this Claim Form because you are a Class Member in the class action entitled *Michala Kazda v. Aetna Life Insurance Company*, Case No. 3:19-cv-02512-WHO

If Aetna denied your pre-authorization or post-service request for liposuction to treat your lipedema ("Lipedema Surgery") on the ground that Lipedema Surgery was "cosmetic," "investigational" or "experimental," and you proceeded to pay out-of-pocket for the surgery, and were not reimbursed by any other source (including, for example, other insurance or Medicare), for which you owe no reimbursement obligation, then you may use this Claim Form to request reimbursement as part of the settlement of this class action.

You must submit a claim form by _____ to [insert name of TPA] at the address set forth below. You must also include with your claim form:

(1) documentation sufficient to show you had Lipedema Surgery (such as an operative report, other clinical records or sufficiently detailed payment records);

(2) Proof of payment (checks, wire transfer receipts, invoices reflecting actual payment, or other reasonable proof substantiating payment) showing net out-of-pocket payments to medical providers for the surgery, and

The TPA will make and communicate a decision about whether your claim will be reimbursed within 90 days of receiving the claim form.

If you have any questions about this form, or need an additional form, please contact the TPA at XXX-XXX-XXXX. Submitting this Claim Form does not guarantee that you will receive benefits.

**Instructions:**

Please read all of the instructions and complete the Claim Form as indicated below.

For your protection, California law requires the following to appear on this form:  Any person who knowingly presents a false or fraudulent reimbursement for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

When you have completed this Claim Form, please mail it—along with supporting documentation—directly to the TPA at the address listed below:

THIRD PARTY ADMINISTRATOR
XXX
City, State

---

AETNA MEMBER (OR FORMER MEMBER) INFORMATION

| Member (or former member) Name Last | | First | | | Middle |
|---|---|---|---|---|---|
| Home Address | | | Date of Birth (Mo / Day / Yr) | | Primary Phone Number |
| City | State | | Zip | Patient Sex | Is this a new address?<br>YES ☐          NO ☐ |
| Aetna Member ID No (for current members). | | | | | |

CONTINUED ON NEXT PAGE

| OTHER COVERAGE OR BENEFITS INFORMATION | | | |
|---|---|---|---|
| Have you received coverage or benefits from any other health plan or health insurance company for Lipedema Surgery<br><br>YES ☐         NO ☐ | | If you were enrolled in Medicare when you paid out-of-pocket for Lipedema Surgery indicate the parts you were enrolled in at the time of coverage:<br><br>PART A ☐    PART B ☐ | |
| If the answer is "Yes" to the above, what date did you receive coverage or benefits and what were the amount of benefits received?<br><br>Date:                          Amount: | | If you were enrolled in Medicare when you paid out-of-pocket for Lipedema Surgery what dates were you enrolled?<br><br>Effective Date:                End Date: | |
| Name of other health plan or insurance company | | Policy No. / Subscriber No. | |
| Health Plan or Insurance company address | City | State | Zip |
| Name of policyholder | | Social Security No. | Date of Birth |
| Employer Name | Employer Address | City | State / Zip |

| AUTHORIZATION TO OBTAIN AND RELEASE MEDICAL INFORMATION |
|---|
| I hereby authorize any physician, health care practitioner, hospital, clinic, or other medically-related facility to furnish to Aetna, its agents, designees, or representatives, any and all information pertaining to medical treatment for purposes of reviewing, investigating, or evaluating this claim.  I also authorize Aetna, its agents, designees, or representatives to disclose to a hospital or health care service plan, insurer, or self-insurer any such medical information obtained if such disclosure is necessary to allow the processing of any claim.<br><br>This authorization becomes effective immediately and will remain in effect until _____.<br><br>A photocopy or scan of this authorization will be considered as effective and valid as the original.<br><br>I certify that the above statements are correct. |

AETNA MEMBER, FORMER MEMBER, OR                PRINT NAME                                        DATE
PARENT OR LEGAL GUARDIAN'S
SIGNATURE (if Member is under 18 years old)


_____

CONTINUED ON NEXT PAGE

3 of 5

INFORMATION RELATED TO YOUR LIPEDEMA SURGERY

(3) Instructions:  Please complete this section to the best of your ability.

In addition, please enclose:

    (i)     documentation sufficient to show you had Lipedema Surgery (such as an operative report, other clinical records or sufficiently detailed payment records);

    (ii)    Proof of payment (checks, wire transfer receipts, invoices reflecting actual payment, or other reasonable proof substantiating payment) showing net out-of-pocket payments to medical providers for the surgery, and

You can request a copy of your clinical records and bills from your provider if you have not kept a copy.

The TPA cannot process your reimbursement without adequate proof of payment.

| Dates Of Service | Place Of Service | Health Care Provider | Service Received | Total Charge | Amount You Paid For Service |
|---|---|---|---|---|---|
| Example June 17, 2019 | Santa Rosa Medical Group | John Smith | liposuction | $45,000 | $30,000 |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

I AFFIRM THAT I HAVE PROVIDED TRUE AND ACCURATE INFORMATION ON THIS CLAIM FORM AND ACCOMPANYING CLAIM FORM DOCUMENTATION PAGE(S) TO THE BEST OF MY ABILITY.  I UNDERSTAND THIS CLAIM IS SUBJECT TO REVIEW AND VERIFICATION, AND THAT THE TPA MAY REQUEST THAT I SUBMIT ADDITIONAL INFORMATION TO SUPPORT MY CLAIM FOR REIMBURSEMENT,

| AENTA MEMBER, FORMER MEMBER, OR PARENT OR LEGAL GUARDIAN'S SIGNATURE (if Member is under 18 years old | DATE |
|---|---|
| _____ | |